UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 2024-CA-22067-RKA

MICHELLE TERRY,

     Plaintiff,

v.

CARNIVAL CORPORATION,

     Defendant.

_____/

## PLAINTIFF'S OMNIBUS DAUBERT MOTION TO STRIKE DEFENDANT'S EXPERTS COURTNEY, BARREDO, AND HOLLERN

COMES NOW, Plaintiff, MICHELLE TERRY, by and through her undersigned attorneys, and files her Daubert Motion Regarding Dr. Amy Courtney, Dr. Victor Barredo, and Dr. Douglas A. Hollern, who are the subjects of this Motion. and as grounds states the following:

### I.    BACKGROUND

Plaintiff, MICHELLE TERRY, was on a cruise vacation with Defendant, Carnival Corporation (herein "Carnival"). On June 5, 2023, Plaintiff was a passenger aboard the *Elation* (the "subject vessel"). See *Plt.'s Amended Complaint*, Ecf.16 at ¶ 11. At the time of the incident, Plaintiff was on Deck 11, in the designated smoking area (herein the "subject area"). *Id.* at ¶ 12. Plaintiff was seated in the subject area and conversing with other passengers. *Id.* at ¶ 13. Immediately behind where Plaintiff was seated, and unknown to Plaintiff, Carnival Crewmembers were opening and unpacking furniture including chairs. *Id.* at ¶ 14. The furniture was wrapped in plastic wrap, stacked on dollies and/or luggage carts, and moved to Deck 11 by Carnival's crewmember(s) for set up. *Id.* at ¶ 15. Suddenly, and without warning to Plaintiff or other

passengers, one of the Carnival Crewmember(s) caused the stack of furniture, including the chairs to fall and slam into Plaintiff striking multiple areas of her body including, but not limited to, her head, neck, shoulder, arms, and back. *Id.* at ¶ 16-17. Due to the forceful impact to her head, Plaintiff suffered from an altered state of consciousness. As a result of this incident, Plaintiff suffered a traumatic brain injury and other injuries including injuries to her neck and back requiring surgery to her cervical spine and surgical recommendations for her thoracic spine. *Id.* at ¶ 18-19.

Seeking redress for these injuries, Plaintiff initiated this negligence action against the Defendant, CARNIVAL CORPORATION, on May 30, 2024. See *Plt.'s Initial Complaint*, Ecf. 1. A jury trial is presently set to begin on June 16, 2025. See *Order Setting Trial*, Ecf. 15. In support of its case theory, Defendant has retained a biomechanical expert, Amy Courtney, Ph.D., CAISS, who Defendant believes can offer relevant testimony; a neurologist, Victor Barredo, M.D., M.S, and an orthopedist, Douglas A. Hollern, M.D., who are the subjects of this Motion.

### Dr. Amy Courtney

Dr. Amy Courtney is an Engineer with a B.S. degree in Engineering Mechanics, M.S. in Engineering Sciences, and a Ph.D. in Medical Engineering and Medical Physics. See *Defendant's Expert Witness Disclosure of Dr. Amy Courtney*, Exhibit "A", at pp. 1. Dr. Courtney is expected to provide testimony regarding her opinions as to the biomechanical mechanisms pertaining to Plaintiff's injuries and pathologies as documented in Plaintiff's medical records. *Id.* Dr. Courtney's report seeks to inject her assumptions and speculation in attempt to create evidence. Dr. Courtney's report uses inappropriate and unsupported methodology to reach her conclusions. As such, the entirety of Dr. Courtney's report lacks an appropriate evidentiary foundation and should therefore not be admitted or at the very least highly limited. Furthermore, Dr. Courtney is not a medical doctor and seeks to interject medical opinions into her report, which is beyond the scope of her expertise. As discussed more thoroughly below, Dr. Courtney should be precluded from testifying

at trial because her opinions and conclusions will not assist the trier-of-fact in determining what caused Plaintiff's injuries. The jury is well-equipped with life experience to make this determination from the very same facts that Dr. Courtney relies on and the jury should not be subjected to the surplus facts that Dr. Courtney's report seeks to implant into evidence. Dr. Courtney's conclusions on the issues do nothing more than advocate rather than assist.

Alternatively, Dr. Courtney's opinions should be limited to her area of expertise in biomechanics and "the application of mechanical principles to biological systems, [which] is well suited to answering questions pertaining to injury mechanics", and she should be precluded from testifying as to areas that require medical experience. *Id.* at pp. 2.

### Dr. Victor Barredo

Dr. Victor Barredo is a Neurologist who is Board Certified in Psychiatry and Neurology. See *Defendant's Expert Witness Report of Dr. Victor Barredo*, Exhibit "B", at pp. 1. Dr. Barredo is expected to provide testimony regarding his neurology opinions as to the Plaintiff's injuries and pathologies as documented in Plaintiff's medical records. *Id.* Dr. Barredo's report seeks to inject his personal bias and assumptions regarding Plaintiff's past, and conclusions regarding neuropsychology, despite his own admission that insufficient tests were given to determine the validity of neuropsychological testing. Moreover, Dr. Barredo's opinions should be limited to his area of expertise as his report includes improper Neuropsychological Opinions, which he admits is outside of his area of expertise and instead the province of a neuropsychologist, yet he improperly interprets cognitive function tests and relies on the DSM-5 psychological criteria, which is outside his expertise. Additionally, Dr. Barredo's opinions should be limited to his area of expertise as his report includes improper biomechanical engineering statements and opinions. Also, Dr. Barredo's report uses prejudicial and irrelevant statements in violation of FRE Rule 403. *Id.* at pp. 3, 4. Furthermore, Dr. Barredo's report is replete with contradictions and speculative

statements regarding the severity of Plaintiff's Traumatic Brain Injury including inconsistent use of the diagnostic criteria and conflicting evidence. See Generally *Id.* As discussed more thoroughly below, Dr. Barredo should be precluded from testifying at trial because his opinions and conclusions will not assist the trier-of-fact in determining what caused and the severity of Plaintiff's injuries. Alternatively, Dr. Barredo's opinions should be limited to his area of expertise in neurology, and he should be precluded from testifying as to areas that require neuropsychological or biomechanical expertise. *Id.* at pp. 2.

### Dr. Douglas Hollern

Dr. Douglas Hollern is a Board-Certified Orthopedic Spine Surgeon. See *Defendant's Expert Witness Disclosure of Dr. Douglas Hollern*, Exhibit "C", at pp. 1. Dr. Hollern is expected to provide testimony regarding his opinions as to Plaintiff's injuries and pathologies as documented in Plaintiff's medical records. *Id.* at pp. 3. Dr. Hollern's report seeks to offer testimony outside of his area of expertise including opining on neurological findings and causation as it relates to biomechanical forces, both of which are outside the scope of his expertise. As such, this testimony should be stricken and limited only to Plaintiff's orthopedic injuries.

## II.     RELEVANT LAW

Expert testimony is admissible from a qualified expert if it is relevant and reliable. FED. R. EVID. 702. Trial courts are to act as gatekeepers to ensure expert testimony is relevant and reliable. *Kumho Tire Co., Ltd. v. Carmichael*, 526 US. 137 (1999). This standard creates a three-part inquiry including: (1) whether the expert witness has the sufficient, specialized knowledge to render an opinion; (2) whether the expert witness' methodology is sufficiently reliable; and (3) whether the expert's opinion will assist the trier of fact. See i*d.*; *See FED. R. EVID. 702*. Each of these criteria should be considered separate and distinct from eachother and should not be conflated. *United States v. Frazier*, 387 F.3d 1246, 1260 (11th Cir. 2004). When a party proffers

the testimony of an expert witness under Rule 702 of the Federal Rules of Evidence, that party **bears the burden of laying the proper foundation**, and that party must demonstrate admissibility by a preponderance of the evidence. See *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291–92 (11th Cir.2005) (*emphasis added*); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

The Eleventh Circuit refers to each of these requirements as the "qualifications," "reliability," and "helpfulness" prongs. *Frazier*, 387 F.3d at 1260. While some overlap exists among these requirements, it is the court that must individually and separately analyze each concept. See *Id*. If a proffered expert witness meets all three criteria, the expert is provided wide latitude to offer opinions, "including those that are not based on firsthand knowledge or observation." *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 592 (1993). The proponent of the expert witness bears the burden of establishing the admissibility of the expert witness's testimony under Rule 702. *Rink*, 400 F.3d at 1291.

### Reliability Test

When determining whether an expert's testimony is reliable, "the trial judge must assess whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Frazier*, 387 F.3d at 1261 (internal formatting, quotation, and citation omitted). To make this determination, the district court examines: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Id.* at 1260 (citing *Quiet Tech. DC – 8, Inc. v. Hurel – Dubois, UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir.2003)). "The same criteria which are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony." *Id.* at 1262 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Thus,

the aforementioned factors are non-exhaustive, and the Eleventh Circuit has emphasized that alternative questions may be more probative in the context of determining reliability. See *Id.*

"[A] trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1111 (11th Cir.2005). A "fit" must exist between the offered opinion and the facts of the case. *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir.2004) (citing *Daubert*, 509 U.S. at 591). "For example, there is no fit where a large analytical leap must be made between the facts and the opinion." *Id.* (citing *General Electric Co. v. Joiner*, 522 U.S. 136 (1997)). Under *Daubert*, a district court must take on the role of gatekeeper, but this role "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech.*, 326 F.3d at 1341. Consistent with this function, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

## III.   ANALYSIS

Plaintiff, under Federal Rule of Evidence 702 and the *Daubert* standard, moves to exclude Dr. Courtney, Dr. Barredo, and Dr. Hollern from offering their opinions in this matter at trial. As such, Plaintiff respectfully requests the Court grants its Omnibus *Daubert* Motion as further indicated below. It is further well settled that "even if a witness is qualified as an expert regarding a particular issue, the process used by the witness in forming his opinion must be sufficiently reliable under Daubert and its progeny. *Eberli v. Cirrius Design Corp.*, 615 F.2d 1357 (S.D. Fla. 2009). *See also McCorvey v. Backster Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002).

### A. Dr. Courtney's testimony is predicated on unreliable methodology

In rendering the opinions found with the Expert Report of Dr. Courtney (Exhibit "A"), Dr. Courtney relies on the inspection photographs and findings created during an "inspection" of

*exemplar* tables, chairs, and trolley on the Carnival Elation in Port Jacksonville, Florida, on January 20, 2024. See *Expert Report of Dr. Courtney*, Exhibit "A" at pp. 3. During her inspection of the exemplar furniture, she notes that the exemplar chair was weighed using "a digital ***luggage scale*** indicated a weight of *approximately* 15.6 pounds" and "[t]he height of the back of the chair was *approximately* 38 inches, and the seat height was *approximately* 17 inches." *Id.* (*emphasis added*). Dr. Courtney further notes that there are "various references to a 'stack' of chairs and tables on a trolley[,]" but notes that there were "**no specific descriptions, photographs, or demonstrations of this arrangement**." *Id.* at pp. 11. (*emphasis added*). In fact, in discovery no photographs of the stack or video of the incident including chairs and/or trolley were produced. Additionally, no policies, procedures, or demonstrative materials were produced responsive to discovery, Plaintiff's Schedule "B" of the Notice of Deposition of Carnival's Corporate Representative and was not testified to in the Rule 30(b)(6) deposition.

Thereafter, without any explanation or discussion of the methodologies or alternatives considered, Dr. Courtney concludes that "[t]he only arrangement that ***made sense*** and that was ***somewhat stable*** involved a set of four chairs and two tables." *Id.* (*emphasis added*). This arrangement directly contradicts the testimony of David Budi Raharjo, the housekeeping attendant responsible for pushing the trolley and chairs during the incident, who testified there were "five or six chairs" on the trolley, as explicitly stated in Dr. Courtney's report. *Id.* at pp. 6. Dr. Courtney continues that "[b]ased on my inspection, the orientation of the 'stack' . . . was likely with the back of the upside-down chair closest to the back of Ms. Terry's chair. Otherwise, the falling lower chair would have contacted only the back of her chair and not her head." *Id.* at pp. 11-12.

As a threshold issue, Dr. Courtney fails to describe in her methodology how she rules out any other alternative method of stacking the chairs and fails to explain the differential in the

number of chairs as testified to by David Budi Raharjo- the crewmember responsible for this incident. She even describes her "stack" throughout her report using quotations as if to call into question the legitimacy of her prescribed method of stacking the exemplar chairs. *Id.* at pp. 11 and 12. She further describes her "most likely orientation" as "somewhat stable" calling into questions whether this is even the best method – let alone the factually correct way the chairs were stacked on the date of the incident. Based on her report, she does not claim to have interviewed David Budi Raharjo or any other Carnival Crewmember/Employee to gain the requisite knowledge to derive these facts and conclusions found in her report. Therefore, Dr. Courtney's methodology for "tip-over testing" is flawed as not only did she use "exemplar" chairs, but also used an arrangement that she unilaterally created for her testing, not based upon the actual testimony, facts available and, at least in part, contradictory to the testimony of those involved in the incident. *Id.* at pp. 12.

The court's gatekeeper function in assessing the admissibility of expert testimony requires a three (3) prong test. *Kumho Tire Co., Ltd.,* 526 US. 137. **First**, the testimony is based upon **sufficient facts or data.** *Id.* **Next**, the testimony is the product of reliable principles and methods; and **finally**, the witness has applied the principles and methods reliably so that the expert's opinion will assist the trier of fact. *Id.* (*emphasis added*). First, Dr. Courtney's analysis is based upon insufficient facts and data that is not supported by the report and the proffered testimony. As stated above, the evidence, including testimony, demonstrates that there were "five or six chairs" and **no mention of tables**. See *Dr. Courtney's Expert Report,* at pp. 11. Moreover, the manufacturer's specifications, produced by the Defendant, regarding those five or six chairs are different from the specifications Dr. Courtney provides in her report. *Id.* at pp. 10. See *Kannoa Marbella*, "Dining Chair with Arms", attached as Exhibit "D". The *Kannoa Marbella*, "Dining Chair with Arms", specifications states that the weight of the subject chair(s) was 20 pounds; the chair(s)'s height was

40 inches; and the chair(s)'s seat height was 18 inches. *Id.* In Discovery, Carnival provided no other similar specifications sheets for other furniture such as tables. Therefore, Dr. Courtney's measurements of the *exemplar* chairs are significantly different from the manufacturer's specifications including: Dr. Courtney's listed Seat Chair Height being 1 inch shorter; Dr. Courtney's overall Chair Height being 2 inches shorter, and Dr. Courtney's Chair Weight being 4.4 pounds lighter. These facts alone, and the contradiction in the manufacturer's documents produced by Carnival during discovery raises significant questions as to whether Dr. Courtney evaluated the appropriate and/or substantially the same chairs, despite continued reference to them throughout her report as "exemplar" chairs.

Again, much like her flawed methodology for configuring the so-called "stack" Dr. Courtney's report offers no explanations to these highly contradictory measurements. Surprisingly, all of Dr. Courtney's measurements are smaller or reduced from what is plainly stated on the *only* reliable evidence produced about the subject chairs. Thus, the reliability of the facts and data used by Dr. Courtney in reaching her expert opinions are highly flawed and unreliable.

As such, given the unreliable data being used and the flawed principles and methods, if any, that are demonstrated in determining the number and content of the so-called "stack" used within Dr. Courtney's report, her opinions will only stand to confuse the trier of fact and is a blatant attempt to interject the exemplar photographs and her view of the stack, its configuration, and makeup, as actual evidence of the configuration used on the date of the subject incident. "[A] trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *Id.* (quoting *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1111 (11th Cir.2005)). Furthermore, given the inconsistencies in the chair specifications, number of chairs, and inclusion of unsubstantiated tables, and the lack of

methodology used to determine the alleged chair arrangement, Dr. Courtney's proffered testimony and resultant mathematical calculations are  flawed and cannot be corrected.

During Dr. Courtney's so-called testing, she states that "[t]hree trials were completed. In each trial, the top chair on a 'stack' was ***gently pushed*** from the far side, toward the chair on the deck, until it became unbalanced and continued to fall due to gravity." *See Dr. Courtney's Expert Report* at pp. 12. Dr. Courtney offers no evidence from any testimony or video recordings that the chairs were gently pushed causing them to fall. Instead, Dr. Courtney's report states that the chairs fell after "Mr. Raharjo tore through the plastic wrap using his hands and started taking off the chairs one by one." *Id.* at pp. 6. Dr. Courtney's report measures the alleged force to "be a range of 3.32 pound to 8.44 pounds." *Id.* at 12. However, this is based on the flawed weight calculated by Dr. Courtney's luggage scale and not from record evidence- the manufacturer's specifications. Similarly, the number of chairs in the stack and the configuration are unsupported, and therefore produce similar fatal flaws. The same incorrect and unsupported measurements from the "exemplar" furniture and the only stack that "made sense" was used by Dr. Courtney when deriving the calculations of the chair's velocity (and failing to consider height variations) using the "publicly accessible and widely-used physics-based software." *Id.* at 13.

Therefore, Dr. Courtney's conclusion that "[t]he part of the rotating chair with the highest linear velocity at the moment of contact was moving at less than 3.9 feet per second" is based on inaccurate measures, flawed assumptions, and only seeks to interject the proffered photographs of an alleged "stack" that is not supported by the evidence. For these reasons, Dr. Courtney's report is nothing other than her own observations and opinions. As such, these highly subjective findings and results belie her opinions. *See Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1313-17 (11th Cir. 1999) (experts testimony based upon peer review study was properly excluded due to

the expert's inability to explain the correlation between the results and the case at hand.). Therefore, her report and expert testimony must be stricken as it is not reliable and lacks the factual underpinning required under *Daubert* and Rule 702. In the alternative, at the very least, Dr. Courtney's photographs of the "inspection" and calculations based on faulty conclusions should be stricken and should not be permitted during her trial testimony or submitted to the trier of fact.

### B. Dr. Courtney's Report includes personal opinions that will not assist the trier of fact

"The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion." *Frazier,* 387 F.3d at 1260 (citing Daubert, 509 U.S. at 597). Carnival bears the burden of satisfying all of the elements including its proffered expert's qualifications, reliability, and helpfulness, and based upon the above analysis, Carnival cannot meet its burden. See FED. R. EVID. 702. A court may reasonably conclude that there is simply too great an "analytical leap" between the data and the opinion proffered. Opinions regarding credibility, truthfulness and effort are inadmissible and should be stricken. This would include Dr. Courtney's testimony regarding the biomechanics of the falling chair from a unilaterally and unsupported by the evidence created stack and subsequent injury. Expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person. *See United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985) (expert testimony admissible if it offers something "beyond the understanding and experience of the average citizen"); *Frazier*, 387 F.3d at1262.

During her inspection of the subject area, Dr. Courtney's report elicited the following comments: (1) "[t]here were various references ... to a 'stack' of chairs and tables..."; (2) "...to form two 'stack'..."; (3) "...the 'stack' of tables and chairs was reported to be wrapped in plastic...", (4) "...the height from the deck of each 'stack' was approximately 61 inches..."; (5) "...the orientation of the 'stack' involved in the subject incident..."; (6) "...chair falling from the top of the 'stack'..."; (7) "...between her chair and the 'stack' on the trolley..."; (8) "If the 'stack' was closer..."; (9) "If

the 'stack' was farther..."; (10) "...the top chair on a 'stack,'..."; (11) "...the 'stack' also tipped over..."; and (12) "...the 'stack' did not completely separate....". *See Courtney's Report* at pp. 11-12. Dr. Courtney's consistent use of quotes seems to raise an inference that she questions the veracity and credibility of her unilaterally selected arrangement of chairs and whether this "stack" is the same as it occurred during the incident. As such, this a blatant example of improper opinion testimony and professional speculation. These statements are inappropriate for testimony from an expert and do not assist the trier of fact. Despite the use of quotes, and her commentary regarding the speculative stability of her unilaterally and evidentially contradictory chosen stack, Dr. Courtney fails to provide sufficient factual support for her opinions. These remarks are hypothetical and without proper evidentiary or expert foundation and are in violation of Rule 702.

Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury, *See Rouco*, 765 F.2d at 995, or if the expert testimony is cumulative or needlessly time consuming. *See e.g., Hull v. Merck & Co., Inc.*, 758 F.2d 1474, 1477 (11th Cir. 1985) (per curium) (finding that admission of speculative and "potentially confusing testimony is at odds with the purposes of expert testimony as envisioned in Fed. R. Evid. 702"). Here, Dr. Courtney's report and testimony would only serve to confuse or mislead the jury, as her calculations are based on flawed assumptions and unreliable methodology. Moreover, as there is no video or photographic evidence of the incident or any evidence regarding the arrangement or number of chairs, Dr. Courtney's pictures stand to mislead the jury because they unilaterally create the appearance of evidence regarding the arrangement of chairs, even though testimony contradicts this said arrangement. Thus, not only will it mislead and confuse the jury, but it is also more prejudicial than probative-thus exclusion is also appropriate under FRE Rule 403.

Because juries often give much credence to an experts testimony and opinions, trial courts are cautioned to exclude such testimony when facts testified to are of a kind that do not require any specialized knowledge or experience to form a conclusion, or of such a character that they should be presumed to be within the common experience of all persons moving in the ordinary walks of life. *Frazier*, 387 F.3d at 1263 ( "Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse."); *Whelan v. Royal Caribbean Cruises, Ltd.*, 976 F. Supp. 2d 1328, 1332 (S.D. Fla. 2013) (holding that Expert testimony "is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves." ). Dr. Courtney has proffered testimony which goes well beyond expert testimony and seeks to inject her opinion regarding the subject incident. Dr. Courtney gives no factual support for these opinions. Her findings and her report are rife with commentary and personal opinions, suffer from highly speculative conclusions and are without foundation, are not within her expertise, and should be stricken, as they are in violation of Rule 702. Her report and testimony should be deemed inadmissible and improper testimony by an expert witness. In the alternative, at the very least, Dr. Courtney's photographs of the "inspection", conclusions reached from her inappropriate stack, its content and configuration, the number of chairs and the height of the chairs,  should be stricken and should not be allowed during her trial testimony or submitted to the trier of fact.

**C. Dr. Courtney's opinion far exceeds her expertise**

Dr. Courtney's expressed opinions clearly violate the required standards for expert testimony. Dr. Courtney holds herself out as an expert in injury biomechanics. *See Dr. Courtney's Report* at pp. 1. However, Dr. Courtney expresses opinions on the medical possibilities of injuries arising, medical matters outside her expertise as an engineer. *Id.* at pp. 15. For example, Dr.

Courtney states that the Plaintiff's spinal injuries are consistent with "age-related degeneration, repetitive loading over time, and the body's long-term response to alterations in vertebral stress distribution due to degenerative changes." *Id.* This is a medical opinion, not a biomechanical one. For Dr. Courtney to opine on the nature of the Plaintiff's injuries is out of the scope of her expertise. Many of her opinions are based upon outright assumptions, speculation and conjecture. Her opinions fail to meet *Daubert* standards. Dr. Courtney has not identified any background, training or experience in the fields of medicine for her to be able to draw such conclusions.

Accordingly, as pointed out by this Court in *In re Denture Cream Products Liability Litigation*, 795 F.Supp.2d 1345, 1350 (S.D. Fla. 2011):

> "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). "Rather, the trial court is free to 'conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Hendrix,* 609 F.3d at 1194 (citing *Joiner,* 522 U.S. at 146, 118 S.Ct. 512).

Dr. Courtney has failed to offer evidence that an expert in biomechanics is qualified to comment on the medical possibilities of the injuries sustained because of this incident. Dr. Courtney's contradictory opinions would not assist the trier of fact and instead confuse the jury. Accordingly, in the alternative, Dr. Courtney's testimony regarding the medical injuries suffered by Plaintiff should be stricken or at the very least limited to only her area of expertise in biomechanics.

### D. Dr. Barredo's report fails to follow his own methodology

Throughout his report, Dr. Barredo repeatedly questions the various statements regarding the duration and timing of Plaintiff's loss of consciousness and/or altered state of consciousness. See Generally *Dr. Barredo's Report.* For example, regarding Plaintiff, he reports that "[s]he *feels* that she was unconscious[.]"and "[s]he *thinks* she was still very confused when she was in the infirmary." *Id.* at pp. 2. (*emphasis added*). Dr. Barredo then notes that "[t]he next day, she says,

several of the passengers came back to check on her and told her that she had been unconscious." *Id.* The next day, "[s]he says she was not feeling well", "[s]he does remember eating some banana nut bread", "[s]he tried to enjoy the rest of the cruise but felt that she had "sea-legs" and was a little bit unbalanced", and "[she] continued to feel that 'sea-legs' sensation." *Id.*

He states that "[f]actors such as a loss of consciousness are critical to determining the severity of a traumatic brain injury (TBI), which requires at least 30 minutes of loss of consciousness and 24 hours of an altered consciousness". Despite acknowledging these standards, Dr. Barredo's own statements conflict with the ultimate conclusions contained within his report. *Id.* at pp. 17. Dr. Barredo's own report includes definition of concussion diagnosis and Mild Traumatic Brain Injury (mTBI). *Id.* at pp. 19. This includes certain diagnostic criterion including: (a) Biomechanically Plausibly Mechanism of Injury; **and** one (1) or more of the following: (a) Clinical Signs; (b) Acute Symptoms; (c) Objective Finding or Laboratory Finding; or (d) Neuroimaging (e.g. MRI). *Id.* Dr. Barredo concludes that:

> "within reasonable medical probability, the preponderance of objective documented medical evidence does not support Mrs. Terry having suffered permanent brain damage from this injury even if we consider the possibility of a concussion or Mild Traumatic Brain Injury (mTBI), which would have been on the milder side of that syndrome that goes up to **30 minutes or loss of consciousness** and **24 hours of amnesia**.

Id. at 17. This conclusion fails to consider all the factors required under his *own* definition of TBI.

With regards to the first criterion, Dr. Barredo acknowledges that Plaintiff suffered a biomechanically injury to her head. *Id.* at pp. 9. According to his own definitions, if Criteria one (1) is met, then the patient must demonstrate at least one of the other criteria. With regards to the second criteria, Dr. Barredo's report notes numerous clinical signs of a brain injury including: loss of consciousness ("This would be her first episode of loss of consciousness."); confusion ("She thinks she was still very confused when she was in the infirmary."); motor dysfunction ("She had her daughter fill out the report as she felt she was not able to."); and amnesia ("She says there is

just not much that she remembers." and "…any good recollection of remember what hit her"). *Id.* at pp. 2. With regards to the third criteria, Dr. Barredo's report notes acute symptoms including: headache ("Mrs. Terry had a lot of headaches after this."); dizziness ("…was a little bit unbalanced." and "She says she still has dizziness."); emotional symptoms (during his CME Dr. Barredo notes she was "teary-eyed at times" Id. at 5.); and nausea ("Ms. Terry continued to feel that 'sea-legs' sensation."). *Id.* at pp. 2.

With regards to the fourth criteria, Dr. Barredo's report notes below normal clinical/laboratory findings (on 2 of 3 named Tests performed during the CME) including: Semantic Fluency Category Testing (Score: Low); and FAS testing (Score: Low). *Id.* at pp. 5. With regards to the fifth criteria, Dr. Barredo's report notes neuroimaging evidence of intracranial trauma after reviewing a Brian MRI, yet simply concludes that are incongruent with mild TBI and would require a more severe brain injury. *Id.* at pp. 6. Despite evidence of a Brain Injury, Dr. Barredo dismisses his own review of the MRI based on the "forces"- Plaintiff addresses this issue both *Infra* (regarding Dr. Courtney's Report) and *Supra.*

### a. Contradictions and Speculative Statements Regarding Symptoms

Dr. Barredo's report is rife with contradictions. Dr. Barredo questions whether Plaintiff has had emotional or lability changes despite noting her "decreased socialization" and being "spaced out at times." *Id.* at 3. With regards to emotional symptoms, Dr. Barredo states it is defined as: "uncharacteristic emotional lability and/or irritability." *Id.* at pp. 20. However, regardless of these symptoms, reaches a conclusion contrary to his findings. *Id.* at 22.

Furthermore, Dr. Barredo noted a "mild wobbly tandem" gait, which may indicate balance impairments, but he did not link it definitively to a traumatic brain injury. Dr. Barredo fails to dismiss this symptomology despite this being a symptom of neurological conditions or vestibular

dysfunction. Dr. Barredo does note that Vestibular testing can one of the positive signals of a brain injury under the Fourth (Testing) Criteria. *Id.* at 20. However, this finding seems to play no significance in his report and is not mentioned again.

Dr. Barredo fails to be consistent in his reporting of the Planitiff's history. Dr. Barredo reports that Plaintiff stated she had "no recollection of what hit her." *Id.* at pp. 2. Dr. Barredo then later states, "she feels that she was unconscious" and recalls people arguing. *Id.* This contradicts his own acknowledgment of inconsistencies in Plaintiff's memory and consciousness level throughout his report- the very fact that there are inconsistencies in her memory of the relevant events; duration; poor memory; concentration; and focus all raise issues related to signs and symptoms of traumatic brain injury. However, throughout Dr. Barredo's report, he fails to place any significance to symptomology including her loss of consciousness and/or retrograde amnesia.

Throughout the report there are multiple instances where the Plaintiff describes disorientation, confusion, and amnesia; yet, Dr. Barredo fails to address the time period surrounding these events, raising questions about the objectivity of his conclusions regarding the severity of her traumatic brain injury. Dr. Barredo seems to have made up his mind about the Plaintiff and her past without giving proper credence to what the subjective findings are, and what the objective findings and testing potentially demonstrate. Instead, he, in a very telling bit of commentary, improperly state that "as time went on, the history of loss of consciousness or amnesia increased with each telling of her story." This statement is both speculative, highly prejudicial and should be stricken. *Id* at pp. 10.

Dr. Barredo makes numerous speculative statements using words like "could" including with regards to white matter hyperintensities, stating they "could" be caused by vascular disease due to smoking. or it "could" be linked to traumatic brain injury. *Id*. at pp. 11. Dr. Barredo further

speculates on the time period of the hemosiderin deposits (which are evidence of a brain bleed) stating they "could" be from years ago, but lacks evidentiary support and is unreliable; yet, states "one cannot date a hemosiderin deposit." *Id.* Dr. Barredo selectively picks findings supporting his conclusions while disregarding others that suggest clear evidence of a traumatic brain injury.

### b. Improper Commentary on Diagnostic Testing

Dr. Barredo takes aim Plaintiff's diagnostic testing. First, Dr. Barredo acknowledges that "DTI scans evolved from a test that I and many others thought would be helpful to diagnose Mild Traumatic Brain Injury to a highly controversial test." *Id.* at pp. 15. Despite this conclusion, Dr. Barredo states "[t]here are so many studies regarding DTI that I have to look at reviews of the studies that evaluate the study parameters, study dynamics and conclusions." *Id.* at 16.

> "The largest … DTI studies published in 2023 came to the conclusions that while 'its **sensitivity to detect moderate to severe injury in white matter following TBI is relatively established**, particularly in group studies, the utilization of diffusion data at the level of the individual (patient) remains complicated.' 'for studies reporting correlations between DTI metrics and symptom presentation, the correlational directions reported were quite mixed, suggesting no strong pattern.' 'A correlation between abnormalities in fractional anisotropy (FA) .... and cognitive performance would be expected; however, this was not reliably observed in this sample of studies that reported on the findings of such correlations.' (Lindsey, 2023)."

*Id.* at 16-17. Dr. Barredo continues that "[,]In spite of the above, DTI scans continue to be used to diagnose **mTBI** at an individual level in many cases where there are symptoms and temporal patterns that are incongruent to the normal course of post **mTBI** symptoms." *Id.* at 17. (*emphasis added*). Dr. Barredo seems to acknowledge the persistent use of DTI and their value in diagnosing moderate-to-severe TBI while accepting the challenges to any burgeoning area of science. However, Dr. Barredo improperly comments on the validity of treating physicians' diagnostic tests, which is outside the scope of his expertise. *Id.* at 16. Carnival has hired a radiologist, Dr. Keyserling, to opine on this. Duplicative testimony is improper and unhelpful to

the jury and potentially bolsters their own expert's likely testimony. Dr. Barredo's expert testimony is "imprecise and unspecific". *Cook*, 402 F.3d at 1111. Dr. Barredo seems to pick and choose which diagnostic criteria is significant or relevant and ignores, in some cases, what his own testing and/or reviews of the testing are demonstrating. Dr. Barredo opinions will not assist the trier of fact and therefore should be stricken.

### E.  Improper Neuropsychological Opinions

Dr. Barredo is not a neuropsychologist. However, throughout his report Dr. Barredo makes references to neuropsychology and neuropsychological testing. See generally *Dr. Barredo's Report*.  Dr. Barredo states that "mental status testing in neurological examinations are screening tests for cognitive problems as they are not neuropsychological tests with performance and symptom validity tests to ensure good effort." *Id.* at pp. 5.  Despite this disclaimer, Dr. Barredo continues to make substantive findings about Plaintiff's cognitive function, based on neuropsychological testing, which is outside his expertise. Dr. Barredo opines that Plaintiff's semantic fluency category testing and FAS word retrieval testing resulted in scores of: "low". This seems to contradict his previous acknowledgment of the limitations of his testing. Furthermore, he seems to argue that Plaintiff is "malingering." *Id.* at pp. 13. However, then immediately states "[t]he latter diagnosis can only be established by neuropsychological testing with performance and symptom validity testing." *Id.* at 13. Dr. Barredo seeks to interject opinions outside his expertise.

Dr. Barredo continues when suggesting that Plaintiff's persistent cognitive dysfunction is a sign of malingering when he states that "[i]n her case, she says that according to her husband and daughter, her memory is getting worse, i.e., the opposite of what one would expect, i.e., a progressive increase and development of new symptoms as time went on." *Id.* He further states that under DSM-V for Traumatic Brain Injuries evaluated by neuropsychological testing a Major

Depressive Disorder must be ruled out. Id.  Thereafter, without any support or psychological or psychiatric references or testing just concludes: "[i]n this case, Mrs. Terry has obvious depression." *Id.* Dr. Barredo refers to DSM-5 diagnostic criteria, which are beyond his qualifications, making improper inferences about Plaintiff's symptoms and potential malingering. He further states, "one has to wonder about her sexual abuse history in this setting," which is highly prejudicial and should be stricken under Rule 403. Id. at Page 13.Dr. Barredo has failed to offer evidence by which an expert in neurology is qualified to comment on the psychological injuries or neuropsychiatric results sustained as a result of this incident. Therefore, these opinions should be disallowed as outside Dr. Barredo's area of expertise.

### F.  Dr. Barredo offers improper biomechanical engineering opinions

Dr. Barredo attempts to offer improper biomechanical engineering testimony that is well outside his area of expertise. Dr. Barredo states that "[t]he ***forces necessary*** to create all of these white matter hyperintensities are totally incongruent with the type of mild traumatic brain injury and would require ***a much more severe degree of brain injur***y." *Id.* at 6. Dr. Barredo is not a biomechanical engineer and his testimony regarding the forces is outside of the scope of his area of expertise.  Dr. Barredo acknowledges that he is not an expert in this area by stating: "I would defer to biomechanics experts on this issue." *Id.* at pp. 10. See also *Id.* at pp. 11. Despite that statement, Dr. Barredo improperly opines that for a diagnosis of concussion or mild TBI, "we have to have a biomechanically plausible mechanism of injury criterion." *Id.* at pp. 10. Then, he references ICD-10 diagnostic criteria for concussions, improperly bolstering his opinion with external reports beyond his expertise. Dr. Barrdeo's conclusions improperly parallel those of Dr. Amy Courtney, whose methodology and factual basis have been challenged above.

### G. Dr. Barredo's Report is highly prejudicial

Throughout his report, Dr. Barredo makes prejudicial comments and statements regarding Plaintiff's alleged abusive background, incidents involving the babysitter's boyfriend exposing himself in front of Plaintiff, and Plaintiff dropping out of school and becoming a stripper. See *Dr. Barredo's Report* at pp. 3. Dr. Barredo continues when commenting on Plaintiff's work history that Plaintiff "has never worked since her stripper days." *Dr. Barredo's Report* at pp. 4. These comments will not assist the trier of fact and are also more prejudicial than probative, and thus exclusion is also appropriate under FRE Rule 403. Dr. Barredo's report concludes that the "objective evidence does not support Mrs. Terry having suffered permanent brain damage from this injury" despite deeply inconsistent statements throughout his report and suggestions of an initial prolonged altered consciousness; amnesia and memory loss; acute symptomology, clinical correlation and positive laboratory testing both by Plaintiff's treating doctors and during Dr. Barredo's own CME, and positive findings during the diagnostics testing.

In sum, Dr. Barredo's contradictory opinions and report would not assist the trier of fact and instead confuse the jury. Dr. Barredo's entire report and opinions should be stricken. For the foregoing reasons, Plaintiff moves to strike the above-referenced statements from Dr. Barredo's report and to preclude him from offering unreliable, speculative, and prejudicial testimony at trial. Accordingly, in the alternative, Dr. Barredo's testimony regarding the neuropsychic testing, psychiatric diagnosis, and biomechanical injuries suffered by Plaintiff should be stricken or at the very least limited to only his area of expertise in neurology.

### H. Dr. Hollern's Report is beyond the scope of his area of expertise

Dr. Hollern's opinions are well beyond the scope of his expert opinions, where Dr. Hollern discusses Plaintiff's traumatic brain injury (TBI). See generally *Dr. Hollern's Report*. Furthermore

Dr. Hollern states that the mechanism of injury is unlikely to have caused cervical pathology and that there is no reason to assign disability from this "low-energy accident." *Id.* at pp. 3. Dr. Hollern continues to state that "[a]lthough the stacks of chairs fell on her, **it did not cause any type of catastrophic disc or spine injury** that would require any type of surgical intervention." *Id.* at pp. 2. (*emphasis added*). Dr. Hollern makes this statement in a purely conclusory manner without providing any methodology for how he arrived at the conclusion. Dr. Hollern acknowledges that his testimony should be limited by his own words, stating that "[f]or this type of injury, she had an examination for an alleged traumatic brain injury which is **out of the scope of this specific CME**." *Id.* at pp. 3. (*emphasis added*). Dr. Hollern was not disclosed as a biomechanical or biomedical expert. Therefore, his opinions must be limited only to his area of expertise. He improperly states that "[h]owever, given **the mechanism of her incident**, it is unlikely that this caused her cervical pathology." *Id.* (*emphasis added*). As such, Dr. Hollern's statements regarding the mechanism of injury should be stricken. Furthermore, any reference to traumatic brain injury by Dr. Hollern should be excluded as it is outside his area of expertise, is prejudicial, and is not helpful to the jury. In sum, Dr. Hollern's testimony regarding biomechanics, biomedical conclusions, and Plaintiff's traumatic brain injury are improper and beyond his expertise.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the Court grant her *Daubert* Motion Regarding Dr. Courtney, Dr. Barredo, and Dr. Hollern in their entirety and preclude them from offering opinions at trial or, in the alternative, limit Dr. Courtney's testimony, Dr. Barredo's testimony, and Dr. Hollern's testimony, at trial to the parameters of her expertise as addressed more thoroughly above.

BY:    /s/ *Glenn J. Holzberg*
GLENN J. HOLZBERG
Fla. Bar Number: 369551
Attorney for Plaintiff

## LOCAL RULE 7.1. CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Local Rule 7.1(a)(3)(A), I hereby certify that counsel for the movant has conferred with counsel for Defendant in a good faith effort to resolve the issues herein. Defendant has agreed, as contained in Defendant's Expert Report of Dr. Barredo, not to make references to Plaintiff's prior work as a "stripper" and will be further dealt with in a Motion in Limine. With regard to the other issues raised in the Motion, the Parties cannot agree and therefore are unable to resolve the issues.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 12, 2025, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

BY:    /s/ *Glenn J. Holzberg*
GLENN J. HOLZBERG
Fla. Bar Number: 369551
Attorney for Plaintiff

## SERVICE LIST
### Case No.: 24-CV-22067-ALTMAN

**GLENN J. HOLZBERG, ESQ.**
Florida Bar No: 369551
glenn@holzberglegal.com
erika@holzberglegal.com
**LOUIS M. HOLZBERG, ESQ.**
Florida Bar No: 1011340
louis@holzberglegal.com
erika@holzberglegal.com
**HOLZBERG LEGAL**
Offices at Pinecrest II, Suite 220 7685 S.W.
104th Street
Miami, FL 33156
Telephone: (305) 668-6410
Facsimile: (305) 667-6161
*Attorneys for Plaintiff*

**Michael J. Drahos, ESQ.**
Florida Bar No. 0617059
*michael.drahos@gray-robinson.com*
**W. Cooper Jarnagin, ESQ**
Florida Bar No. 117767
*cooper.jarnagin@gray-robinson.com*
**Ashley Genoese, ESQ.**
Florida Bar No. 1019357
*ashley.genoese@gray-robinson.com*
**GrayRobinson, P.A.**
515 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401
Telephone: (561) 268-5727
Facsimile: (561) 268-5745
*Attorneys for Defendant*