UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI CIVIL DIVISION

CASE NO. 1:23-CV-22067-RKA

MICHELLE TERRY,

        Plaintiff,

v.

CARNIVAL CORPORATION,

        Defendant.

_____/

**DEFENDANT CARNIVAL CORPORATION'S**
**EXPERT WITNESS DISCLOSURE**

Defendant, CARNIVAL CORPORATION, by and through its undersigned counsel,

hereby serves its Expert Witness Disclosure and states as follows:

1.      **Victor H. Barredo, M.D. (Neurology)**
        **South Miami Neurology**
        **Chief of Clinical Neurology Services**
        **Baptist Health Systems: South Miami Hospital**
        **6200 Sunset Drive, Ste #305**
        **Miami, FL 33143**

Dr. Victor H. Barredo is a board-certified neurologist who is expected to testify concerning causation and damage issues in the case as provided in his summary report and any deposition testimony.  Dr. Barredo conducted a medical examination of the Plaintiff, Michelle Terry on January 31, 2025.  He reserves the right to alter or supplement his report based upon ongoing discovery and investigation.  His opinions are based upon his knowledge, training and experience, along with his review of Plaintiff's Complaint, the medical records and diagnostic images, as well as any deposition testimony completed in the case. Carnival Corporation also reserves the right to ask Dr. Barredo to respond to any issues raised by Plaintiff's experts.  Further information concerning his opinions are provided in the summary report attached herein, along with a copy of his Curriculum Vitae, fee schedule, testimonial history and billing attached as Composite Exhibit A. **Dr. Barredo is available for deposition on February 20ᵗʰ or March 6ᵗʰ at 4:00 p.m., via Zoom.**

**2.      Douglas A. Hollern, M.D. [Orthopedic Spine Surgeon]**
**3232 Coral Way, Apt. 117**
**Miami, FL 33145**

Dr. Hollern is a board-certified Spine Surgeon.  He is currently in Private Practice specializing in NeuroSpine and Pain.  Dr. Hollern conducted a medical examination of the Plaintiff, Michelle Terry on January 30, 2025.  He reserves the right to alter or supplement his report based upon ongoing discovery and investigation.  Carnival Corporation also reserves the right to ask Dr. Hollern to respond to any issues raised by Plaintiff's experts.  His opinions are based upon his knowledge, training and experience, along with his review of Plaintiff's Complaint, the medical records and diagnostic images as well as deposition testimony completed in the case. Further information concerning his opinions are provided in his medical examination report, along with a copy of his Curriculum Vitae and fee schedule.  Same is attached herein as Composite Exhibit B.

**3.      Harold F. Keyserling, M.D.**
**801 Middlefield Road, Apt. 4**
**Palo Alto, CA 94301**

Dr.  Harold Keyserling is a board-certified radiologist and neuroradiologist in Palto Alto, California.   He is currently a Clinical Associate Professor at Stanford University and a Neuroradiologist associated with Palo Alto VA Medical Center.  Dr. Keyserling is expected to testify consistently with his summary report and any deposition testimony.  He reserves the right to alter or supplement his report based upon ongoing discovery and investigation.  His opinions are based upon his knowledge, training and experience, along with his review of Plaintiff's Complaint, the medical records and diagnostic images, as well as any deposition testimony completed in the case. Carnival Corporation also reserves the right to ask Dr. Keyserling to respond to any issues raised by Plaintiff's experts.   Further information concerning his opinions are provided in the summary report attached herein, along with a copy of his Curriculum Vitae, fee schedule, testimonial history and billing attached as Composite Exhibit C.

**4.      Amy Courtney, Ph.D., CAISS [Biomechanics]**
**8875 Hidden River Parkway**
**Suite 300**
**Tampa, FL 33637**

Amy Courtney is a Biomechanics Engineer who currently serves as Senior Manager of Biomechanics at Exponent. Dr. Courtney reserves the right to alter or supplement her report based upon ongoing discovery and investigation. Carnival Corporation also reserves the right to ask Dr. Courtney to respond to any issues raised by Plaintiff's experts.  Her opinions are based upon her knowledge, training and experience, along with her inspection of the vessel and pertinent items, review of Plaintiff's Complaint, photographs of the subject area, medical records, as well as deposition testimony completed in the case.  Further information concerning her opinions are provided in her summary report, along with a copy of her Curriculum Vitae, fee schedule,

testimonial history and billing invoices.  Same is attached herein as Composite Exhibit D.  **Dr. Courtney is available for deposition via zoom on March 7th or 10th [flexible start times].**

Defendant reserves the right to supplement this Disclosure with appropriate rebuttal experts following receipt and review of Plaintiff's Experts.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via-email on this 11th day of February, 2024 to: Glenn J. Holzberg, Esq., glenn@holzberglegal.com, Louis M. Holzberg, Esq., louis@holzberglegal.com, holzberglegal@gmail.com, erika@holzberglegal.com,

GrayRobinson, P.A.
515 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401
Tel: (561) 268-5727
Fax: (561) 268-5745

By: */s/ Michael Drahos*
Michael J. Drahos
Florida Bar No. 0617059
W. Cooper Jarnagin
Florida Bar No. 117767
Ashley N. Genoese
Florida Bar No. 1019357
*Michael.Drahos@Gray-Robinson.com*
*Cooper.Jarnagin@Gray-Robinson.com*
*Ashley.Genoese@Gray-Robinson.com*



Exponent
8875 Hidden River Parkway
Suite 300
Tampa, FL 33637

telephone 813-379-3470
www.exponent.com
Offices in Asia, Europe, and North America

February 7, 2025

Michael J. Drahos, Esquire                    via email: Michael.Drahos@gray-robinson.com
Shareholder
Gray Robinson, P.A.
515 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401

Subject:   Terry v Carnival Elation
           Exponent Project No. 2409266.000

Dear Mr. Drahos:

In accordance with your request, Exponent conducted a biomechanical investigation of the above captioned matter. I also evaluated the biomechanical mechanisms pertaining to her claimed injuries and pathologies as documented in her medical records. Exponent bills my work on this matter at a rate of $425 per hour in 2025. My *curriculum vitae* and testimony history are appended to this report.

As a consultant in Exponent's Biomechanics practice, I provide scientific expertise in the area of injury biomechanics, including orthopaedic, spinal, and traumatic brain injuries (TBIs). I earned a bachelor's degree in engineering mechanics from Michigan State University and a Master of Science degree in Engineering Sciences from Harvard University. I earned a Ph.D. in Medical Engineering and Medical Physics from a joint program with Harvard University and the Massachusetts Institute of Technology (MIT) in 1994. My degree program included specialized medical training at Harvard Medical School, including coursework and clinical training. I am also a Certified Abbreviated Injury Scale Specialist (CAISS), which is a certification related to the quantification of acute injury severity based on findings reported in medical records.

Prior to joining Exponent, I was a researcher in the Department of Biomedical Engineering at The Cleveland Clinic Foundation and the Orthopaedic Biomechanics Laboratory of Beth Israel Hospital and Harvard Medical School. I later held an appointment as Assistant Professor teaching physics at the United States Military Academy at West Point. In the course of 35 years of biomechanical research, I have co-authored more than 75 articles in the peer-reviewed scientific and medical

2409266.000 – 4349

Michael Drahos, Esquire
February 7, 2025
Page 2

literature. I am a member of relevant professional organizations and serve as a peer reviewer for scientific journals and U.S. military grant programs for TBI research.

My education, training, and experience as a biomechanical expert are consistent with those described in the *Reference Manual on Scientific Evidence*[1] as being appropriate qualifications and useful to the trier of fact in cases like this one. Specifically, the *Manual* states, "The traditional role of the physician is the diagnosis (identification) of injuries and their treatment, not necessarily a detailed assessment of the physical forces and motions that created injuries during a specific event. The field of biomechanics … involves the application of mechanical principles to biological systems, and is well suited to answering questions pertaining to injury mechanics." I relied on Ms. Terry's medical records for findings reported by her treating physicians. My training, along with my experience, prepared me to correctly review and understand that information.

## Materials Received

The following materials were provided for review:

- Incident Information
  - Carnival Passenger Injury Statement signed by Ms. Terry, dated June 5, 2023

- Legal Documents
  - Second Amended Complaint and Demand for Jury Trial, August 30, 2024

- Medical records and imaging studies pertaining to Ms. Terry, including from the following providers
  - Carnival Elation Medical Center
  - NeuroDoc
  - Altus Medical Group
  - Radiology Associates Orange Park
  - Spine, Brain and Joint Institute
  - Ascension St. Vincent's Emergency Services
  - Community Radiology Associates, PA
  - ICC MRI
  - Physician Partners of America
  - Radiology Associates Imaging

- Testimony

  - Deposition transcript of Michelle Terry, with exhibits, dated November 14, 2024
  - Deposition transcript of David Budi Raharjo, dated November 19, 2024

---

[1] *Reference Manual on Scientific Evidence* (Third Edition, National Academies Press, 2011), Committee on Science, Technology, and Law Policy and Global Affairs, published by the National Research Council in conjunction with the Federal Judicial Center, Washington D.C., pp. 900-902.

2409266.000 - 4349



Michael Drahos, Esquire
February 7, 2025
Page 3

- Photographs and Video Recordings
  - Color Photograph (1, .pdf) of Ms. Terry's scalp
  - Color Photographs (11, .pdf) of the incident area
  - Color Photographs (2, .pdf) of the material handling trolley
  - Video recording of Ms. Terry and her daughter interviewed by security crew at the infirmary, dated June 5, 2023
  - Color Photograph (1, .pdf) of dining chair specifications and dimensions
- Miscellaneous
  - Carnival account statement attributed to Ms. Terry, printed on June 5, 2023

I also inspected the incident area and exemplar tables, chairs, and trolley on the Carnival *Elation* in Port Jacksonville, Florida on January 20, 2024. At that time, some testing was also performed.

## Incident Summary

This background information is provided as a general summary of the subject incident based on the materials provided to date and is not intended to be a complete recitation of all facts considered in this analysis.

According to the Second Amended Complaint and Demand for Jury Trial, the incident occurred on June 5, 2023, on the outdoor Deck 11 (Figure 1) of the vessel Carnival *Elation*, operated by Carnival Corporation. In the Passenger Injury Statement, the time of incident was reported to be around 4:35 P.M., and Ms. Terry wrote that she was "sitting on deck 11 in the 'smokers' chair smoking a cigarette" when "unexpectedly the stack of chairs fell on [her] from behind". She wrote that she had a bump on her head with muscular discomfort throughout the left side of the neck to the shoulder.

Various descriptions of the incident were recorded in Ms. Terry's medical records, including the following:

> June 5, 2023, "*a pile of chairs fell onto the back of her Head*"- Elation Medical Center, Case Summary

> June 13, 2023, "*knocked out by a trolley full of deck chairs and deck of tables.*" "*She was on a Cruise Ship and was sitting down in a chair. Employees of the cruise ship were pushing a cart by on wheels that had tables and chairs with saran wrap around them. One of the workers cut the saran wrap as they were walking past the patient causing the tables and chairs to collapse and fall onto the patient. She was stuck [sic] in the back of the head and in her Cervical and Thoracic Spine. The patient fell to her right and had a loss of consciousness. She is unsure how long she had a loss of consciousness for and did not regain consciousness until she was in a wheelchair on her way to the medical center on the cruise ship*"- Spine, Brain and Joint Institute

2409266.000 - 4349



Michael Drahos, Esquire
February 7, 2025
Page 4

June 19, 2023, "*She was on a cruise, on the upper deck when witnesses say she was hit in the head by a stack of chairs [when] a crew member was trying to unload. The chairs her hitting her on the left side of her head. She was knocked unconscious at that time for 3-5 minutes. When she regained consciousness she began vomiting. The next thing she remembers is sitting in a wheel chair on her way to the infirmary. She has no recollection of events for about 30 to 40 minutes after being hit in the head. She was confused when she regained awareness as she was repeatedly asking, "who hit me?" She believed at that time that someone had punched her in the head. She also reports having headache, dizziness, tinnitus, and nausea at that time. In the ship infirmary she states that they diagnosed her with concussion. She also endorses having a big bump on the Left side of her head. Daughter reports that at that "she was not herself". The next day she tried to go on an excursion, however she had severe headache, and felt nausea*"- Telehealth H&P Note

July 19, 2023, "*Hit in the head with a stack of chairs. At time of incident she was knocked unconscious for 3-4 minutes, then had anterograde amnesia lasting another approximately 30-40 minutes. She also reports having a large bump over left side of her head. She was confused upon regaining awareness*"- Telehealth SOAP Note

July 25, 2023, "*Patient was on a cruise ship and had a stack of chairs and tables fall on her head and was knocked out.*"-Initial Surgical Consultation, Atlus Medical Group



Figure 1. Incident area and diagram of Deck 11 on Carnival *Elation* (with incident area annotated)



Michael Drahos, Esquire
February 7, 2025
Page 5

## Testimony of Michelle Terry

Michelle Terry provided deposition testimony on November 14, 2024. She testified that her highest level of education was seventh grade, and she was not employed in May of 2023. She testified that from 2000 until 2023, she never maintained any health insurance. The subject cruise was the first cruise ship she had ever been on, and she went with her daughter.

Ms. Terry testified that on the second day of the cruise, both she and her daughter got sick from the Chef's Table meal and got some stomach-soothing medication from the cruise infirmary.

Ms. Terry testified that on the day of the incident, the third day on the cruise, she and her daughter got back on board from the Atlantis hotel around 3:00 or 3:30 P.M. She then went down the hall to start a load of laundry, went up to the 10th deck and grabbed a "virgin" piña colada, and then went up to the 11th deck to have a cigarette. She could not recall the chair she was sitting in when the subject incident occurred, but she described it using an area photograph as one of the chairs directly in front of two people facing each other in the photograph and her chair was facing the water (Figure 2). She testified that it was "very quick" after she sat down and lit the cigarette when the incident happened.



Figure 2. Exhibit 2 from Ms. Terry's deposition of November 14, 2024 showing incident area

2409266.000 - 4349



Michael Drahos, Esquire
February 7, 2025
Page 6

After the subject incident, Ms. Terry remembered some "arguing" about getting her to medical and a Carnival worker on her knees in front of her wanting to take her to her cabin. She testified that she recalled feeling pain in the head and neck while she was on Deck 11 and before going to medical. She testified that she went to the infirmary from Deck 11 by wheelchair. Ms. Terry testified that once she reached the medical center, they offered an injection, which she declined, and did an x-ray of her neck. Then they sent her to her cabin with "some kind of medicine." She described that the wound to her head was swollen about the size of an egg. Ms. Terry testified that the doctor told her that she had a concussion prior to going back to her cabin. She was able to walk out of the medical center by herself and was given a muscle relaxer once she left the medical center.

The day after the subject incident, the fourth day of the cruise, Ms. Terry and her daughter took a charter boat to Princess Cay and stopped at a clinic there because she was "very disoriented, dizzy, and struggling." She stated that she had a problem with understanding their English at the clinic and didn't feel safe, and after speaking with her husband and son, she pulled together. After they left the clinic, she rented some paddleboards and went out in the water for about 35 minutes, and did snorkeling before going back to the ship.

After the subject incident, Ms. Terry testified that her brain was different in a way that she could not multitask, could not drive, could not be trusted with obligations of being around her young grandchildren, and could not enjoy things that she used to enjoy. She underwent neck surgery in September 2024. She testified that she was currently taking antidepressant and pain medication. Ms. Terry testified that had smoked cigarettes since she was a teenager.

## Testimony of David Budi Raharjo

Mr. Raharjo provided deposition testimony on November 19, 2024. He testified that he was a housekeeping attendant for the Carnival Cruise with his first contract started on June 3, 2023, working in the crew area that included the toilets, offices and the crew cabins, and sometimes bringing chairs to the open deck area.

On the day of the incident, Mr. Raharjo was tasked to move a stack of tables and chairs using a trolley with his partner Frank Cates. He stated the trolley's condition was fine. He testified that the chairs were already set up on the trolley. There was plastic wrapped around the chairs and tables holding them together.

When bringing the trolley to the smoking area, Mr. Raharjo was at the back and his partner was at the front. Once they arrived at the smoking area, his partner locked the trolley using his foot. Mr. Raharjo tore through the plastic wrap using his hands and started taking off the chairs one by one. He estimated there were five or six chairs and tables in the stack on the trolley.



Michael Drahos, Esquire
February 7, 2025
Page 7

While they were setting up the chairs, his partner asked guests to step back and clear the area. Mr. Raharjo testified that, after he placed the top chair at the smoking area, the second one fell from the top of the stack on the trolley, which he estimated to be 1.5 meters high. The chair fell on a guest who was sitting next to where the trolley was. They were putting chairs to the left of where she was sitting.

Mr. Raharjo testified that the guest was crying after [she] was hit. He denied observing [her] losing consciousness or vomiting throughout the entire time. Mr. Raharjo observed that the guest was upset and immediately called his supervisor and emergency services. Then the medical teams came not long after and brought the guest to the medical center.

He denied being told by his supervisor to work quickly prior to the incident. He testified that, because of this accident, he was fully contracted in the crew areas since then.

## Medical History

This section summarizes medical findings reported in the records provided for review as of the date of this report and do not represent a complete medical history for Ms. Terry. These factual summaries do not contain Exponent's opinions.

On June 5, 2023, Ms. Terry was evaluated at 5:03 P.M. by Ganizani Miawanda, M.D., at the Medical Clinic of Carnival *Elation* for a complaint of headache, swelling, or hematoma on head and pain over her neck. Ms. Terry was reported to have pain on points of impact, localized to neck, C3-C6 range and on left temporal region of scalp; she denied dizziness, tingling/numbness, weakness, tremor, fits/seizures. On physical examination, she was reported to have no tenderness on palpation of neck, no acute traumatic changes on C-spine X-ray, normocephalic and atraumatic head, steady gait, and negative Romberg test. Ms. Terry was reported to have left the medical center in a stable condition with GCS [Glasgow Coma Scale] score of 15/15 and declined wheelchair assistance. X-ray images of Ms. Terry's cervical spine were later interpreted by Lester Gerson, M.D. at Community Radiology Associates as demonstrating normal alignment of the cervical vertebral bodies and no fracture or other acute osseous lesion.

On June 8, 2023, Ms. Terry was evaluated at Ascension St. Vincent's Emergency Services for contusion of the thoracic spine and head injury. Computed tomography (CT) studies of Ms. Terry's head and cervical spine and x-ray images of her thoracic spine were ordered.

On June 13, 2023, Ms. Terry was evaluated by Lindsay Burden, APRN at Spine, Brain and Joint Institute. Ms. Terry was reported to state that she had pain in the middle of back, lower neck, arms and shoulders.

On June 23, 2023, Ms. Terry was evaluated by Michael Deveau, M.D., at Physician Partners of America for a chief complaint of pain in the mid back. She was reported to be undergoing physical



Michael Drahos, Esquire
February 7, 2025
Page 8

therapy and was prescribed gabapentin and Flexeril for pain relief. A review of systems indicated no nausea or vomiting but was positive for joint pain, mid back pain, muscle spasms, tingling, and numbness.

On June 28, 2023, Ms. Terry was evaluated by Barren Buono, M.D., at Radiology Associates Orange Park. A magnetic resonance imaging(MRI) study of her brain was interpreted by Dr. Buono as demonstrating several scattered white mater signal foci within the brain and abnormal statistically significantly decreased fractional anisotropy values in 4 out of 12 regions of interest and 4 out of 6 white matter tracts. An MRI study of Ms. Terry's thoracic spine was interpreted by Dr. Buono as demonstrating normal cord signal characteristics, normal height of vertebral bodies without fractures, no vertebral body listhesis, normal bone marrow signal and unremarkable paraspinal soft tissues. On January 29, 2024, Ms. Terry was again evaluated by Dr. Buono and was reported to have no significant interval change revealed by MRI of her thoracic spine since the prior study, and an identified disc herniation remained unchanged.

On July 10, 2023, Ms. Terry was evaluated by Michael Sandborn, M.D., at Spine, Brain and Joint Institute for follow up visit and MRI review.

On July 11, 2023, Ms. Terry was evaluated by Mark Timken, M.D. at ICC MRI. An MRI study of her lumbar spine was interpreted by Dr. Timken as demonstrating thoracolumbar dextroscoliosis and lower lumbar levoscoliosis. Additional findings included disc bulge at the L1-L2 level; loss of disc height and hydration, and disc bulge with hypertrophy of the facets and ligamentum flava at the L3-L4 level; loss of disc height and hydration with broad-based disc herniation and hypertrophy of the facets and ligamentum flava at the L4-5 level; and loss of disc hydration and disc herniation at the L5-S1 level.

On July 19, 2023, Ms. Terry was evaluated by Omar Moore, M.D. at NeuroDoc via telehealth for complaints of decreased concentration, memory impairment, neck pain, back pain, headaches, dizziness, tinnitus, nausea, and insomnia, which were reported as starting after she was hit in the head by a stack of chairs.

On July 20, 2023, Ms. Terry was evaluated by Angela Locklear, APRN at Physician Partners of America for a complaint of pain in the mid back. Ms. Terry reportedly stated that she had cervical and lumbar pain since her injury in June, she had cervical traction at physical therapy, after which her cervical pain had become almost as severe as the thoracic pain, and she reported having headache daily.

On July 25, 2023, Ms. Terry was evaluated by Andrew Cannestra, M.D., Ph.D. at Altus Medical Group. Ms. Terry was reported to have a complaint of neck pain, lower back pain and thoracic pain. Ms. Terry reportedly stated that she could not walk a straight line and cannot balance on one foot. On physical examination, she was unable to perform a tandem gait, and her Romberg test was

2409266.000 - 4349



Michael Drahos, Esquire
February 7, 2025
Page 9

positive. Her neck was reported to have decreased range of motion of approximately 40% according to age, while her lumbar spine had a decreased range of motion of approximately 20%. MRI studies of Ms. Terry's brain, cervical spine, thoracic spine and lumbar spine were interpreted by Dr.  Cannestra. An MRI study of her cervical spine was interpreted as demonstrating central disc herniation at C4-C5 level, disc bulging at C5-C6 level with osteophytic ridging with moderate stenosis, and C6-C7 broad-based disc herniation with moderate stenosis. MRI of her brain was interpreted as demonstrating scattered white matter signal foci. An MRI study of her thoracic spine was interpreted as demonstrating a right side disc bulge at T7-T8 level, a left side disc bulge at T8-T9 level, and a broad-based disc bulge at T9-T10 level. Additional findings included Modic changes across the L4-L5 level, slight listhesis and some facet hypertrophy at L4-L5 level, and disc bulges at L3-L4, L4-L5, and L5-S1 levels.

On September 11, 2023, Ms. Terry was evaluated by Michael Sandborn, M.D. at Spine, Brain and Joint Institute and was reported to have cervical pain at 10/10 with tingling in arms and legs, headaches associated with nausea, and trouble with concentration and memory issues.

On October 6, 2023, Ms. Terry was evaluated by Omar Moore, M.D. at NeuroDoc. She was reported to have no clear prolongation to absolute latency or inter-peak latency, and no gross amplitude asymmetry based on Auditory Evoked Potential (AEP) testing. She was reported to have normal latency and symmetric left/right amplitude based on Visual Evoked Potential (VEP) testing. She was reported to have normal bilateral R1, R2 and contralateral R2 responses based on Blink Reflex testing. Ms. Terry's heart rate variability test and sympathetic skin response in the hands were reported to have no significant abnormalities. Ms. Terry was reported to have visual disturbance and was evaluated by Dr. Moore. She was reported to have impairment in smooth pursuits, saccadic eye movements, and visual fixation, likely contributing to impaired ability to visually focus and track moving objects. Nystagmus was observed on horizontal end gaze in both eyes. Brain visual processing speed was impaired on functional testing.

Around the time of the subject incident, Ms. Terry was 54 years old. She was reported to be approximately 5 feet, 3 inches tall and weigh approximately 147 pounds. She had a history of smoking and was noted to be a current daily smoker. She was reported to be a homemaker. Additionally, Ms. Terry had a history of being hit by a semi-truck and sustaining back injury in 1991.



Michael Drahos, Esquire
February 7, 2025
Page 10

## Inspection

I inspected the incident area and exemplar tables, chairs, and trolley on the Carnival *Elation* in Port Jacksonville, Florida, on January 20, 2025 (Figure 3).



Figure 3. Exemplar chairs, tables, and trolley in the smoking area of Deck 11 of the Carnival *Elation*. (Exponent photographs taken January 20, 2025)

Repeated measurements of the chair weight utilizing a digital luggage scale indicated a weight of approximately 15.6 pounds. The height of the back of the chair was approximately 38 inches, and the seat height was approximately 17 inches (Figure 4)



Figure 4. Dimensions of exemplar chair. (Exponent photographs taken January 20, 2025)

Ms. Terry's medical records reported her height to be approximately 63 inches tall. Seated in the type of chair evaluated at my inspection, the top of Ms. Terry's shoulders would have been below the top of the back of the chair, and her head would have been above it. Since I am approximately the same height as Ms. Terry's reported height, I verified this anthropometric assessment by sitting

2409266.000 - 4349



Michael Drahos, Esquire
February 7, 2025
Page 11

in an exemplar chair with a cushion; my shoulders were below the top of the back of the chair and my head was above it.

There were various references in the materials provided for review to a "stack" of chairs and tables on a trolley like that depicted in Figure 5. However, there were no specific descriptions, photographs, or demonstrations of this arrangement. During my inspection, possible orientations of tables and chairs arranged on an exemplar trolley for transport were evaluated. The only arrangement that made sense and that was somewhat stable involved a set of four chairs and two tables. Two chairs fit upright side by side on the trolley. A table fit inside each chair. Two more chairs were placed upside down on each upright chair and table, to form two "stacks" of three items each – two chairs and a table. I noted that, at the time of the incident, the "stack" of tables and chairs was reported to be wrapped in plastic while being transported to the incident location from storage, which was not replicated at my inspection. With this arrangement, the height from the deck of each "stack" was approximately 61 inches to the tip of the leg of the upside-down chair on top (Figure 5). Consistent with this arrangement, the crew member, Mr. Raharjo, estimated the height of the stack to be approximately 1.5 meters at his deposition, which corresponds to 59 inches.



EXPO_Terry (43)                                EXPO_Terry (44)

Figure 5. Likely arrangement of chairs and tables on the trolley around the time of the subject incident. (Exponent photographs taken January 20, 2025)

Ms. Terry testified that, just before the incident, she was seated in a similar chair and smoking; her chair was facing the water and the back of the chair was toward the activities of the crew unloading additional chairs and tables. She testified that she did not see the arrangement of the chairs and tables on the trolley before the incident. Based on my inspection, the orientation of the "stack" involved in

2409266.000 - 4349



Michael Drahos, Esquire
February 7, 2025
Page 12

the subject incident was likely with the back of the upside-down chair closest to the back of Ms. Terry's chair. Otherwise, the falling lower chair would have contacted only the back of her chair and not her head.

## Testing

While aboard the Carnival *Elation*, I performed tip-over testing to evaluate the kinematics and dynamics of a chair falling from the top of the "stack" described in the previous section onto a chair like the one in which Ms. Terry was seated. In the most likely orientation determined as described above, the upside-down chair on top, if it became unbalanced, would have rotated toward Ms. Terry's chair and downward due to gravity.

Based on Ms. Terry's height, the distance between her chair and the "stack" on the trolley was estimated so that rotation of the upside-down chair on top would result in the tip of the chair leg contacting her head. This represented the most severe condition in the likely scenario. If the "stack" was closer to Ms. Terry, a lower portion of the chair would have contacted her head at a lower velocity. If the "stack" was farther from Ms. Terry, the falling chair would not have contacted the indicated location on the left parietal area of her head.

To collect kinematic data of a chair falling from this orientation onto the back of another chair, high-resolution video was recorded at a frame rate of 120 frames per second with a scale in view for later quantitative analysis (Figure 6). Three trials were completed. In each trial, the top chair on a "stack" was gently pushed from the far side, toward the chair on the deck, until it became unbalanced and continued to fall due to gravity. In each trial, one chair leg contacted the top of the back of the chair on the deck; the table below it in the "stack" also tipped over during each trial, and the combination of chair and table tipping over pushed on the back of the chair on the deck. This is consistent with Ms. Terry's perception of the direction of loading during the subject incident.

The combination of chairs and table in the "stack" did not completely separate during the fall in any of the trials, indicating that some of the chair weight remained supported throughout the event. I evaluated the force required to suspend the upside-down chair on the top of the stack at different orientation angles. I measured a range of 3.32 to 8.44 pounds with increasing tip-over angle.



Michael Drahos, Esquire
February 7, 2025
Page 13



Figure 6. Still images from video recording of tip-over testing performed with exemplar tables, chairs, and trolley on the Carnival *Elation*. The top, left image is annotated to show the direction of the force initially applied until the chair became unbalanced and fell on its own due to gravity and the approximate trajectory (path of motion) of the chair leg.

To calculate dynamic information for the falling chair, for each trial the trajectory of the tip of the leg of the upside-down chair on top was tracked from the start of the trial until it contacted the back of the chair on the deck using the Tracker video analysis and modeling tool.[1] The same analysis could be repeated by anyone using the recorded video and this publicly accessible and widely-used physics-based software. The velocity of the tip of the chair leg was calculated. The three trials produced very similar results that the velocity of the tip of the chair leg when it contacted the top of the back of the chair on the deck was approximately 3.9 feet per second. Since Ms. Terry's head was several inches above the top of the back of the chair, the velocity at contact with her head was lower, so that 3.9 feet per second provides a conservative upper bound on the velocity of the chair leg when it contacted her head.

## Biomechanical Analysis

Alleged injuries attributed to the subject incident include concussion and intervertebral disc herniations of the cervical spine. Ms. Terry's medical records were reviewed for the specific findings relevant to each of these claims, and biomechanical mechanisms for similar injuries were evaluated. Based on the testing performed on the Carnival *Elation* on January 20, 2025, data from relevant but more severe testing was utilized to evaluate the maximum loading to Ms. Terry's head and neck during the subject incident. The results of the biomechanical testing were evaluated based on established relationships between head and neck biomechanical loading metrics and risk of injury.

---

[1] https://physlets.org/tracker

2409266.000 - 4349



Michael Drahos, Esquire
February 7, 2025
Page 14

Because of biological variation as well as variations in test conditions, a risk, or likelihood of injury is expressed rather than a threshold.

Dr. Miawanda, the ship's doctor, documented that, right after the incident of June 5, 2023, Ms. Terry reported pain on points of impact, localized to the C3-C6 area of her neck and the left temporal region of the scalp. On physical examination, her head was reported to be normocephalic and atraumatic. She was reported to deny dizziness or weakness, she was reported to have steady gait and a negative Romberg test. An interview with Ms. Terry and her daughter in the infirmary was recorded on a camera worn by a security crew member. During the interview, Ms. Terry gave details of her actions, perceptions, and interactions with others before and after the incident. Her lack of detailed knowledge about how the involved chair was oriented and how it fell on her was based on her sitting with her back to the trolley and the crew's activities before the incident.

Exponent has conducted biomechanical research on the response of the head to a hard object dropped on the head of a Hybrid III anthropomorphic test device (ATD, or crash test dummy). This research is directly relevant to the subject incident. The Hybrid III is a widely used test device developed to measure forces in a biofidelic way at specific locations instrumented with calibrated sensors. In Exponent's research, two-foot square and three-foot square plaster samples weighing 14.4 pounds and 29.4 pounds, respectively, were dropped from a height of 48 inches onto the head of an ATD.

These weights are higher than the partial weight of the tipped-over chair in the subject incident. The impact velocity for each drop test was approximately 16 feet per second, four times higher than the velocity of the tipped-over chair in the subject incident. The kinetic energy of the dropped objects upon impact in this more severe testing was 57.2 ft-lb (for 14.4 lb plaster) and 116.9 ft-lb (for 29.4 lb plaster), whereas the kinetic energy of the tipped-over chair during the subject incident was less than 3.7 ft-lb (it would be 3.7 ft-lb with the whole weight of the chair traveling at the measured velocity at contact). Therefore, head responses in this testing were higher than those expected in an individual similar to Ms. Terry during the subject incident. Therefore, the data represent a conservative overestimate of the head impact in the subject incident.

The biomechanical response of the head was quantified as the maximum head acceleration as well as the Head Injury Criterion (HIC), which takes into account the maximum head acceleration as well as the duration of impact. The HIC is calculated as the maximum integral over time of the head acceleration and is a unitless number (Figure 7).

2409266.000 - 4349



Michael Drahos, Esquire
February 7, 2025
Page 15

$$HIC = (t_2 - t_1) \left[ \frac{1}{(t_2 - t_1)} \int a\, dt \right]^{2.5}$$

where a is the resultant acceleration of the ATD head cg in units of g's, and the values $t_1$ and $t_2$ are the time points in [s] for which the HIC is a maximum. The interval, $t_2$-$t_1$, may not exceed the specified maximum time interval.

Figure 7. Method for calculating the head injury criterion (HIC), one widely-used metric for head and brain injury due to head impacts. The maximum HIC interval ($t_2$-$t_1$) was limited to 15 ms.

The results of this testing demonstrated that the more severe dropped plaster impacts did not result in head acceleration or HIC values consistent with concussion. The risk of concussion from these more severe head impacts was less than 1% (Funk 2011, Rowson and Duma 2011, Rowson and Duma 2018, Mertz 2016).

These results are consistent with other biomechanical and mathematical modeling studies of head impacts involving objects impacting the head (Ruan 1993, Bartsch 2012, Suderman 2014, Campolettano 2017, Hovey 2018, Levadnyi 2018, Dos Santos 2020,) or diving-type head impacts with similar impact energies (Viano 2008, Toomey 2013, McCartney 2021).

I am not aware of any biomechanical testing or computer modeling research that is consistent with cervical spine injury, beyond possibly transient strain, resulting from head impacts occurring at a velocity of 3.9 feet per second over a range of relevant impact masses, including diving injuries where the individual's own torso is the applied mass (e.g, Scher 2005, Nightingale 2015).

Initial x-ray imaging of Ms. Terry's cervical spine was interpreted as negative for acute traumatic changes. On July 25, 2023, Dr. Cannestra interpreted MRI studies as demonstrating pathologic findings in Ms. Terry's cervical spine including intervertebral disc herniations at C4-C5 and C6-C7 levels, as well as disc bulging at C5-C6 level with osteophytic ridging. These findings are consistent with age-related degeneration, repetitive loading over time, and the body's long-term response to alterations in vertebral stress distribution due to degenerative changes (Adams 2006, Urban 2006, Kumaresan 2001, Theodore 2020).

The subject incident provided no mechanism to cause any structural disc injury to Ms. Terry's cervical spine. Biomechanical studies have shown that in the absence of damage to adjacent bony and/or ligamentous structures, disc bulges or herniations do not occur acutely from an individual compressive loading event. The earliest imaging studies following the subject collision were interpreted by Ms. Terry's treating physicians as showing no acute bony injury and no ligamentous or paraspinal soft tissue injury. Within physiologically reasonable ranges of motion of the spine, disc bulges without adjacent bony damage have been produced experimentally only through repetitive compressive loading for thousands of cycles, through what is known in engineering terms as a fatigue process (e.g., Adams 1982, Adams 2006). In contrast, MRI studies of Ms. Terry's cervical



Michael Drahos, Esquire
February 7, 2025
Page 16

spine were interpreted by her treating providers as demonstrating osteophytes associated with the intervertebral disc pathology. Osteophytes are a buildup of calcified tissue (kind of like a callous) that occurs over time as a result of altered stress distribution in the vertebrae.

Findings consistent with degenerative disc disease in the spine are common for an individual of Ms. Terry's age of 54 years old even without symptoms (Brinjikji et al. 2015; Theodore 2020; Parenteau 2021) (Figure 8).



Figure 8. Distribution of age-specific prevalence of degenerative spine imaging findings in patients with no symptoms, based on a peer-reviewed meta-analysis of 33 published studies (Brinjikji et al., 2015).

Ms. Terry's medical records and her testimony indicate that she was a smoker. In addition to age as a contributing factor to degenerative disc findings as mentioned above, smoking can lead to changes in the biomechanical function of the discs that then contribute to degenerative changes in the spine with age and further lead to neck and shoulder pain (e.g., Chen et al. 2018 and references therein). Animal studies have demonstrated that negative effects of cigarette smoke inhalation or nicotine intake include increased local inflammation, disruption of the strength-giving collagen fibers, and decrease of the proteins that preserve hydration and elasticity of the nucleus pulposus (Oda et al. 2004; Uematsu et al. 2001). These changes compromise the biomechanical function of the disc, which contributes to degenerative pathology (Adams and Roughley, 2006).

2409266.000 - 4349



Michael Drahos, Esquire
February 7, 2025
Page 17

## Conclusions

Based on the materials provided for review, my inspection of the incident area and exemplar items on the Carnival *Elation*, testing performed with exemplar items on the Carnival *Elation*, prior head impact testing by Exponent, published biomechanical and scientific research, and my education, training, and experience, I have reached the following conclusions and opinions to a reasonable degree of scientific certainty:

- Around the time of the subject incident, Ms. Terry was seated in a deck chair similar to those described and depicted herein, in the smoking area of Deck 11 of the Carnival *Elation*.

- Another deck chair similar to those described and depicted herein toppled over from a stack on a trolley such that the leg of that chair contacted the left parietal (top) area of Ms. Terry's head during the subject incident.

- The part of the rotating chair with the highest linear velocity at the moment of contact was moving at less than 3.9 feet per second.

- Biomechanical data from more severe drop testing indicates that the head impact and acceleration in the subject incident are associated with a minimal risk of concussion. This is consistent with results from a variety of other relevant biomechanical testing and computational modeling regarding head impacts and the likelihood of concussion or more severe head or brain injury.

- Biomechanical data from a variety of biomechanical tests and computational studies indicate that a head impact similar to the subject incident did not provide a biomechanical mechanism sufficient to result in acute cervical spine injury, beyond possibly transient strain.

## Limitations

The opinions included in this report are stated to a reasonable degree of engineering and scientific certainty. The opinions stated in this report are based on the materials reviewed as well as the education, experience, and knowledge of the author. This report summarizes work performed to-date and presents findings resulting from that work. Exponent reserves the right to supplement this report and expand or modify opinions based on review of additional material as it becomes available through ongoing discovery and/or through any additional work or review of additional work performed by others.

Sincerely,

*Amy C Courtney*

Amy Courtney, Ph.D., CAISS
acourtney@exponent.com

2409266.000 - 4349



Michael Drahos, Esquire
February 7, 2025
Page 18

## Selected Bibliography

Adams MA, Hutton WC. (1982). The mechanics of prolapsed intervertebral disc. International Orthopaedics 6:249-253.

Adams MA, Roughley PJ. (2006). What is intervertebral disc degeneration and what causes it? Spine 31(18):2151-2161.

Bartsch A, Benzel E, Miele V, Morr D, Prakash V. (2012). Hybrid III anthropomorphic test device (ATD) response to head impacts and potential implications for athletic headgear testing. Accident Analysis & Prevention, 48, 285-291.

Brinjikji W, Luetmer PH, et al. (2015). Systematic literature review of imaging features of spinal degeneration in asymptomatic populations. Am J Neuroradiology 36(4): 811-816.

Campolettano ET, Bland ML, Gellner RA, et al. (2017). Ranges of injury risk associated with impact from unmanned aircraft systems. Annals of Biomedical Engineering, 45, 2733-2741.

Chen Z, Li X, Pan F, Wu D, Li H. (2018). A retrospective study: Does cigarette smoking induce cervical disc degeneration? International Journal of Surgery 53:269-273.

Desmoulin GT, Anderson GS. (2011) Method to investigate contusion mechanics in living humans. Journal of Forensic Biomechanics 2: Article ID F100402, 10 pages.

Dos Santos AAA. (2020). Efficacy of Hard Hats in Attenuating Head Accelerations: A Combined Experimental and Computational Investigation. (Master's thesis, University of North Florida).

Fryar CD, Carroll MD, Gu Q, Afful J, Ogden CL. (2021). Anthropometric reference data for children and adults: United States, 2015-2018. Vital and Health Statistics, Series 3, Number 46. U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics, Hyattsville, Maryland.

Funk JR, Cormier JM, et al. (2007). An evaluation of various neck injury criteria in vigorous activities. Proceedings of the IRCOBI Conference, Maastricht (The Netherlands), September 2007.

Funk JR, Cormier JM, et al. (2011). Head and neck loading in everyday and vigorous activities. Annals of Biomedical Engineering 39(2):766-776.

Funk JR, Rowson S, Daniel RW, Duma SM. (2012). Validation of concussion risk curves for collegiate football players derived from HITS data. Annals of Biomedical Engineering 40: 79-89.

Funk JR, Watson RA, et al. (2015). Kinematics and kinetics of vigorous head shaking. Journal of Applied Biomechanics 31:170-175.

Herzog W, Conway PJ, et al. (1993). Forces exerted during spinal manipulative therapy. Spine 18:1206-1212.

Hovey CB, Terpsma RJ, Reyes RC, Bowman DC. (2018). Head impact from falling payload of a small balloon (No. SAND-2018-12977). Sandia National Lab.(SNL-NM), Albuquerque, NM (United States); Sandia National Lab.(SNL-CA), Livermore, CA (United States).

2409266.000 - 4349



Michael Drahos, Esquire
February 7, 2025
Page 19

Jackson CE, Nordstrom L, Fonda JR., Fortier CB, Milberg WP, McGlinchey RE. (2017). Reporting of symptoms associated with concussion by OEF/OIF/OND Veterans: comparison between research and clinical contexts. Brain Injury 31(4), 485-492.

Kumaresan S, Yoganandan N, et al. (2001). Contribution of disc degeneration to osteophyte formation in the cervical spine: A biomechanical investigation. Journal of Orthopaedic Research 19(5):977-984.

Levadnyi I, Awrejcewicz J, Zhang Y, Goethel MF, Gu Y. (2018). Finite element analysis of impact for helmeted and non-helmeted head. Journal of Medical and Biological Engineering, 38, 587-595.

McCartney ME. (2021). Occupational Head Protection: Considerations for Test Methods and Use (Doctoral dissertation, Virginia Tech).

Mertz HJ, Patrick LM (1971). Strength and response of the human neck. SAE Technical Paper 710855.

Mertz HJ, Irwin AL, Prasad P (2016). Biomechanical and scaling basis for frontal and side impact injury assessment reference values. Stapp Car Crash Journal 60:625-657.

Netter FH (2006). Atlas of Human Anatomy, 4th ed., Saunders Elsevier.

Nightingale RW, Myers BS, Yoganandan N. (2015). Neck injury biomechanics. In: Yoganandan N, Nahum AM, Melvin JW, editors. Accidental Injury: Biomechanics and Prevention. Springer.

Oda H, Matsuzaki H, Tokuhashi Y, Wakabayashi K, Uematsu Y, Iwahashi M. (2004). Degeneration of intervertebral discs due to smoking: experimental assessment in a rat-smoking model. Journal of Orthopaedic Science 9(2):135-141.

Parenteau CS, Lau EC, Campbell IC, Courtney A. (2021) Prevalence of spine degeneration diagnosis by type, age, gender, and obesity using Medicare data. Scientific Reports 11(1):5389.

Post A, Hoshizaki TB, Gilchrist MD, et al. (2015). The dynamic response characteristics of traumatic brain injury. Accident Analysis & Prevention 79:33-40.

Rowson S, Duma SM. (2011). Development of the STAR evaluation system for football helmets: integrating player head impact exposure and risk of concussion. Annals of Biomedical Engineering, 39, 2130-2140.

Rowson B, Rowson S, Duma SM (2018). Biomechanical Forces Involved in Brain Injury. In: Textbook of Traumatic Brain Injury; Silver, JM, McAllister, TW, Arciniegas, DB, Eds. pp. 25-39.

Ruan JS, Khalil TB, King AI. (1993). Finite element modeling of direct head impact. SAE Technical Paper No. 933114.

Scher I, Trachtman D, Young D, & Dubey A, (2005). Falling objects: is there really a potential for head injury? Summer Bioengineering Conference, June 22-26, Vail, Colorado.

Suderman BL, Hoover RW, Ching RP, Scher IS. (2014). The effect of hardhats on head and neck response to vertical impacts from large construction objects. Accident Analysis & Prevention, 73, 116-124.



Michael Drahos, Esquire
February 7, 2025
Page 20

Sugiura R, Ikarashi S, Suzuki D, et al. (2022) In vivo impact tests assuming human–robot contact to evaluate soft tissue bruise injury tolerance. Mechanical Engineering Journal. 9(6):22-00153.

Theodore N. (2020). Degenerative cervical spondylosis. New England Journal of Medicine 383(2):159-168.

Toomey D. (2013). Cervical spine tolerance and response in compressive loading modes including combined compression and lateral bending. (Doctoral dissertation, Wayne State University)

Triano JJ (2001). Biomechanics of spinal manipulative therapy. Spine J 1:121-130.

Triano JJ (1998). Biomechanical analysis of motions and loads during spinal manipulation. University of Michigan. Thesis/dissertation.

Uematsu Y, Matuzaki H, Iwahashi M. (2001). Effects of nicotine on the intervertebral disc: an experimental study in rabbits. Journal of Orthopaedic Science 6(2):177-182.

Urban JPG and Roberts S (2003). Degeneration of the intervertebral disc. Arthritis Research & Therapy 5(3):120-130.

Viano DC, Parenteau CS. (2008). Analysis of head impacts causing neck compression injury. Traffic Injury Prevention, 9(2), 144-152.

The Abbreviated Injury Scale 2015 Revision. Association for the Advancement of Automotive Medicine, Chicago, Illinois.

2409266.000 - 4349

