Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO:  2024-CV-22067-RKA


MICHELLE TERRY,

        Plaintiff,

v.

CARNIVAL CORPORATION,

        Defendant.
_____/


        Remote Audio-Video Communication
        Monday, January 13, 2025
        12:00 p.m. - 2:51 p.m.




        DEPOSITION OF MAURICE VEGA



        Taken before Paula Pace, RPR, Notary Public
in and for the State of Florida at Large, pursuant
to Notice of Taking Deposition filed in the above
case.

Page 2

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
HOLZBERG LEGAL
Offices at Pinecrest II, Suite 220
7685 S.W. 104th Street
Miami, Florida 33156
BY:  Glenn Holzberg, Esquire
Glenn@holzberglegal.com

ON BEHALF OF THE DEFENDANT:
GRAY ROBINSON, P.A.
515 North Flagler Drive
Suite 650
West Palm Beach, Florida 33401
BY:  Cooper Jarnagin, Esquire
Cooper.Jarnagin@gray-robinson.com

- - - - - -

I N D E X

- - - - - -

TESTIMONY OF MAURICE VEGA
                                    PAGE
Direct Examination by Mr. Holzberg        003
Certificate of Reporter              135
Certificate of Oath                  136
Errata                          138
Notification Letter                  139

E X H I B I T S
                                    PAGE
PLAINTIFF'S
Exhibit 1 - Notice of taking deposition       005
Exhibit 2 - Marbella Chair               020
Exhibit 3 - Job Description-Hotel Steward      020
Exhibit 4 - David Rah - Seafarer Agreement     021
Exhibit 5 - Performance Review          040
Exhibit 6 - Passenger Injury Statement      052
Exhibit 7 - Infirmary...records - Corp Rep depos 079
Exhibit 8 - Privilege Log                  094
Exhibit 9 - Answer and Affirmative Defenses    127

Page 3

Thereupon,

MAURICE VEGA,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. HOLZBERG:

Q.  Good afternoon.  As you well know, my name is Glenn Holzberg.  I represent the plaintiff, Michelle Terry, in this case, along with Neil Gornto from Farah Farah and of course Louis, from my office.  I'm going to ask you some questions this afternoon, based upon a re-notice of taking deposition duces tecum propounded in this case earlier.  I believe the service date was December 11, 2024.

I will try, as best I can, to ask my questions clearly and succinctly.  In the event I fail, please ask me to rephrase and I'll be happy to.  Otherwise, if you answer, I'll assume you understand the question as phrased.  And the only thing we need is complete and as truthful answers as possible.  You need to answer verbally a yes or no, instead of uh-huh or uh-uh, so we have a clear record for later.

We're going to be referring to the

Page 4

documents.  Maurice, have you been provided documents that we previously sent over and discussed last week with Cooper's office?

A.  Yes, I have.

Q.  Okay.  So I'll go through those individually in a few minutes.  The -- well, let me finish with the rules, then we'll get to the depo itself.  Occasionally, Mr. Jarnagin may be making objections on behalf of Carnival.  If you hear him object, it's going to be difficult for Paula to take down, you know, more than one of us at the same time.  Unless he instructs you not to answer, which is typically on, you know, the ground of privilege, you could answer the question.

You know you're under oath of the and you need to give me as complete and truthful answer as possible or that you're aware of.  And you know you have been designated as a corporate rep, so you can give me what personal knowledge you may have, but generally the questions will be asked as the representative of Carnival.  So, for example, if you say "I don't know," that means Carnival has no knowledge of that subject.

Do you understand those rules?

A.  Yes, I do.

Page 5

Q.  Okay.  Also, some of the, you know, formalities, you know, this is -- you know you're under oath, obviously, as if it's in court, but it's somewhat informal.  If you need a break, which I may, I have been a little under the weather, but I'm going to try to do this in a couple hours, so we'll just move along.  But if you need a break at any time, for whatever reason, please let us know and we'll be happy to stop.

A.  Thank you.

Q.  Okay.  Let's begin.

Have you seen a copy of the notice of the taking the deposition duces tecum, that we will mark as Exhibit 1 in this case, before today?

A.  Yes.

(Thereupon, Plaintiff's Exhibit No. 1 was marked for identification.)

BY MR. HOLZBERG:

Q.  Have you been designated on behalf of Carnival, the defendant in this case, to testify as to all 18 areas of inquiry, in the Amended Schedule A?

A.  Yes, I have.

Q.  Okay.  So in other words, there's not going to be a second deposition with a couple of

2 (Pages 2 - 5)

Page 6

numbers or subparagraphs reserved for somebody else; you've got them all?

A. Yes, to the best of my knowledge, yeah. I don't think there is anything that would need to be sent up to anybody else.

Q. Okay. And Schedule B contains documents to be produced. And a lot of those were provided last week. And then a few more records I'm having an opportunity to review, and you do have them available?

A. I do.

Q. Okay. Good. All right. So let me ask you some basics and then we're going to get into the meat of the depo.

I don't know that I have ever taken your deposition before. Have you ever given a deposition before today?

A. Yes. I don't think with you, maybe with Louis maybe one time, but, yes, prior to today, yes, I have.

Q. Okay. Were those all as a corporate representative or designated representative on behalf of Carnival in your current capacity?

A. Yes.

Q. How many depositions, approximately,

Page 7

have you given before today?

A. Approximately probably somewhere around seven or eight. Definitely under ten.

Q. Okay. Other than Carnival corporation, as a part of your employments, that type of depositions, have you ever given a deposition otherwise?

A. No.

Q. Have you ever testified in a case otherwise? In other words, you had to go to court, for whatever reason, to testify, or an administrative proceeding to testify?

A. No.

Q. Fair enough. So you understand generally what the format is, you know, question, answer, objections, this is like you're testifying in court, this may be read in court one day, you may testify in court in addition to this deposition, and all of those are under those?

A. Yes.

Q. Okay. Let's jump in. Let's look at Schedule A of Exhibit 1, the notice of taking deposition.

Item 1. And I think, Maurice, it's best -- I'm sorry. Since we've known each other

Page 8

from other dealings with Carnival for many years now, do you mind if I call you Maurice or would you refer Mr. Vega?

A. No, not at all.

Q. Let's stay informal. You can call me Glenn, as we always have.

Number 1. Have you had an opportunity to review any rules, regulations, policies, or procedures in effect at the time of the incident regarding the items laid out in Items 1 A through F?

A. Yes. The -- there are no procedures, no policies in place. There's nothing written for this. So as far as things to review anything, there is nothing to review as far as regulations.

Q. And for -- okay. Fair enough. Just for the record and for "this," what are you referring to, this subject matter?

A. This being the incident that occurred.

Q. Okay. Just so we characterize it for the record, Item A says, the unpacking and setting of the furniture and that -- we mean on the ship?

A. Yes.

Q. No policies, rules or regulations?

A. Correct.

Page 9

Q. B, the safety measures, instructions, and warnings that crew members are required to provide during removing, relocating, packing, unpacking and setting up the furniture on ships. Likewise, there are no safety measures, instructions, or warnings to crew members they are required to follow during this procedure?

A. That is correct, there are none.

Q. All right. Generally, how do you understand the facts of this case? Just so that we know when we're talking about this procedure or this incident, we and the jury understand what you're referring to --

A. My --

Q. -- Carnival?

A. My understanding is that -- understanding is that Ms. -- your client, Ms. Terry, was seated on Deck 11 in the smoking area when there were two crew members who were given the task to bring back chairs that had been outside of the ship -- right outside the ship, being brought back up to the ship and being unpacked from the trolley they were on, and being placed back in the smoking section when the incident occurred.

Our understanding is that once upon

3 (Pages 6 - 9)

Page 10

unloading the chairs or in the process of unloading the chairs, one of the chairs had teetered and fallen on Ms. Terry's neck/head area, causing her to be in pain and was the reason why she had to go down to the medical center after the incident or after the fall occurred.

Q. Okay. So let me break that down because there was a lot of information there, and I appreciate it.

First of all, were these new or used chairs?

A. My understanding is these chairs have been onboard for some time, so there would not be brand new chairs. They had been used throughout the ship, throughout the fleet, from my understanding.

Q. So they were used --

A. Yes.

Q. -- previously used chairs by Carnival?

A. Correct?

Q. Were they being relocated from one ship or one position or one ship to another?

A. They were being positioned from the outside area, just outside of the ship where -- I guess it would be the -- where the area where the

Page 11

passengers would be coming back onto the ship. There is a setup outside where these chairs are used. And then pretty much at the end when everybody is ready for the ship to debark from the port, they are brought back up to Deck 11.

Q. So I think I could envision that. Let's picture that, if we can, for the jury. You're saying these chairs were used just off the ship on the pier, close to the ship?

A. Correct.

Q. And were they set up near the gangway so that when people coming back either leaving the ship and they want to rest first or returning from a long walk on the port -- or in the port, they can sit before getting back on the ship?

A. Yes, I believe that's -- that's what the setup was.

Q. Okay. Maybe under like, you know, canopies or umbrellas or, you know --

A. Correct.

Q. -- maybe into an area where ice water or drinks or something for them to, you know, enjoy before or after, you know, getting on and off the ship?

A. Correct, that's my understanding.

Page 12

Q. Okay.

MR. HOLZBERG: Cooper, you and I had discussed some screen sharing that you could assist me with, if at all possible. I want to look at GR000053. And it was attached, I believe, to the supplemental response for request to production. It's the Kannoa Marbella chair image with some specs on the bottom.

MR. JARNAGIN: Right. Give me one moment.

MR. HOLZBERG: Absolutely. So it's 53, a bunch of zeros 53. GR is your firm, it's Gray Robinson's Bates stamp identifier.

BY MR. HOLZBERG:

Q. So let's start. Maurice, is that your understanding, that this was one of the chairs that was in the stack that some of which fell on Ms. Terry?

A. Correct, that is the subject chair.

Q. Okay. And is that the right description of it, is Kannoa, as you understand it, or Kannoa, the manufacturer of the chair?

A. To my understanding, yes.

Page 13

Q. Is Marbella the model?

A. Also yes.

Q. Okay. Look at the text on the bottom. Can you read that into the record. And basically, I'm looking at where it says "Overall, Seat Height, Weight."

A. Yes.

Q. Can you read those into the record, please. So what is the approximate size and weight of this chair?

A. "Overall" -- it looks like it would be specs and dimensions. "Overall" is -- looks like 25 inches. Depth to 26. Height 40 inches. Seat height, 18. Arm height, 26. And weight is listed as 20 pounds.

Q. So these are all in inches? In other words, the width, 25 inches, would be the area of the seat between --

A. Correct, to my -- well, yeah, from the diagram, from -- the 25 is from --

Q. Side-to-side, within the arms?

A. Yes.

Q. And then the depth would be front to back seat, or chair itself?

A. Yes.

4 (Pages 10 - 13)

Page 14

Q. Okay. The height would be from the floor to the top of the backrest?

A. Correct.

Q. So that's about not quite three and a half feet high, more than a little more than two and a half wide, and then the seat height would be basically the floor to where you're bottom sits, 18 inches off the ground to where the seat is?

A. Correct.

Q. Arm height, that would be the floor to the top of the arm, 26 inches, a little more than two feet?

A. Also correct.

Q. And then the weight of the chair, you said 20 pounds.

A. Yes, it's listed as 20 pounds. My understanding is that this was weighed on -- there is a discrepancy. There is a difference between the weight of it based on -- we acknowledge that here it says 20 pounds, on the manufacturer's. I believe it was weighed onboard, and it was eight pounds. Also from my personal knowledge of these chairs to being on a cruise and sitting in the chairs, I believe that the weight isn't 20 pounds. It's probably closer to the eight pounds, but I

Page 15

know if it -- indeed it needed be looked at, we do have these chairs available to be weighed or looked at or --

Q. In light of -- in light of that discrepancy, please make sure you are observing the chair now. When you say you have the chair, do you have a sample chair or do you have the actual one that fell?

A. Sample chair.

Q. You have the exact chairs that were --

A. No. Right, we have the chair -- the same type of chairs. We have the same exact chair that fell on her. We would not be able to identify the exact chair that fell, but we do have --

Q. Okay. After the chair fell, to your understanding, it was not marked or preserved and put aside?

A. No, to my understanding it was not. There is no issues for the chair being -- there was no issues found on the chair so it would not have been preserved as -- or kept aside because of that.

Q. In other words, you agree that the cause of this incident, that the chairs were -- the chair striking her is that it fell off the top of a stack, not that there was something defective

Page 16

itself about the chair, but it was just the falling of the chair itself onto Ms. Terry?

A. Yeah. It's my understanding that the chair teetered off of the trolley chart and struck Ms. Terry.

Q. Do you know, or are there any documents to identify, how many chairs were stacked in this stack that teetered and fell on Ms. Terry?

A. I do not. Based the crew member's deposition that was already taken, I believe he had said there might have been two or three chairs. This was the top of the two or three chairs on the trolley at the time.

Q. Do we have any pictures or do you know of what type of trolley it was?

A. I believe it was a laundry trolley, but I don't believe we have any pictures of it that we've seen.

Q. Could you describe a laundry trolley for us? Is it flat? Does it have sides? Is there sides that have a top on it, or is the platform on which the chairs were standing, just above the wheels?

A. Today, because I know a few different types of trolley onboard, I can't really ascribe as

Page 17

to what is exactly the -- I guess the description of it. I know that it would be flat and pulled by one of the crew members or a couple of the crew members at a time, but I can't give you exactly the -- I don't have the picture up of the particular one that was used in this incident.

Q. Have you seen a sample trolley? In other words, one that would be substantially similar to the one that was used in this incident?

A. Like I said, from personal knowledge, I have seen different type of trolleys onboard the ship, but I can't answer as to exactly which one was used.

Q. Can you describe the trolleys you've seen onboard?

A. Some of them are the -- like the trolleys that are used with the luggage that have the -- the metal bar is very similar to what would be used in a hotel or any area like that, carpet at the bottom and silver bars on top, and basically the -- the outline of a trolley, a little bit long, two feet in width.

Q. Maybe four or five wide with handles on both sides?

A. Yes, more than likely.

5 (Pages 14 - 17)

Page 18

Q. One most of us would see when we check into a hotel that is --

A. Yes.

Q. Okay. So that would be -- we all know the bottom flat surface, may be a carpeted top to make it look nice, maybe two feet-ish wide and three and a half, four long?

A. Right.

Q. Okay. And what other types of trolleys have you seen? Oh, and the wheels up to the height of the top of the flat surface where the luggage would -- in this case perhaps the chairs would be, 18 inches give or take?

A. Correct, sounds about -- sounds about reasonable, yes.

Q. Okay. What other types of trolleys have you seen that may have been used to transport these chairs?

A. Not likely -- I mean, there are other types of trolleys used for the beverages and all that, but from my understanding, that's not the type of trolley because they're much smaller, shorter. There are no -- just --

Q. The most likely trolley used would be this luggage type of cart?

Page 19

A. Either luggage or a laundry type of -- I believe similar to a luggage trolley.

Q. The individual that was unstacking the chairs when they fell on Ms. Terry, I believe we identified and took his depo. Do you recall his name? I've got it here somewhere.

A. The one who was already deposed, Mr. David Raharjo.

Q. Raharjo. What was his position?

A. Yeah, he is a hotel stewardess or housekeeping attendant.

Q. For the record, we have his deposition here. It's David Budi, B-U-D-I, Raharjo, R-A-H-A-R-J-O. That's the individual?

A. Correct. From my understanding, he is one of the two individuals that were with the trolley at the time.

Q. Okay. Do you know, either based on the deposition of Mr. Jarnagin or his supervisors, how long he had been working this job before the incident?

A. From my understanding, it was his first or second week on his contract with Carnival that he had started.

Q. Did he have a previous contract before

Page 20

this?

A. Not to my knowledge, not with Carnival anyway.

Q. Okay. And the job, I believe some documents produced this morning, I haven't had a chance to go through in detail, but it described his title. He was a hotel steward?

A. Yes, hotel steward and a housekeeping attendant.

Q. What is a hotel steward?

A. Normally, they're -- normally, they're in charge of cleaning the open areas, cabins, be it crew or guest cabins, or sometimes cleaning of the general areas, like the decks.

MR. HOLZBERG: For the record, Paula, I'm going to -- the picture of the chair is going to be marked as Exhibit 2.

(Thereupon, Plaintiff's Exhibit No. 2 was marked for Identification.)

MR. HOLZBERG: And then the job description that was produced today under GR0000237 through -- actually, it looks like a one-page document, so it's 237, will be marked Exhibit 3.

(Thereupon, Plaintiff's Exhibit No.

Page 21

3 was marked for identification.)

MR. HOLZBERG: And then Exhibit 4 will be Mr. Raharjo's personal seafarer's agreement, with attached terms and conditions. That looks like it's fairly extensive. Bear with me. GR000238, goes through 260.

(Thereupon, Plaintiff's Exhibit No. 4 was marked for identification.)

BY MR. HOLZBERG:

Q. Maurice, have you seen some of these before today? Exhibit 3, job description, have you seen that?

A. Yes, as of this morning.

MR. HOLZBERG: All right. So, Cooper, could we post that as Exhibit 3.

BY MR. HOLZBERG:

Q. Is this an accurate description of the job description of Mr. Raharjo from the incident?

A. Yes, it appears so.

Q. All right. Can you read the basic -- so in other words, it looks like the basic job description in the like the fifth block, I guess it is, under "reports to," read into the record.

A. Sure. "The hotel steward/stewardess

6 (Pages 18 - 21)

Page 22

is responsible for cleaning and maintaining public areas, open decks, spa area, gym, sauna, steamrooms, lockers, crew areas, and staff/officer cabins, as assigned, and as per CCL standards."

Q. Did you speak to Mr. Raharjo before this depo?

A. No, I did not.

Q. At any time regarding this case?

A. I did not.

Q. Did you have an opportunity to speak to his supervisor?

A. I personally did not.

Q. Did somebody speak to them who then summarized or discussed with you what the supervisor said about the incident or about his job?

A. I believe -- yes, I believe counsel had spoken to both of the crew members.

Q. Raharjo and the other person who was involved in the unpacking of the chairs?

A. Correct. That would be Mr. Ranagappa.

Q. What was Mr. Ranagappa doing at the time the chairs were being unstacked by Raharjo that fell on Ms. Terry?

A. My understanding is that he was also

Page 23

-- they were both unpacking or dismounting the chairs from the trolley at the time.

Q. The same how ever many chairs were in the stack on the trolley?

A. To my understanding, yes, they were both doing -- doing so.

Q. And what was he doing when Raharjo was unstacking the chairs or attempting to unstack the chairs?

A. Exactly what he was doing, I think it would probably best to ask him. I understand he is going to be deposed, but from the general information that I have is that he was unstacking as well. He had -- he was the one in front of the cart or leading the cart that has to clear the area before they began undoing the plastic wrapping and unstacking the chairs.

Q. When you say clear the area -- asked to clear the area, what was he asked to cheer?

A. From my understanding, there were different passengers in the area where they were going to dismount or put the chairs back into where they normally are where the place, so he had asked -- given verbal instructions to passengers to clear the areas, to move as they were unloading the

Page 24

chairs.

Q. Okay. And obviously, or, clearly, it seems like the chairs were unpacked despite Ms. Terry that was still sitting there?

A. Well, they were -- from my understanding is there were some individuals that moved and Ms. Terry, along with other individuals, were still seated in the area or close to the area.

Q. Can you explain why would have continued with the unpacking if they still hadn't left the area, including Ms. Terry?

A. I mean, if they're in the area it doesn't necessarily mean that they were unpacking right next to them or in the spot that they were. Those -- I believe that those were the same chairs that they were unpacking, so they were probably working -- from my understanding, they were working to the left of where Ms. Terry and the other passengers were.

Q. And then the chairs fell in the opposite direction toward Ms. Terry?

A. My understanding is that it fell from -- it would have been Ms. Terry's -- I guess over her left shoulder onto her.

Q. So in other words, the chairs fell --

Page 25

the three-stack or so chair -- set of chairs fell onto Ms. Terry from the trolley that Mr. Raharjo and the other gentleman were working on?

A. Right. From my understanding, one chair that had fallen from that trolley, but that same trolley they were working on.

Q. The top of the stack?

A. From the stack, yeah. From the stack that they were -- I guess it would be the now top of it, the stack because it was the one on top.

Q. And do we know how high the stack was from the ground to the top of the stack from which the chair fell onto Ms. Terry?

A. I don't know exactly the exact number, but I believe it's the -- Mr. Raharjo had testified that it was a few feet from the floor.

Q. Okay. But it had to be more than a few -- more than two feet? I mean, each of the chairs we know -- the dimensions of the chair, even the base of the chair looks like it's 18 inches, and the top of the chair is 26 inches. If you put three on top of each, you could at least multiply by three plus the difference between the floor around the top of the trolley, correct?

MR. JARNAGIN: Object to form.

7 (Pages 22 - 25)

Page 26

THE WITNESS: Yes.

BY MR. HOLZBERG:

Q. So if we estimated for the floor of the deck surface to the top of the trolley is at least 18 inches, perhaps 24, and each chair is 18 inches, plus whatever thickness of the chair is, we have got at least 18 times four. So that would be what, 72, about six feet at least, plus whatever --

A. I don't believe -- I mean, I would disagree as to how that would be stacked. We would have to see as to how the actual chairs were stacked. If it's 18 inches, you could -- it also depends on how those chairs were stacked on top of each other.

Q. How would you stack them? Look at Exhibit 2 again, the photographs, and tell me all the possible ways you think you could reasonably stack that?

A. Again, I wouldn't be able to answer that question. The person who had -- would be better suited would be Mr. Raharjo or Mr. Ranagappa who were stacking them.

Q. I'm sure you've had, you know, occasions, homes, restaurants, parties, you know, places you've been where you see, you know, chairs

Page 27

that people sit on that are stacked. Are they typically stacked one on top of the other?

A. You can either -- depending on the chair, you could either stack them on top of each other, you could stack them from the -- turning one upside down so you'd have the legs on the top and the bottom. So it would just depend on how those chairs can be stacked or how they're instructed to be stacked.

Q. Okay. Looking at picture number -- Image Number 2, Exhibit 2, which is the image of the chair, wouldn't it be very difficult to stack seat to seat because of the arms, the distance of the arms on the back. I mean, three-quarters of the chair is covered in arms and back.

A. I mean, you could --

MR. JARNAGIN: Form.

BY MR. HOLZBERG:

Q. Go ahead.

A. You could stack it from the back depending on how that -- they decide to stack it, you could stack from the arm touching armrest to armrest upside -- with one of the chairs upside down.

Q. Okay. Wouldn't that make it more

Page 28

unstable, because all you have is the width of that arm, which looks to me from this image like it's a little more than an inch? That's a pretty precarious stack. So then if you're balancing the entire eight or 20-pound chair on one-inch arm width --

A. It could, but, again, I was not present there. I don't know how exactly they stacked that. That's --

Q. Okay. Now, if you agree, as you testified earlier, there are no written policies, procedures, rules, or regulations about how these types of chairs or any furniture that is being located or relocated on decks should be stacked, unstacked, distributed in any way. There are no policies, correct?

A. Correct, there are no policies or procedures as to how. It is on-the-job training that they receive as to how they're -- how it's stacked or whatnot.

Q. So what on-the-job training did either of these individuals, including Mr. Raharjo, received before unstacking these chairs back onto the deck where Ms. Terry was sitting?

A. I would not know that. That would be

Page 29

a better question better suited to ask them as to what exactly they --

Q. Of course. When you say "I don't know," you know that means Carnival has no knowledge of that, not you personally?

A. We do -- right. We do not have that information because there is no written policies or procedures as to how to do that.

Q. And the only possible on-the-job training, as you described it, they could have been given to Mr. Raharjo would have been within the week or two before this incident because he is only on the ship in this job, or in any job, for a week or two before, as you previously testified?

A. Correct. It would be through his supervisor or whoever would be instructing him how to do so.

Q. Who was his supervisor?

A. My understanding is that the -- Ranagappa is his senior and then there are the housekeeping manager, and assistant housekeeping manager who were onboard.

Q. Who was that?

A. I believe last name is Ravi Kumar is the manager, the housekeeping manager, and the last

8 (Pages 26 - 29)

Page 30

name of the assistant housekeeping manager is Alcantara.  That's A-L-C-A-N-T-A-R-A.

Q.  A-L-C, not A-L-A-C?

A.  Correct, A-L-C-A --

Q.  Same spelling as the New Orleans pitcher?

A.  Yes.

Q.  Okay.  Are either of those available for deposition, to your knowledge?

A.  I would -- I believe one of them is -- I don't know which one is -- was onboard or still is onboard, but they are still employed by Carnival.

MR. HOLZBERG:  Cooper, do you know if those have been requested or set.

MR. JARNAGIN:  I believe for those two specific ones, I would have to go back and look.  I think you requested the depositions of like eight different people, and I think two are still outstanding because they're off the ship.  But if they're onboard the ship, we would make them available for you.

MR. HOLZBERG: Okay.  All right.  Let me know as soon as you can if any of the

Page 31

two particularly are off contract, in other words, home, vacation, or between contracts, because then I'll have to address that when we get it.

MR. JARNAGIN:  Okay.

MR. HOLZBERG:  Thank you.

BY MR. HOLZBERG:

Q.  So looking at Exhibit 3 again that's on the screen now, you agree that at the time of this incident Mr. Raharjo was not cleaning or maintaining the public area, correct, or open deck --

A.  Correct.

Q.  -- or open spa area, any of the areas designated there?

A.  Correct.  Part of the maintenance is also, you know, the chair alignments because I know they do -- not necessarily these lounge chairs or anything, part of that is rearranging the chairs out at the end of the day or the beginning of the day as they lay them out.

Q.  Let's go through each of the bullet points.  You don't have to read any of those until you get to any more relevant.  Do you see any more bullet points that would encounter -- or encompass,

Page 32

excuse me, this job function, returning furniture that was placed elsewhere and being put back where it belongs on deck?

A.  Based on that, I would say part of the maintenance of the public areas is the -- are the chairs and the positioning of the chairs or moving the chairs, because, again, that's -- if it's, for instance, a crew member -- if one of these crew members is the housekeeping attendants sees an area or a chair that's turned over or flipped over or whatnot, it's part of their duty to maintain the area.  That would be part of his -- arranging the chairs as they should be.

Q.  Okay.  Fair enough.  You see where the words starts with "Adhere to all Carnival service values at all times"?

A.  Uh-huh.  I do.

Q.  What does that mean?

A.  Service values could be from being just polite, smiling at a guest, addressing the guest, their just overall demeanor, safety of the guest.  All that could be considered service values.

Q.  Okay.  You testified earlier that Ms. Terry and others were in the designated smoking.

Page 33

So this ship at least had an area that passengers who smoke are allowed to smoke, correct?

A.  Correct.

Q.  And they were using the area as designated by Carnival, they were smoking in the smoking area, or at least they were there for purposes of smoking in that area?

A.  That's correct.

Q.  And Mr. Raharjo and all other crew members are aware this is a designated smoking area?

A.  Correct.

Q.  At the time of the incident, he knew that as well?

A.  Correct.

Q.  Were any attempts made by Mr. Raharjo or the other individual who was unpacking this furniture to block off the area before the unpacking procedure, in other words with tapes, warning trips, ropes, stanchions with ropes or warning cones?

A.  No.

Q.  Have --

A.  I'm sorry.  Go ahead.

Q.  I was finished.

9 (Pages 30 - 33)

Page 34

A. No. To my -- no, there was no cordoning off or stanchions or anything to block the area as it's -- and there is no procedure for us to have that, so it was not done.

Q. So in other words, the intention is when they were doing this job, that passengers would be present, or at least the expectation?

A. Yeah, and that's why the adherence of the verbal notification that they're putting on there, it's also open and obvious that it would -- that a trolley is coming in with chairs, you know, to stand clear of the area, along with the verbal announcement that one of the team members had said prior to unloading the chairs.

Q. You disagree that in this area there are many of these chairs?

A. I agree.

Q. That are --

A. I agree there were other chairs in the area, yes.

Q. So why couldn't this wait until the deck was closed or it was off hours or less busy hours, for instance, maybe 10 o'clock at night, 6:00 in the morning?

A. Because they were -- all the

Page 35

passengers were now onboard. There are areas to be used by the passengers. And they were -- from my understanding, passengers were around waiting for the chairs to be used as well.

Q. My understanding from the deposition of Raharjo was that he used some type of knife or some type of device to unseal or open some plastic wrap that had been installed around the chairs, and that's what caused it to fall. When he split it open and the chair fell when he sliced off the plastic.

MR. JARNAGIN: Objection.

BY MR. HOLZBERG:

Q. Is that your understanding of what happened?

A. My understanding is that he used his hands to open the plastic, and it wasn't immediately after --

Q. Go ahead.

A. It wasn't immediately after the plastic was unwrapped, but as he was still unloading a different chair, putting a different chair down.

Q. What -- where was the plastic wrap installed?

Page 36

A. I don't know as to when he would have -- when they would have put the plastic wrap on it. I'm not sure. I would imagine, but it would be just a presumption, that they do it before -- downstairs as they're loading it up, but that would be better suited to ask either one of them as to when they did that.

Q. Is there typically plastic wrap kept in a crew area on the ship that is used for these types of purposes?

A. Not too sure as to if they -- again, if that's something that they have at their disposal or if it's brought down before they did -- they go ahead to do this. That would be better asked to them.

Q. When they unload luggage -- this is a luggage cart we believe they were using, most likely, a cart that was a luggage cart, correct?

A. To my understanding, yes, it could have been.

Q. Are luggage -- the bags, luggage, typically wrapped in plastic when they are collected from passengers and before they're used with the trolley to, you know, bring them to passenger rooms or from passenger rooms

Page 37

embarkation?

A. Not necessarily, but I've seen it many times onboard that they will not use any plastic on the -- on the luggage.

Q. And you agree there is no policy or procedure that says that plastic wrap should be used whenever transporting anything on these luggage carts or other trolleys?

A. Right, there is no procedure as far as to use the plastic wrap or not.

Q. Okay. If Mrs. Terry and other guests who were sitting in the area, the designated smoking area at the time of the incident, wanted to finish the cigarette or just didn't want to leave -- as you say, it was -- everybody was returning to the ship and the ship was leaving the port ready to sail, they don't want to lose their seats, does adhere to Carnival service values at all times include deferring to the wishes of the guests, though it's going to be okay, if you don't want to leave the area, then we can wait and we'll do this later?

A. Well, I mean, they have a task to perform. And part of that -- in a sense, they are adhering to the service because you're doing that

10 (Pages 34 - 37)

Veritext Legal Solutions

800-726-7007                                                      305-376-8800

Page 38

for the other guests who are waiting for chairs or needing the chairs to sit down. It's not just the ones that were there.

Q. So the needs of Carnival and the needs of other guests were more important than the needs of Mrs. Terry and the people sitting with her in the smoking area at the time?

MR. JARNAGIN: Object.

THE WITNESS: No, I wouldn't agree to that. They could still have used the -- they could have still used the area. They could have just -- could have just used reasonable -- in her case, she could have used reasonable care. She could have moved up, backed up or moved to the side or actually just out of the chair while they finished the -- that process and still kept her chair.

BY MR. HOLZBERG:

Q. Do you know exactly what Raharjo or the other gentleman said to Ms. Terry right before the incident?

A. I don't know the exact verbatim as to what it is. My understanding was that we are unloading, if they could please clear the area,

Page 39

that they're unloading the chairs.

Q. Was there any response from Ms. Terry or others?

A. That, I'm not sure.

Q. How good is Mr. Raharjo's English, do you know, at the time of the incident?

A. I'm not too certain as to how -- how well his English is.

Q. It's required to be at least pretty decent or good, right, to speak English?

A. He should be able to communicate.

Q. That's one of his job requirements, isn't it?

A. Correct.

Q. You agree the majority of Carnival passengers are English-speaking, even those that have second language capabilities speak English for the most part?

A. I'd agree, yeah, to an extent, yeah. Some are better than other, but, yes, they do have to be able to communicate and understand.

MR. HOLZBERG: We're going to mark as Exhibit 4 the performance evaluations of Mr. Ranagappa. And Exhibit 5 -- well, it looks like -- hold on a second before I do that.

Page 40

Cooper, it looks like what was produced this morning were performance evaluations, but it looks like it's of Ranagappa, or not Raharjo. Can you explain why it was -- let's go off the record for a moment.

THE COURT REPORTER: Going off the record at 12:47 p.m.)

(Off-the-record discussion.)

THE COURT REPORTER: Going back on the record at 12:49 p.m.

MR. HOLZBERG: Disregard the last statement. We're not going to mark the performance evaluation. We're going to mark as Exhibit 5 Raharjo's. I see that now. Thank you, Cooper. It looks like 248 through 250, three pages.

(Thereupon, Plaintiff's Exhibit No. 5 was marked for identification.)

BY MR. HOLZBERG:

Q. This is -- can you read the date of the evaluation?

A. It looks like review period February 10, 2024, and February 12, 2024.

Q. What's the next one?

A. The next what? I'm sorry?

Page 41

Q. The next --

MR. HOLZBERG: Can you go to the next page. I, think 249, Cooper.

THE WITNESS: Yes, November 20, 2024 to November 21, 2024.

BY MR. HOLZBERG:

Q. I think that's it. The third page is just the completion of the previous page. So that's the only two evaluations. Is that what your understanding is, Maurice?

A. My understanding, yes.

Q. Okay. And this incident happened on June 5th, '23?

A. Correct, that's my understanding.

Q. So the closest one to this would have been February '24, so this would have been at least eight months later, approximately?

A. Sounds right, yes.

Q. And November 24th would be not quite two years later, more than a year and a half later?

A. Right.

Q. So can you tell me what relevance, if any, this has to Mr. Raharjo's evaluation or performance of his job eight months, it looks like?

A. I'm sorry. I don't really understand

11 (Pages 38 - 41)

Page 42

the question. What relevance does it have?

Q. Yeah. I mean, it says he has good communication skills, he's engaged and takes pride in his word, but that was 8 months and 20 months later. How does that reflect his performance at the time of this incident in June, 2023?

A. I mean, there's -- you take into account the entire period from June 23rd, there was nothing -- nothing wrong that was found to be that he had done or something that he missed to do or did not do as part of his job requirements or was needed from him. The matter was investigated.

Q. Was he ever -- okay. So there was an investigation?

A. Yes. The matter was investigation -- investigated, and there was no -- nothing that was found that he did or the other crew member did wrong or needed to be reprimanded or needed to be written up or anything like that.

Q. Is it true -- and I believe he testified after this he was never given the furniture relocation or unpacking assignment again?

A. I believe he did testify to that.

Q. But no discipline, no punishment, reprimand was ever made as a result of this?

Page 43

A. That's correct, there was nothing found as far as any type of thing that he did wrong or any action he did wrong or could have done.

Q. Did he say that the chair fell because of winds or the ship movement or anything unrelated to his own action?

A. To my knowledge, he did not say any of that.

Q. Okay. Is there any evidence that the chair fell and struck Ms. Terry because of anything like wind, you know, repositioning of the ship, ship movement, you know lisping, wave action, water --

A. To our knowledge, no, there was nothing to any wind or -- the ship was still in port, so it was not moving at the time.

Q. Okay. And there was no burst of wind at any time or bridge log or any statements of any of the individuals who were present, was there?

A. Yeah, correct. To my understanding, there is -- there was no high wind situation.

Q. Did Ms. Terry grab the chair or bump into the chair or take any action on her own that would have caused or contributed to this chair falling from the stack and striking her?

Page 44

A. The -- she -- from her testimony, she did not. Our understanding of our investigation, she did not.

Q. And what about any of the other individuals sitting around her in the designated smoking area, did any of them get up, bump the chair, interfere with the unpacking process or in any way cause or contributed to the chair striking Ms. Terry?

A. To those sitting in the area, no. As far as them, they were seated so they would not have contributed. I don't know about the other passengers that were in the area with them, but we don't have any information on that.

Q. Mr. Raharjo's statement was taken by Carnival, correct?

A. Correct.

MR. HOLZBERG: All right. So Cooper, let's go ahead and look at that. And I want to apply our stipulations when we get on the record that we have stipulated for purposes of this that any of the incident report involving this case, any of the statements, the photographs, or anything else that was done to investigate this incident, are privileged. And also subject to any objections

Page 45

that Carnival may have, other than privilege, all of those are preserved for either before trial or at trial and used, reference to, or looping at them today, will not be deemed a waiver of any potential future objections of any kind. Agreed, Cooper?

MR. JARNAGIN: Agreed, yes.

MR. HOLZBERG: All right. So can we take a look at the incident report.

MR. JARNAGIN: Yes, I'll pull that up.

BY MR. HOLZBERG:

Q. So I'm going to ask you questions, Maurice, about what we've referred to in the past and I'll refer to today as objective facts. In other words, who, what, when, where, you know, timing, like people, locations, names, things like that. I'm not going to ask you about any, you know, conclusions or opinions that Carnival members may have.

A. Is this because -- you guys were cutting in and out a little bit there. It is for the accident report, correct?

Q. Yes, and any attachments.

MR. HOLZBERG: Please pull that up.

THE WITNESS: I'm going to be able to kind of go back and forth with the

12 (Pages 42 - 45)

Page 46

attachments, but I do have the accident report open.

MR. HOLZBERG: Cooper, let me know when you're ready.

MR. JARNAGIN: Okay. Go ahead.

BY MR. HOLZBERG:

Q. Okay. Do you have the accident report or incident report in front of you?

A. I do.

MR. HOLZBERG: Can we see the cover sheet, Cooper.

MR. JARNAGIN: The cover sheet of the accident report?

MR. HOLZBERG: Yes, incident or whatever it is. So I'm going to ask him to identify it and state the name.

MR. JARNAGIN: No, I don't want to physically pull up the accident report on the screen, no.

BY MR. HOLZBERG:

Q. Let's go through then. What is the title?

A. Give me one second. It's kind of lagging a little bit.

So this is under -- the reporting

Page 47

number is CCLELHEA202300118V, as in Victor.

Q. What does that represent?

A. The reporting number.

Q. Internal number for purposes?

A. Correct.

Q. Is there any significance of that, that has the ship name, the date, the location or anything like that from those identifying letters and numbers?

A. The identification would be -- it's Carnival CCL. EL would be the Elation, which is the ship, and then the year 2023 in that number.

Q. Okay. What's the title?

A. Give me one second. Having an issue. Not fully loading. It's kind of being cut off.

Q. You have a hard copy or it's only on the screen?

A. No, it's only what's on the screen.

Q. Can Cooper send it to you again in a different format.

MR. JARNAGIN: Yes. If we're -- if we want to, we can go off the record and take a break for a few minutes, like maybe send him everything in a more accessible format.

MR. HOLZBERG: Yeah, let's do that.

Page 48

MR. JARNAGIN: Let's say 10.

MR. HOLZBERG: Yeah. You said 10, Cooper?

MR. JARNAGIN: Yes.

MR. HOLZBERG: Fine. It's 12:57. Let's try to get back at 1:07.

THE COURT REPORTER: Going off the record at 12:57 p.m.

(Thereupon, a short recess was taken.)

THE COURT REPORTER: We're back on the record at 1:08 p.m.

BY MR. HOLZBERG:

Q. All right. Maurice, what's the title of the report?

A. There's no real title. The titles to these usually are the number I provided.

Q. What's the next thing below the number you provided?

A. Just the ship, the -- it being on the ship on the Elation. A type of personal injury with medical treatment.

Q. All right. So let's go through the objective facts. Who did this incident involve?

A. This was involving Ms. Michelle Terry.

Q. Okay. You're not looking at the

Page 49

Passenger Injury Statement. This is an internal incident report, something different, correct?

A. Correct, yes.

Q. What was the date of the incident?

A. Date of the incident is -- sorry. That's the voyage. June 5th, 2023.

Q. What time was the incident?

A. Time is, let's see, 1705 -- sorry. That's the -- 1705 -- is the date -- the time requested medical attention.

Q. 1705, would be 5:05?

A. Correct.

Q. P.M.?

A. Correct.

Q. Is there a time?

A. That's what I'm looking for. Let me see the time. June 5th, 2023, at approximately 4:35 p.m.

Q. Okay. And where was it located, the incident?

A. This would have been on Deck 11, port side.

Q. That's an outside?

A. Correct, that is an outside deck.

Q. Okay. And is there a description of

13 (Pages 46 - 49)

Page 50

what happened, the accident, and what occurred?

A. Yeah. There -- the description, the injured guest claimed that on June 5th, 2023, at approximately 4:35, she was seated and smoking at guest designated smoking area located on Deck 11 mid ship port side. She felt something struck her from behind and realized it was chairs that fell on the back of her head. Thus, she sustained an injury to her neck and head.

Q. Okay. Does it identify any witnesses?

A. Let me see. No. The only two it identifies is the two crew members, Mr. Ranagappa and Mr. Raharjo.

Q. Okay. No other passengers?

A. No.

Q. Does it reference whether other passengers were present, regardless of whether their names were taken?

A. The only other name taken was her daughter, Ms. Laurel Terry, but she wasn't -- she was involved with it, but not present, but there are no -- no other passengers.

Q. According to Raharjo and Ranagappa, there were other passengers present at the time of the incident, correct?

Page 51

A. Correct.

Q. According to Ms. Terry on her Passenger Injury Statement, she did say that there were other individuals but she didn't know or recognize them?

A. From my understanding, that is correct as well.

Q. "Who witnessed the accident? Passengers onboard, unrecognizable.

"Who was with you, or nearby, at the time of the accident? Passengers on board, unknown or unrecognizable."

So there were other passengers, correct?

A. Correct.

Q. Who filled out this report? Is it like security or somebody else or -- yeah, I guess SO.

A. The author was the Assistant Chief Officer, and their name is Jakelyn Salvador.

Q. Why didn't Ms. Salvador write down the name of the individuals who were present and get their statements?

A. I'm not sure if they were actually witnesses to the incident. They could be around be

Page 52

the area, but I don't know exactly what she asked or what was asked of the nearby people.

MR. HOLZBERG: We're going to mark as Plaintiff's Exhibit 6, I believe, the plaintiff's Passenger Injury Statement, which is one page. And we'll come back to this, Cooper. Just leave it on your task, the incident report. Let's look at Passenger Injury Statement. Do you have that.

MR. JARNAGIN: Yes, let me pull it up.

THE WITNESS: Okay.

MR. HOLZBERG: You got it?

MR. JARNAGIN: Yes, I do.

(Thereupon, Plaintiff's Exhibit No. 6 was marked for identification.)

BY MR. HOLZBERG:

Q. In the middle, "Are you hurt? If so, explain." There's another question below. "Who witnessed the accident?

A. Passengers onboard, unrecognizable.

Q. Okay. So you're reading that from Exhibit 6, correct?

A. Correct.

Q. And that's the answer to Carnival's

Page 53

question to Ms. Terry of "Who witnessed the accident?"

A. Sorry. Repeat that.

Q. Yeah. The answer you just provided, you jumped a little ahead so I'm just going to fill in the facts.

The answer you read, "Passengers onboard - unrecognizable," was in response to the question "Who witnessed the accident?"

A. Well, they were passengers -- let me go back.

Q. I'm asking you the question.

A. What?

Q. I'm asking you to read the questions into the record so the jury understands the context.

A. The "who witnessed the accident" is what you asked me to, what I just finished reading, correct?

Q. Correct. And she answered "passengers on board"?

A. Unrecognizable, correct.

Q. When was this -- when is this Passenger Injury Statement typically taken?

A. This is usually taken when they are in

14 (Pages 50 - 53)

Page 54

the medical center.

Q. When did she go to the medical center in this case?

A. I think it was just briefly -- my understanding it was just almost immediately after the incident occurred.

Q. Okay.

A. She was brought down minutes after it occurred.

Q. And this was taken by whom or provided to her by whom?

A. Who provided her this statement that --

Q. This form, yeah, the blank form.

A. Yeah, the -- more than likely one of the two security officers who investigated the incident.

Q. Salvador, or her supervisor or herself?

A. It was either Salvador or the other -- the other security officer.

Q. All right. And yet, your records -- Carnival's records show no statements taken from these passengers onboard even though this statement was obtained very soon after the incident, maybe

Page 55

half an hour? I believe you read at the time of the medical center.

MR. JARNAGIN: Object.

THE WITNESS: Correct.

BY MR. HOLZBERG:

Q. Within less than a half hour, she was in the medical center. This statement was very soon after that. Why didn't they get statements, do you know?

A. Well, my understanding is they were the two that brought her down or met her at the medical center.

Q. Why did they both need to bring her down?

A. I'm not too sure as to the reason why they -- it would be better asked to them as to if that is their process of doing it. They're actually attending to her. She's claiming that she's hurt. The first thing they are going to do is attend to the guest.

Q. Do you know if that is Michelle Terry's signature on the bottom of Exhibit 6, Passenger Injury Statement?

A. My understanding is it is. Her daughter filled out the form and she signed it.

Page 56

Q. Do you know what the initials next to the signature below the signature line to the left? L.T.?

A. Signature --

Q. The initials next to the --

A. Do I know who it is? I imagine -- I assume it's her daughter's initials.

Q. Okay. And you described her initial -- her name a few minutes ago, right?

A. Yeah.

Q. You said Laurel Terry?

A. Correct.

Q. You see where it says.

COURT REPORTER: Is he breaking up on --

(Thereupon, a discussion was held off the record.)

BY MR. HOLZBERG:

Q. Three-quarters of the way down, "Please state in detail what happened at the time of the accident," Exhibit 6.

A. Yes. You want me to read her response to that -- to the "Please state what happened at the time of the accident occurred?

Q. Yes, please.

Page 57

A. Okay. "At the time of the occurrence, patient was sitting opposite direction of employee left side carrying a stack of chairs when then unexpectedly the stack of chairs fell on the patient from behind."

Q. Okay. And then there to the right.

A. I think it's supposed to say left side of head.

Q. Okay. You agree that that is a third person's -- another person's writing? Under maintenance, it says "Patient" wasn't it?

A. I'm sorry. You were cutting off. I would agree that?

Q. This is a third party based on the -- (unintelligible).

A. You keep cutting in and out. I don't know if it's just me or --

Q. Yeah, I don't know what is going on, to tell you the truth. I will try it again. You'd agree somebody else wrote this based on the phrasing of the words of the statement?

A. I would agree that it was not Michelle -- Ms. Terry that wrote it.

Q. Right. Patient was sitting. Chair

15 (Pages 54 - 57)

Page 58

fell on the patient from behind. Somebody else wrote it, right?

A. Sure, yeah. Again, my understanding from what -- from the body cam footage that we have of the interaction when they were laying this out, it was her daughter that filled this out.

Q. Okay. You agree Ms. Terry and the other passengers were in a place where they were allowed to be at the time of this incident?

A. Yes, I would agree.

Q. Okay. The next statement -- the two below, actually. "What do you believe caused this accident?" What was written there?

A. "What do you believe caused this accident?" "Employee dropped a stack of chairs on head/neck area."

Q. And then what was the next line, the question and answer?

A. "What equipment, if any, was involved in the accident?" "Stack of chairs."

Q. Next line.

A. "Please state what you could have done to avoid the accident." Nothing."

Q. Is there anything that Carnival is

Page 59

aware of, have any evidence, statements, videos, or photographs or any material or information of any kind that Ms. Terry did anything to cause or contribute to this incident that the chairs fell on her head?

A. We don't have any video of the incident. As far as our position is, could she have done something differently. Yes, she could have moved, she could have heeded the warning that was given or the instruction that was given. She could have backed up. She could have turned. She could have looked at the trolley and seen what was going on. So just reasonable -- to exercise reasonable care. I mean, if there's something heavy behind you or something sharp behind you or anything like that, despite it being there, the reasonable person would be looking at it.

Q. Okay. That is based on the assumption that Mr. Raharjo told these people, including Ms. Terry, that they were unstacking chairs and that they should move before they did so?

A. Correct, based on the instruction given. And even if --

Q. The instructions given, the -- do you have any information, any evidence of any

Page 60

statements, other than from Mr. Raharjo that he gave the instruction to Ms. Terry and other passengers?

A. No, we don't. It's based on his testimony.

Q. Do you have written statements from Raharjo and Ranagappa as part of the incident report -- so let's go back to that.

A. All right. Let me look at the -- if I'm allowed to look at their -- at his statement to see what he -- what he wrote.

Q. Yeah. Let's start with Raharjo, please.

A. Sure.

Q. If there is one. First look for it and identify it if you find it.

A. No, Raharjo's written statement does not say that.

Q. Well, first, let's -- let's go backwards a little bit. Is there a statement of Raharjo, David Raharjo being involved in the incident, the crew member?

A. Is there a written statement by him? Yes, there is.

Q. Is it handwritten or typed up?

Page 61

A. Handwritten.

Q. How long is it?

A. How long is it? Probably just a paragraph.

Q. So on one page less, than a full page?

A. Sure.

Q. Does it contain specific fact -- factual statements?

A. Factual as to what he was doing, where he was at the time?

Q. Yes.

A. I would say those are factual statements, yeah.

Q. Yes. All right. So where does he say he was?

A. He was on Deck 11 port side, guest smoking area.

Q. So you agree that that's the area where Ms. Terry was injured?

A. Correct.

Q. It says, "Describe the time of the incident."

A. "Approximately 4:30 p.m."

Q. Is this consistent with the guest injury statement of Ms. Terry, Exhibit 6, and the

16 (Pages 58 - 61)

Page 62

previous information you saw on the incident report cover sheet?

A.  No difference with the time.

Q.  I know.  Let me go back.  The Passenger Injury Statement, Exhibit 6, that we previously looked at, I believe said 4:35, so five minutes off?

A.  4:35, yes.

Q.  Correct.  That's according to the Passenger Injury Statement, Exhibit 6, at 4:38, correct?

A.  Correct.

Q.  So if it's off, it's off by a few minutes?

A.  Correct.

Q.  Does it describe Ms. Terry by name?

A.  It does not.

Q.  Does it -- a passenger with a cabin number?  Excuse me.  Passenger name?  So how does he reference Ms. Terry in this statement?

A.  He referenced her as female guest sitting on the chair.

Q.  Does he identify other female -- male or female guests in the area at the time of the incident?

Page 63

A.  No.

Q.  Does he identify -- does he identify his partner in the area at the time of the incident?

A.  He does --

Q.  Does he identify --

A.  -- yes.

Q.  -- anything about the chair, the number of chairs or anything factual about the chairs?

A.  No, there is no identification as to the number of chairs.

Q.  Does it describe that the chairs fell and struck Ms. Terry in any way, or the passenger, the female passenger?

A.  Yes.  It describes it as -- only kept on top of the -- yes, it says the stack -- it references the chair -- that the terrace chairs stack.

Q.  The chair -- I don't understand the word.  The tears (phonetic) chair?

A.  Yes, he refers to that chair as the terrace chair.

Q.  A terrace chair, like an outdoor terrace?

Page 64

A.  Correct.

MR. HOLZBERG:  Cooper, do you mind just reading that phrase so we can stop beating around the bush here and take it a word at a time?  I don't see how this is so privileged or so critical to Carnival's defense.  I'm talking about facts now, objective facts.  And you know there's case law that says it's allowed to be disclosed.

MR. JARNAGIN:  Right.  You certainly ask Maurice questions about the accident contained within the statement.  We just protest it right now.

MR. HOLZBERG:  Read to me the facts.  And if you have an issue as to -- just read to me what is in there.  If you have an issue with a phrase or a line that you want to discuss with Cooper off the record, you know, and do this separately, we can do that, but I'd just like to get the facts of what he said happened.

MR. JARNAGIN:  Yeah.  Maurice, are you able to give a summary of the facts to Mr. Holzberg?

MR. HOLZBERG:  I don't want -- I don't want his opinion or impressions of what it

Page 65

says.  I want what it says, factually what it says.  Or if not, we'll just have a hearing on it, either way.

MR. JARNAGIN:  Yeah.  I mean, if he's sitting here, he can answer your fact-based questions right now.  I think what you're asking is for him to read it verbatim onto the record, and that was not part of the agreement.

MR. HOLZBERG:  And stopping where there may be an issue as to something that is an opinion or conclusion.  I'm entitled to the objective facts.  I believe the cite is Jones versus Carnival.  Judge Adalberto Jordan in his decision about 20 years ago.  It's still good law.

MR. JARNAGIN:  We don't have a disagreement.  Mr. Vega is able to provide you the facts in the statement.  So I think the quickest way is you could ask him what facts are contained within the statement.  Mr. Vega can answer.  And if you have additional questions based on that, then Mr. Vega is here to answer them.

MR. HOLZBERG:  Fine.

17 (Pages 62 - 65)

Page 66

BY MR. HOLZBERG:

Q. Read me the facts, please.

A. Around -- on June 5th, 2023, around 4:30 p.m., I was replacing the terrace chairs at the Deck 11 port side guest smoking area with my colleague, which were taken from the pier on the canopy setup in Nassau. Removing -- when we were removing and setting up the chair, suddenly the terrace chair started -- I don't know -- terrace chair stacked on top of each other fell on top of the trolley sideways and fell -- his handwriting is a little bad, so bear with me here. They attempted to grab the chairs. They fell on back of the female guest sitting on the chair and smoking at the same area. Medical attention was offered to the guest and accepted, and he informed his supervisor, and guest was taken to the medical center.

Q. Anything else?

A. No.

Q. So that is the entirety of the statement pretty much factually throughout?

A. Correct.

Q. All right. You agree there is nothing in that statement that says anything about actions

Page 67

by Ms. Terry?

A. Correct.

Q. And you agree there is nothing in that statement that says that a warning was given before to leave the area or that we're going to be unpacking these chairs, please, you know, relocate or, you know, please step aside until we're complete -- until we're done unstacking the chairs?

A. That is correct.

Q. Is there a statement by anybody else that was obtained -- well, strike that. Before we get to the second statement, if any.

Who took the statement?

A. That was the signature of the security officer.

Q. Raharjo or somebody else?

A. That's what I'm trying to discern, as to whose -- whose signature it would be. I imagine it would be -- it would be Salvador.

Q. I'm sorry? Jacqueline Salvador?

A. Yeah, that's my -- yeah, I believe -- I believe that looks like a J, so it could be -- it's either one of the two -- actually, I apologize. It is -- it is Jac- -- it is confirmed that it is Jakelyn Salvador that took that.

Page 68

Q. Okay. Is there a second -- when was the time of that statement, Raharjo's?

A. This was taken -- it would have been the following morning, 10:30 the following morning?

Q. So on June --

A. 6. June 6th.

Q. Where was it taken, does it say?

A. The security office.

Q. Okay. Is that a standard policy, individuals are identified as to come to the security office and give a statement?

A. Yes, it's usually people who are involved are usually to provide a statement.

Q. Is there another statement that was taken contemporaneous with this incident?

A. Yes, it looks like it was for -- let me open that up.

Q. Was it Ranagappa or someone else?

A. Yes, it's Ranagappa.

Q. So before we pull that up and go through the facts of that, are there any other statements other than Raharjo and Ranagappa that were present at the unstacking of the chairs?

A. No.

Q. Let's look at Ranagappa. And I've got

Page 69

the same analysis; when was it taken, where was it taken, by whom?

A. This was taken, looks like, same 10:30 in the morning, so it would have been -- looks like at the same -- at the same time by -- also by Salvador.

Q. Okay. So presumably, back-to-back?

A. Yeah, it looks like, yeah.

Q. Okay. That was the next morning, June 6th?

A. June 6th, correct.

Q. In the security office on the ship?

A. Yes.

Q. Factually, what did Ranagappa tell Salvador, the security officer, what happened?

A. He was setting up the -- setting back up the terrace chairs with his colleague, approximately 4:30 p.m. on June 5th, 2023, at Deck 11, port side, guest smoking area. While removing chairs from the stack housekeeping trolley, suddenly a chair fell sideways. They tried to grab the chairs. It fell to the back of a female guest sitting on a chair and smoking at the same area. Medical attention was offered to the guest, she accepted, and a supervisor was informed, and she

18 (Pages 66 - 69)

Page 70

was taken to the medical center.

Q. Okay. There's nothing in there that says anything Ms. Terry did or caused that contributed to this incident, correct, no facts?

A. No, there's not.

Q. And there's no other statements? The only statements taken regarding this entire investigation were of Raharjo and Ranagappa, the two you just read?

A. Correct.

Q. No statements were available from any of the passengers who were present or anybody else who may have been available, passenger or crew?

A. That is correct.

Q. There is nothing in Ranagappa's statement or any other statement about warnings being given by either Ranagappa, Raharjo or anybody else to Ms. Terry or any of the other smoking passengers before the chairs were unstacked, correct?

A. Correct.

Q. Is there any record -- any announcements that were made on the intercom on the ship or in the area so that these passengers, including Ms. Terry, could hear that there would be

Page 71

chairs or furniture or any materials being unstacked or reloaded in the area and that they should remove themselves or not be present during the unstacking?

A. No, there would be no announcements made over the loud speaker.

Q. There were none, correct?

A. No.

Q. Mr. Raharjo testified in his deposition he was supposed to have brought some type of knife with him, but he forgot so he used his hands. Do you remember seeing that?

A. Yes.

Q. What type of knife is available to them or did he have, if you know?

A. I'm not sure -- I'm not sure as to what knife he would be provided because, again, this is -- I'm not sure what process they used for this -- for this task.

Q. Do you know if Ranagappa had a knife that was supposed to be used to remove plastic around the chairs for unloading?

A. I'm not aware if he did or did not. Be better asked of him.

Q. All right. The knife you agree that

Page 72

if it was like a razor-type knife, one that retracted and be tracted (phonetic), in other words, pushed a slide, that would be a safe way to remove the plastic because it happens in a finite area where you cut, the plastic just falls away? That would be a safe way of removing the plastic, you agree?

A. Yeah, I would say it would be one -- a way -- a safe way to go ahead and do it, yes.

Q. Using his hands to pull the plastic would be less safer, you agree with that, because using your hands to pull the plastic would require ripping and tearing and more force, a knife requires very little force, correct?

MR. JARNAGIN: Object.

THE WITNESS: I wouldn't necessarily agree to that. I would say that you could tear it or you could -- it depends on the type the wrap is. There is some wrapping where you can just push your finger to it and it becomes pretty easy to undo.

BY MR. HOLZBERG:

Q. Is there any evidence --

A. No, we don't have any evidence of it, but I would -- again, I wouldn't say it is any more

Page 73

safe or unsafe.

Q. Looking at Schedule A again. I understand that in the five years preceding this incident -- one year after there were no other incidents on this ship of chairs falling from a stack and furniture being unpacked that fell on passengers, correct?

A. Yeah, that's correct, in the five years, there is no other -- no other incident fleet wide.

Q. And fleet wide, so on this ship or fleet wide, which is two or three, both you've answered before I asked them, both none on this ship and none on fleet?

A. Correct?

Q. The -- okay. Whatever action there was, we have already gone through all this testimony. Is the action of either Raharjo, Ranagappa, or as you say there may have been some involvement with Ms. Terry, those are the only three actors in this, correct?

A. Those are the only three?

Q. Those are the only three potential actors in this incident?

A. Correct. That we are aware of, I

19 (Pages 70 - 73)

Page 74

believe so, yeah.

Q.   Right.  But we're in litigation, we're going to trial in a few months.  I don't want there to be a surprise later.  Does Carnival have any evidence that anybody else was involved in this that may have caused or contributed to this incident?

A.   No.  As far as you our investigation, no, we don't believe there is anything else we could have identified.

Q.   And you do believe that Carnival, according to their own standards and policies and procedures, did as thorough of an investigation as they could under the circumstances?

A.   Correct.

Q.   There were two security officers involved.  They took statements, they looked for pictures, they looked for evidence, and what they found is what you have said up until now, correct?

A.   Correct.

Q.   Pretty much the statements were Raharjo and Ranagappa?

A.   Correct.

Q.   And that's the totality of the evidence other than what Ms. Terry may have

Page 75

testified to?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  Yes.  Besides that and any type of the body cam and when she answered questions to how it occurred, that's all we have.

BY MR. HOLZBERG:

Q.   Is there a body cam that shows us the incident?

A.   The incident, no.  Just after it while she's in the medical center, she's relaying the information and how she was feeling after the incident.

Q.   Okay.  Has that been produced?

A.   I don't believe.  It's part of the privilege log, I believe.

MR. JARNAGIN:  Yes.  I will step in. Glenn, it has not been produced.  I think Louis and Ashley previously discussed that, so I would recommend asking Louis.

MR. HOLZBERG:  Well, I want that as part of this Schedule B that's coming up, any videos or any photographs.  So we're going to end up probably having a hearing on that unless you want to show it to us

Page 76

now.

BY MR. HOLZBERG:

Q.   It's of Mr. Terry, you agree, Maurice?

A.   Yeah, it's Ms. -- it's the officers, along with Ms. Terry and her daughter.

Q.   In the infirmary?

A.   Correct.

Q.   With others present, nurses, doctors, correct?

A.   I can't see if there's any nurses in there, but they may be in the background.

Q.   Okay.  And they were treating Ms. Terry for injuries sustained as a result of this incident on the Carnival ship, as we described it, right?

A.   Correct.

MR. JARNAGIN:  Yeah, Glenn, I'm not arguing against any of that.  I'm just saying it's been on the privilege log for months.

MR. HOLZBERG:  I understand.  I'm just identifying the facts and we can talk to a judge or a magistrate about it.

BY MR. HOLZBERG:

Q.   And the actors in the body cam are

Page 77

either the security officer or Ms. Terry, correct, the speakers?

A.   Her daughter, Ms. Terry, security officers.

Q.   Are there statements of the daughter on the body cam as well?

A.   As to how she was called and what was -- what her interpretation or her understanding of the incident.  She does mention that, yes.

Q.   But she wasn't present, the daughter, correct?

A.   Correct.  Our understanding is no, she was not present at the -- at the time.

Q.   So the only reasonable thing that Ms. Terry, the daughter, could be testifying about or stating on the body cam is her impressions of her mother's condition and injuries, correct, because she wasn't there at the time of the incident?

A.   Well, it's based on what other -- what she says other passengers had notified her as well.

Q.   Okay.  About the incident, about injuries or both?

A.   About both.

Q.   Okay.  Her mother, Ms. Terry, our client, she's also speaking on the body cam?

20 (Pages 74 - 77)

Page 78

A. She is.

Q. And she's responding to questions from the security officer? Is it Navarro or the other -- I mean Salvador, I'm sorry, or the other?

A. I believe it's from both.

Q. From both. So there's two of them in the infirmary with Ms. Terry's daughter and Ms. Terry asking her questions right after the incident while she's still in the infirmary, ostensibly undergoing medical care and treatment for her head and neck injuries?

A. Correct.

Q. Number 5, we'll come back to the affirmative defenses in a little bit.

Number 5 is, "Identity of crew members involved in the process." It's only Raharjo and Ranagappa, right?

A. Correct.

Q. Number 6 is "Circumstances of the incident." As far as you understand and based on my questions I have asked you, you've testified as to what Carnival understands are the circumstances of the incident, correct?

A. Correct.

Q. Number 7 is, "Nature of the

Page 79

investigation, if any, at the time into the incident." I think we've covered all that. Is there anything else I may have omitted or you may have not provided that you are aware of? So let me go through these things. There were two statements taken. You've read those, correct.

A. Correct.

Q. Ranagappa and Raharjo. And there was a statement taken from Ms. Terry, correct?

A. Correct.

Q. And there's the body cam. That's part of the investigation?

A. Correct.

Q. There's the medical center records?

A. Correct.

Q. And whatever treatment and information they obtained is contained within the records, correct, medical records?

A. Correct.

MR. HOLZBERG: All right. So we're going to mark those. Pull them up. Dig them out. The next numbered exhibit -- are we up to 7 or 8.

THE COURT REPORTER: 7.

(Thereupon, Plaintiff's Exhibit No.

Page 80

7 was marked for identification.)

BY MR. HOLZBERG:

Q. And then what about videos and/or photographs. So look at the incident report and any attachments thereto. Tell me if you see any photographs or any images of the incident or Ms. Terry as part of the incident report.

A. There is photos of the area of the incident.

Q. How many are there?

A. Looking for you right now. One, two, three, four, five, six, seven, eight, nine, ten photos. Hold on. One, two, three, four, five, six, seven, eight, nine. Yeah, ten photos of the -- nine or ten photos of -- this looks like a duplicate, this why I'm just counting back. It's a duplicate photo. Nine photos of the area which include pictures of the chair as well, or chairs, so it's the setup.

Q. Chairs. Let's characterize it as best you can. Number 1, what does it show? Chairs, area, trolley, individuals or a combination of those?

A. No. In all those I just looked at, it shows the chairs. The -- what would be the smoking

Page 81

-- the designated smoking section set up with chairs, small tables and the umbrellas in the area.

Q. Do any of the photographs show the chairs in the stack on the trolley?

A. They do not.

Q. Do any of the photographs show the chair that struck Ms. Terry?

A. They show -- it's 2, 4, 6, 8. It's a big row of the same type of chair, but the exact chair is -- I don't think there's a way to identify it based on these, but it's all -- it's the setup in that area, it's just all those -- that same chair.

Q. Do any of the photographs show the trolley from which the chairs were placed at the time of the fall?

A. Yes, there are two photos of the trolley.

Q. With or without chairs stacked in them?

A. Without.

Q. Are any of the photographs date and time stamped?

A. They are not, that I can see.

Q. How would we know when the photographs

21 (Pages 78 - 81)

Page 82

were taken in relation to the incident, before, at the time of, after the incident?

A. Based the investigation that was done and it being sunny outside, there appear to have been taken the morning after the incident or the day after the incident.

Q. At the time, give or take, when the statements were taken, 10:00 or 10:30, 11:00 in the morning on the 6th?

A. That would be my best guess.

Q. Are there any photographs contemporaneous with the incident right before, during or right after the incident?

A. No, it doesn't look like it. These all look to be after the incident.

Q. Are there any photographs of the plastic wrap that was used in the incident, either the actual plastic wrap or the plastic wraps in the area from which they came or the, you know, maybe the round, you know, plastic spools that you can pull off and use?

A. No, there's not. None of that.

Q. Was there any investigation done to determine what type of plastic it was, where it came from, how much was used, how it was cut or?

Page 83

A. No, it does not appear any -- that it's identified -- the plastic wrap was identified in any -- in any part of the investigation.

Q. Wouldn't that have been important to determine the nature and cause of this incident if it had a rip or tear or finger or fist marks on it or if it had a cut knife on it or if it looked like it was intact because it was just unpeeled gently as if you are unwrapping, say, a sandwich at lunch with wrapping paper on it?

MR. JARNAGIN: Form.

THE WITNESS: I don't necessarily think it's necessary because, based on the investigation, they say that it was the chairs had teetered over -- that fell over, it wasn't because of the cause of the plastic wrap.

BY MR. HOLZBERG:

Q. How do you know that?

A. Basing that based on the information on the -- on the statements of the crew members in the investigation.

Q. And there was nothing in the statement that you read from Ranagappa or Raharjo about that plastic, was it?

Page 84

A. No, but there was the statement read that the chairs fell.

Q. I'm asking you specifically about the plastic. There's nothing about the plastic -- there's nothing in+ that statement about how the plastic was removed, correct?

A. No, there's not.

Q. There's nothing in either statement about the time period when the plastic was removed in relation to the chair falling exactly at the time the plastic was removed, contemporaneously with the plastic being removed, or several minutes after the plastic was removed, correct? No statement regarding those times?

A. Correct.

Q. In Mr. Raharjo's deposition, there's nothing specific about what time you removed the plastic in relation to the chair falling? You agree with that?

MR. JARNAGIN: Objection, form.

THE WITNESS: Based on the statement, I believe he said that he was placing the other chair down as the -- as the chair that struck her came down. So he was in that action, not the time of removing the

Page 85

plastic. He was actually in the action of placing another chair down.

BY MR. HOLZBERG:

Q. When the chair fell?

A. Uh-huh.

Q. Correct? Did you read the deposition?

A. I did.

Q. I'm sorry, did or did not?

A. I did read the deposition, yes.

Q. How soon before this deposition today?

A. Yesterday.

Q. You said before that the stack was two to three chairs high from which the top chair fell, correct?

A. Based on my recollection yes, he noted that it was two or three chairs high.

Q. Well, in fact, do you recall -- and if you would like to look at the deposition, please do -- in question 20 -- -page 22, question, "How many chairs were in each stack?" The answer, "Chairs and tables that was in the same stack, I would say the total was five or six."

Do you recall reading that?

MR. JARNAGIN: Objection, form.

THE WITNESS: Yeah, I do.

22 (Pages 82 - 85)

Page 86

BY MR. HOLZBERG:

Q.  So why do you dispute that there five or six chairs in the stack versus two or three?  Do you have any other evidence that shows two or three chairs over?

A.  Well, he goes on in the deposition, I believe he says that he had already removed a chair from that, so...

Q.  So perhaps from six to five or five to four?

A.  Possibly, yes.

Q.  Page 23, do you recall what he said, "How did you remove the plastic wrap?"  Question, "How did you remove the plastic wrap?"  Answer, "I tore through the plastic wrap using my hands because we did not bring the tool to open up the plastic."

Do you remember that question and answer?

A.  Yes.

Q.  And then later on, on that same page, he said -- when the question was asked, "What happened when you tore through the plastic?"  After I opened or tore through the plastic wrapping, I started placing the chairs one-by-one.  So he

Page 87

didn't gently peel it away like a sandwich paper, he ripped it with his hands.

A.  I mean, he tore through it.

Q.  How do you tear plastic?  How do you tear plastic without using both hands to rip it apart?

A.  I mean, you can still tear plastic, either very difficult or very, very easily.  It depends on the plastic.

Q.  But you have no photographs or videos or statements that say exactly how that plastic was, using his words, tore through the plastic with his hands?

A.  No, I don't.  Just like tissue papers can be torn.  It's very easy to tear.  Tissue paper, it's not very --

Q.  This wasn't tissue paper.

A.  Correct, but it's just very similar.  There's not just one type of plastic where it's a very hard plastic, or -- it could be very soft plastic.  It would be better suited to ask him or ask his --

Q.  Well, if it's six chairs, assuming you're correct in you're assessment these are eight-pound chairs, that's 48 pounds, correct, six

Page 88

times eight is 48?

A.  In the stack of the chairs, sure.

Q.  And if it was 20-pound chairs, six times 20 would be 120 pounds, correct?

A.  Sure, yes.

Q.  I'm sorry.  You froze.  Can you hear me?

So if it's 20 pounds a chair, it's -- six times 20 is 120?

A.  Sure.  That's correct, the math is correct.

Q.  Okay.  So the plastic couldn't have been too flimsy that you could just stick a finger in it and off they went if you're holding either 48 or 120 pounds of material bound together on a moving trolley?

A.  It depends what kind of -- how many chairs he had already -- how much of the plastic was already removed or --

Q.  And he said one.  And I believe he just testified we read one.  So it's like five chairs or four chairs, depending if it was a six or five stack?

A.  Sure, but, again, you're talking about --

Page 89

Q.  That's 40 pounds or 100 pounds if it's 20 pounds or if it's eight pounds, five times eight is 40, five times 20 is a hundred.  So somewhere between 40 and a hundred pounds?

MR. JARNAGIN:  Objection to form.

THE WITNESS:  Correct, sure.

BY MR. HOLZBERG:

Q.  That's the estimate of the weight of the chairs depending upon which weight is correct, right?

A.  Sure.  It would be at the time of that -- that stack of chairs, sure, that is the weight of the chairs if they're stacked.

Q.  What evidence are your basing your previous testimony that you reiterate now these are eight pounds and not 20-pound chairs?  What evidence do you have to establish that?

A.  Based on -- we were informed that they were weighed on -- on the ship, and also my personal experience with those same chairs.

Q.  Did you actually weigh the chairs or are you just saying looking at them and sitting on them?

A.  From picking them up or moving them and sitting in them, yes.  Not personally -- not

23 (Pages 86 - 89)

Page 90

weighing the chairs.

Q.   You didn't actually weigh them?

A.   Correct.

Q.   You didn't go on the ship specifically to test and weigh the chair, did you, or did you?

A.   No, I did not.

Q.   You happened to be on the ship?

A.   I have been on ships that have this chair and I have moved that chair, so that's what I'm basing that on.

Q.   After -- after the incident of before?

A.   Before.

Q.   Is there a -- I believe Carnival calls them at the time of the incident installed test safety meeting minute, the end of the voyage or the periodic executive committee meetings that go through various incidents and events on ships during a period of time.  Are you familiar with that?

A.   Yes.

Q.   And I've seen them printed, though I didn't get it in this case, that they seem to be an Excel spreadsheet with cells, maybe six wide, and then, you know, up and down, depending on the incident.  The final column is usually a picture,

Page 91

you know, one of the ones maybe you just described.  Have you ever seen one in this case?

A.   I have not.

Q.   Do you know why there wasn't a discussion with this incident in such a meeting?

MR. JARNAGIN:  I'm going to step in for a second just because I -- again, I don't know what Louis and Ashley discussed about the meeting minutes or if there exists one for this particular incident.  If one for this incident does exist, I am happy to produce it.  This was just something that hasn't come up yet in this case.

MR. HOLZBERG:  All right.  It's -- it has now.  It's on Schedule B.  I'm reading from Schedule A to discuss the context, but Schedule B, the duces tecum portion of this deposition, just so that we could put it into the record, requests that in -- let me see if I find that.

The incident report in this case, Number 13.  So it's generic, but redacted version of the incident report in this case regarding objective facts, redacted

Page 92

opinions and conclusions by -- and let me see if it's anywhere else.  Yeah, we'll go through that in a few minutes.  There's other things there that also we've gone through that haven't been produced.

BY MR. HOLZBERG:

Q.   Number 12 are the medical infirmary records.  I believe we've marked that as Exhibit 7.  It looks like it's 12 pages.  Is that the entirety of the record, the only one that's from the medical center?

A.   Correct.

Q.   Okay.  And 13, "No videos or photographs taken of the place of the incident."  So there's the body cam.  That's a video, correct?  Only video that you're aware of?

A.   That's correct.

Q.   And that's only of Ms. Terry in the infirmary after the incident?

A.   That is correct.

Q.   There are cameras in this area on the deck, correct?  You agree with that statement?

A.   Yes.

Q.   Is -- can you explain -- can Carnival explain why there's no images captured of this

Page 93

incident given the fact that I believe we have photographs that we can go through that --

MR. HOLZBERG:  And Cooper, those are the ones that we sent over this morning, but that I think perhaps Michelle or her husband took after the incident showing cameras all around this deck, 11 and 12 above area.

BY MR. HOLZBERG:

Q.   Do you know why there's no video of this incident?

A.   Normally when that's the case it's because they're either cameras that aren't live, they don't record, or the cameras that would be recording do not cover the area, they're pointing in a different direction.

Q.   Did anybody look for any videos of this incident, even the security officers, to see if there were any taken that were still available?

A.   It would be part of their investigation to be -- to review any type of camera footage if there was --

Q.   Did they say if they reviewed any, looked for any and reviewed it?

A.   If it's not -- if not in the incident report, they would say there is -- is no cameras or

24 (Pages 90 - 93)

Page 94

no footage available of the incident.

Q.  Does that mean they looked and didn't find any or they didn't look?

A.  Well, no, if it's in the investigation report saying that there is no CCTV footage or it's not covered by it, then it means they have looked. That's part of the procedure.

Q.  In addition to -- this is the privilege log I'll mark as Exhibit 8.

(Thereupon, Plaintiff's Exhibit No. 8 was marked for identification.)

BY MR. HOLZBERG:

Q.  In addition to the eight pages of the accident report that you described, and I'm calling it the accident report because that is what is listed under "subject matter" here, is a one-page investigation report on a PDF authored by Jakelyn, with a K, Salvador.  Do you have that?

A.  Yes.

Q.  Tell me the date of that accident report -- excuse me -- investigation report was?

A.  So in that attachment it doesn't have a date of the -- of when it was done, but we are pretty certain that it's at the time that she is concluding based on the big -- the initial accident

Page 95

report that your referring to, it would be at that same time that was done.

Q.  What is different about the investigation report from the accident report -- from the pages we -- that you looked at?

A.  It's a narrative summary of the incident as to what occurred.

Q.  In her words, Salvador's words?

A.  Yes, that's the person who investigated the -- the incident.

Q.  All right.  So let's do the same analysis.  What facts are in there?

A.  It mentioned Ms. Terry, the cabin, her height, her weight, the date of the incident, the time of the incident, where --

Q.  All consistent of what we -- we've testified to -- you've testified to?

A.  Correct.

Q.  Okay.

A.  Seated in the same area that has been mentioned.

Q.  Uh-huh.  Identity of other passengers?

A.  Same -- no other -- no other passengers mentioned besides her daughter, who meets her there at the medical center.

Page 96

Q.  It does mention the two crew members by name?

A.  Yes, it does.

Q.  Okay.  Anything else?

A.  Yeah.  It mentions -- it does mention that the area of the incident -- the accident is not covered by any CCTV camera.  Does mention that the body cam footage was used while she was in the infirmary.  And also confirms that the ship was docked at the time of the incident.

Q.  Does it describe any portion of the investigation?

A.  As far from the incident or from their -- from the point of view of the two crew members, yes, it explains what they were doing, replacing terrace chairs back on the -- back to the smoking section.  It's -- let's see what else.  Yeah, it starts that they were replacing the terrace chairs, setting up with his colleague, Raharjo.  They were moving the chairs from the -- from the truck -- from the hand truck.  Same -- same facts, started falling sideways and struck her -- struck her in the back of the head.

Q.  Does it say what struck her in the back of the head?

Page 97

A.  He said he was placing the terrace chair.

Q.  Placing the?

A.  I'm sorry.  They were placing the terrace chairs, setting up in the area, and it was the -- grabbed the chair that fell on the back of the female guest sitting behind the chair.

Q.  Who grabbed the back of the chair? I'm not following that.  Can you just read that statement.

A.  Before they were able to grab the falling chair, it fell on the back of the head.

Q.  Okay.  And does it say where the falling chair fell from?

A.  From the handtruck.

Q.  Does it say anything before that? From the stack on the handtruck, are they in a stack, or anything referencing where the chair was at the time of the fall other than from the handtruck?

A.  They were removing the terrace chair that was -- that was stacked on the handtruck when it started falling sideways.

Q.  Okay.  So presumably in the stack? They fell from the stack, correct?

25 (Pages 94 - 97)

Page 98

A. Presumably.

Q. Okay. Say anything about plastic or the wrap being removed or anything to do with plastic wrap?

A. No, there's no mention of the plastic wrap.

Q. You agree that we have been referring to the trolley, the luggage trolley, it's the same as the handtruck?

A. I would agree, yes.

Q. Okay. Anything else in the report factual? Is that the end of the facts of the incident, and then the rest would be, you know, the requested medical care offered, accepted, et cetera, the aftermath?

A. Correct, and the position of the ship.

Q. Which is all in the bridge log, right?

A. Yes.

Q. And you agree there's nothing in there about wind, weather, sea, conditions causing or contributing to this incident?

A. No, there's nothing there.

Q. Does it say anything Ms. -- does it say anything that Ms. Terry did to cause or contribute to this incident?

Page 99

A. No, it does not.

Q. Does it say anything any other passenger did that caused or contributed to this incident?

A. No, it does not.

Q. Does it say any actions by the two crew members, Ranagappa or Raharjo, that caused, contributed or in any way points to any fault in this incident?

A. No, it does not.

Q. Any other actors other than the passengers, Terry, or the two crew members, are there any other actors referenced in any way so far as this investigation, other than the medical staff personnel after the fact?

A. It does not.

Q. Does it say that she concluded her investigation?

A. I'm sorry, does it say what?

Q. That she concluded her investigation.

A. Yes.

Q. Without telling me what it says, and, you know, this will be subject to a hearing perhaps, unless we enter some agreement, is there any conclusion as to what happened as a result of

Page 100

this incident that caused or contributed to this incident?

A. Reading this narrative, no, there is -- no.

Q. Okay. Looking at Exhibit 8, the privilege log, the ten photographs, those are the ones that you testified to earlier that is described here as photographs taken by Carnival security of the scene of the subject incident that Carnival used to transport the chairs and the subject deck chairs. Those are the ones you went through and you thought it was nine, but ten total?

A. Yes, it looks like it's actually -- yes, it would be ten. One is a duplicate, so -- but, yes, it is ten photos.

Q. Okay. No other photos, correct, that you're aware of that is identified in any of these investigations or any of the papers that you've looked at responsive to our requests or that are objected to?

A. No. As I sit here today, I don't know of any other photos.

Q. And the body cam says -- it's Number 6 of the privilege log, 16:59 minutes, a little under 17 minutes, that's the body cam that you have been

Page 101

referring to taken by -- it says Mark Harold Orje, O-R-J-E. Is he the other security officer?

A. Yeah, that would be the other security officer, and, yes, that is the body cam produced in evidence.

Q. So it's a body cam, it's like what a police officer wears, it's like on their vest or on their shirt somewhere that shows right in front of them what is going in front of them?

A. That's correct.

Q. And in this case, it's in the infirmary of Ms. Terry and of her daughter?

A. Correct.

Q. Nothing else?

A. No.

Q. And you've seen it?

A. Yes, I have.

Q. Okay. That's Exhibit 8. Let's go to the next item in Schedule A. "Measures taken to control access to the area where the subject incident occurred or the impact. A, warning signs, caution signs or cones." We talked about that. There were none, correct?

A. Correct.

Q. "Verbal instructions." There were no

26 (Pages 98 - 101)

Page 102

overhead speaker time warnings, correct?

A. No overhead speak announcements, no.

Q. The only verbal instructions that were -- you've testified to were that Raharjo said that he gave to Ms. Terry, but there's no evidence of that in any of the statements, any of the investigation that we just went through, correct?

A. Yes. I believe the testimony is that Raharjo advised that his -- it would be Ranagappa was the one who provided the verbal instructions or the verbal notification of it. That's based on Raharjo's testimony.

Q. And there's no substance of what was said? He just said that he gave her instructions?

A. That he said to clear the area.

Q. And according to what we know happened, neither Terry or the other passengers in the area where she was smoking left the area, correct?

A. To my knowledge, Ms. Terry definitely did not. The -- I'm not aware if any of the other customers got up from their seats or -- they definitely did not leave the area if they were there.

Q. Okay. So nobody listened, basically?

Page 103

A. Nobody what? I'm sorry.

Q. Nobody followed the instructions that Carnival said --

A. Yeah, nobody -- yeah, either they didn't listen to it or they didn't hear it.

Q. Okay. You agree one of the possibilities is they didn't hear it?

A. Possibly.

Q. Okay. And despite either them not hearing it or not listening, because we know they didn't move, they proceeded to unpack the chairs anyway, correct, Ranagappa and Raharjo?

A. Yeah, they continued with the task of unpacking the chairs.

Q. 14C says, "Measures taken to control access to the area included require a policy in effect at the time of the incident that required such areas be restricted for passenger use or traffic." To your knowledge, there are no requirements or policies that the area be restricted or evacuated before such action is taken to unpack things like these chairs?

A. No, there is no policy as long as we can remember, that there hadn't been a need for the policy because this has not occurred before, so,

Page 104

no, there is none.

Q. 15, "Actions taken by crew members in the unpacking process, including removal of the bindings and the plastic material, if any, how it was handled, how the stacked table of chairs are positioned and managed." As far as you understand now based on your testimony, the materials that you reviewed, you've told me whatever actions were taken by the crew members during the unpacking process, and that's the extent of it, what you've discussed?

A. Yes, it is. To my knowledge, yeah, we don't have the action -- there is no set actions. But since it's an on-the-job training, it's the best people to ask would be those two crew members as to what the actual actions or hazards.

Q. Okay. Fair enough. 16, "Any verbal or written instructions and communications with the plaintiff at or near the area of the incident." We've gone through those. There weren't written instructions and the verbal is whatever you said Raharjo said that Ranagappa may have said?

A. That's correct.

Q. "Identity of the deck furniture involved." That was what we looked at previously

Page 105

Exhibit 2, which is the Kannoa Marbella chair?

A. Correct.

Q. And the dimensions, it says 20 pounds. You believe it's eight pounds, but there is no written evidence to show the -- that that was weighed and that it is, in fact, eight pounds, correct? The only written evidence is --

A. Correct. It's based on the -- and based on my -- and also from what we've been told by the ship that it is eight -- eight pounds.

Q. 17B, "The number of tables and chairs that were part of the stack that fell and struck the plaintiff." All we know is what Raharjo testified to and what Ranagappa may say in the future?

A. That is correct.

Q. "Materials and construction of the table and chairs, i.e., wood, metal, plastic." You said you have familiarity with the chairs, correct?

A. With that particular chair, yes.

Q. Can you describe the description -- can you describe the material?

A. Yeah. It's mainly wicker -- a wicker chair. Some -- I believe it's an aluminum of some sort and then just the padding of the -- where

27 (Pages 102 - 105)

Page 106

you're seated on it, but the majority of that chair is of a wicker material.

MR. HOLZBERG: Can you put up, Cooper, again, Number 2, the Kannoa Marbella chair diagram.

MR. JARNAGIN: Yes.

BY MR. HOLZBERG:

Q. Bottom right corner, yeah, there you go.

"Materials and certifications." Can you go ahead and just summarize the materials that we --

A. Sure.

Q. What does it say there?

A. Aluminum, powder coated, welded joints, wicker, high-density polymers, 100 percent acrylic Sunbrella. I believe that would be the three since it's indicated with the checkmarks there, that those are the materials on them.

Q. Okay. And then there's some cement. It says tempered glass. Do you know where that is?

A. I think what it is is the materials -- since it's -- since it has the three checkmarks, I think it refers to -- like the three checkmarks refers to what the chair is made of and the Xs,

Page 107

that does not pertain to.

Q. In other words, it doesn't pertain to this chair?

A. Right.

Q. It's like a table that matches this set?

A. That's my interpretation of it.

Q. I understand. That's fair, I think. Okay. So the first three apply. So basically, aluminum, wicker some fabric?

A. Yes.

Q. Okay. Fair enough. Let's go on. 18, "When was this furniture first purchased and received by the vessel?" Do you know? Did you do any investigation into that?

A. I believe we looked into it. We were not able to distinguish as to when it was purchased, but I believe this -- these chairs have been onboard, I believe, since at least 2021.

Q. How old is this ship? It's the ECSTASY.

A. No, it's the -- it's the ELATION.

Q. ELATION. I'm sorry. I had the E mixed up.

A. Yes.

Page 108

Q. When was it put into service roughly, do you know or remember?

A. It's been probably at least -- it's going to be at least 20, 30 -- close to between 20 and 30 years. It's one of the older ships of the fleet.

Q. Okay. Which class is it in, do you happen to know?

A. The -- next -- I can give you that answer and I can get you the date where they -- for the ship. So entered service -- March of '98 is when it entered service.

Q. Okay. And you believe this furniture was replaced sometime in 2021? This is relatively newer furniture?

A. Well, yeah. From -- my understanding is this is -- this furniture has been onboard at least since 2021 and then the class is the -- Fantasy Class is the -- that it's part of.

Q. Let's look at Schedule B, and I think we'll be -- I'll have a few things and I'll wrap up.

So schedule B we've done a lot already. There are no policies, procedures regarding any of the subjects we talked about,

Page 109

correct?

A. Yeah.

Q. "The unpacking, the safety measures, training, the equipment or aides to do this type of job." We've -- you agree there are no written policies and procedures applicable to this -- the facts of this case?

A. That's correct.

Q. All right. Number 2, "Substantially similar to this ship." Number 3, "Substantially similar to other ships." There are no documents because there were no incidents?

A. I'm sorry, that last part --

Q. There are no documents because there were no other similar incidents?

A. Correct, yeah, there are no incidents of the fleet.

Q. The photos you've identified, Number 4.

"Exemplar. You have the chair or a similar chair we can test and weigh it," and we'll do all that, which we may.

A. Correct.

Q. All right.

MR. HOLZBERG: And, Cooper, you can

28 (Pages 106 - 109)

Page 110

make that available fairly easily.

MR. JARNAGIN: Yes.

MR. HOLZBERG: Do you have one or do you have to get it from Carnival?

MR. JARNAGIN: No, we'd have to arrange to go onboard the ship and one, so I don't have one in our office.

MR. HOLZBERG: I don't think we're going to want to do an actual inspection, but I believe we are going to want to weigh it. So could you arrange to get one and a timing after this?

MR. JARNAGIN: Yes, we're fine providing an exemplar or arrange an inspection of one.

MR. HOLZBERG: Okay. I think we're going to do it -- and like maybe we could do it at your office or warehouse or whatever. We'll figure it out.

BY MR. HOLZBERG:

Q. The medical infirmary chart. We have that, I believe. We've marked it as Exhibit 7, correct? There's only one listed?

A. Yes.

Q. Number 7 is "Report to Coast Guard or

Page 111

law enforcement." Were there any 2692 in this case, or no?

A. I don't believe there were. Let me double check. No, there was no Coast Guard report.

Q. Are no videos of the incident than the photos we talked about, body cam plus ten photos. And the voyage log has a narrative.

MR. HOLZBERG: By the way, it's Number 9 in Schedule B, Cooper, so you'll -- you can produce that if there is any that has safety minute meetings.

MR. JARNAGIN: Yes.

BY MR. HOLZBERG:

Q. Number 10, "Charges of itemized detail made by plaintiff during the subject voyage."

MR. HOLZBERG: Cooper, I don't know if that was ever produced, but I can ask the question of Maurice and then we can decide if it's relevant or not.

BY MR. HOLZBERG:

Q. Does Carnival have any evidence or information of any kind that would indicate that alcohol caused or contributed to this incident that involved Ms. Terry, in other words, she was drinking, under the influence and that may have

Page 112

caused or contributed the incident?

A. No, we don't.

Q. You agree that's not an issue in this case?

A. I agree.

Q. I don't need the charge then. The bridge log we got. And you agree that there was no weather, wind, sea, surf or boat or wave action that caused or contributed to these chairs, did they, or to fall?

A. Agreed.

Q. Warnings we discussed. Other than the verbal warning that may or may not have been given by Raharjo and heard by Terry, there were no warnings, either in writing, verbal or by announcements?

MR. JARNAGIN: Objection, form.

THE WITNESS: Correct, based on what we already discussed.

BY MR. HOLZBERG:

Q. All right. 13 is a redacted version of the incident report.

MR. HOLZBERG: So, Cooper, I'm asking for it. It's been discussed, but given you subject to our stipulation, you refuse to

Page 113

produce it, correct? So we're going to have a further discussion or set up a hearing, correct, and specifically --

MR. JARNAGIN: Not showing it on the screen.

MR. HOLZBERG: Yes, and I would like it, so I'm going to -- we'll have hearing unless we figure out what was -- so redacted version incident -- Number 14.

BY MR. HOLZBERG:

Q. Maurice, you agree that that's what you reviewed and looked at. I mean, again, subject to the stip, that is the entirety of the incident report and the investigation report. I believe it's eight pages and one page, correct, plus the ten photos and the body cam?

A. Yes.

Q. Okay. "Documents related to the type, model, dimensions and the materials is Exhibit 2." We've gone through that. There are no others of the chairs, as far as you understand?

A. Yeah, to my knowledge, that is -- that's it.

Q. "Documents reflecting daytime furniture was received." There are none. You

29 (Pages 110 - 113)

Page 114

looked, you couldn't find them, but you've testified you think roughly 20 were brought on the ship.

A. At least 20, 21, yeah.

Q. Okay. 16, "Documents and materials relating to the plastic or saran warp-like material used to secure the tables and chairs, including this type used in this application."

MR. HOLZBERG: So I would like that as well, Cooper. We could set it up for inspection. I don't expect it today, but I've requested it. So that's 16. So look into that, please. Let me know if we can get samples of it.

BY MR. HOLZBERG:

Q. 17, "Documents and materials, of actions taken by crew members to warn, advise and notify passengers of the impacted process." We've discussed that. And other than perhaps the statement from Raharjo that may -- may or may not have been heard, there are no other statements, written, verbal or by announcement, or evidence of them?

A. Correct.

Q. Okay. That's 17. "Disciplinary

Page 115

actions taken against Raharjo or Ranagappa for this incident." There were none, correct?

A. There were none, correct.

Q. "Communications with crew members of -- through the Seaman's union regarding disciplinary action." There were none, so there are none, correct?

A. That is correct.

Q. "Personnel file 20." Have we gotten pretty much what's there now?

MR. HOLZBERG: Cooper, I think that was -- some of that was produced this morning. Is that what the intention of this morning was?

MR. JARNAGIN: Yes, and that was also supplemental discovery responses based on what Louis and Ashley had discussed, but it just also happens to respond to this as well, yes.

BY MR. HOLZBERG:

Q. Is there anything in the personnel file that you've seen or reviewed, Maurice, that shows Mr. Raharjo's level of English competency at the time of this incident, basically at the time he was hired, which was only a week or two before --

Page 116

or put on the ship a week before?

A. No. What I've seen is what was produced, so I don't there's anything --

Q. You agree -- you agree that for purposes of the deposition he required a translator, right?

A. Yes, that -- that there was a translator presents, yes, I would agree.

Q. I don't remember. I didn't take the depo. Louis did. What was the language, do you remember? Do you know?

A. I'm not too sure.

MR. JARNAGIN: I can't tell you either because Michael defended that deposition.

BY MR. HOLZBERG:

Q. What was his nationality, do you know? Do the records reflect?

MR. JARNAGIN: His records should say where he's from.

BY MR. HOLZBERG:

Q. We can pull it up. I'm looking now to see if we can find it. It would be -- I think Section 48. Well, no, here it is, the contract. Here we go. On 238, which is part of 4, Exhibit 4 attached to this depo. I don't see anything on the

Page 117

first two pages?

A. If we need it, I can look it up pretty quickly.

MR. JARNAGIN: I believe he's from Indonesia. I just don't know which --

MR. HOLZBERG: Right, what languages, there might be numerous like the Philippines or India, I don't now.

MR. JARNAGIN: Yeah, he was from Indonesia, but the language I wouldn't know.

BY MR. HOLZBERG:

Q. Looking at -- so performance evaluation. That doesn't seem to have anything at the top there.

Seafarer's agreement doesn't -- yeah, well, his home address is blacked out. You have that, though. Do you have his home country address? You blacked that out as well.

MR. JARNAGIN: We do have that, yeah.

MR. HOLZBERG: What is it? Look at 238. It's on the cover sheet, 238.

MR. JARNAGIN: I can speak these words into the transcript, but they're not going to make any sense. I can e-mail you the

30 (Pages 114 - 117)

Page 118

home address.  I mean, you've already taken his deposition, but I'm seeing Central Java Indonesia.

MR. HOLZBERG:  Can you spell that?  What's the second word?

MR. JARNAGIN:  It's like Java, J-A-V-A.

MR. HOLZBERG:  Central Java -- you pronounce it Java?

MR. JARNAGIN:  Yeah.

BY MR. HOLZBERG:

Q.  Do you agree that the MLA requires that seamen on Carnival cruise ship is another cruise ship serving U.S. passengers require a proficiency in English?

A.  Yeah, I would agree.

Q.  And that is the language at sea, English, correct?

A.  Correct.

Q.  Okay.  I'm wrapping up.  I'm just going to look at a few more papers and we should be done in a few minutes.  Were there any written policies or procedures regarding this procedure before this incident that were changed -- that were -- were eliminated in any way?  Do you ever

Page 119

remember any procedures providing unpacking and setting up furniture and, you know, safety measures, warning that should be given to the passengers in the area?  Were those procedures done, or you don't recall any ever being in place?

A.  Yeah, not to my knowledge.  To my understanding, it's always been on-the-job training, so it would -- I don't think it's ever existed.

Q.  Did any investigation after the fact, either by the security officers or Carnival, shoreside ever conduct any risk assessments regarding these tasks, moving and unpacking and setting up furniture on the ship when passengers are present?

A.  No.  Again, based -0- since it has not occurred from as far back as they can remember, there is not risk assessment of anything to --

Q.  I'm talking in other words now that this one did occur?

A.  No.  Since, no, because they found that there was no -- no issue with it, no procedure to be done, or to be developed.

Q.  You agree the binding or plastic materials that were on the chairs were likely done

Page 120

sometime from the time it left the port in Nassau and returned to the ship and to -- before it got up on the deck where the chairs fell, correct?  Sometime in that process, the plastic was put on?

A.  I would agree to that.

Q.  Have you ever seen like plastic wrap roll, you know, let's say on a spindle or a dowel, that you can just sort of pull and wrap something around it, sort of like, you know, a -- I guess Christmas wrapping or, you know, gift wrapping in a store, on the ship or at the side of the ship at port of call like this before?

A.  No.

Q.  Did you ever discuss that with anybody before the deposition to find out where it was or what it was --

A.  No.

Q.  -- the plastic?

A.  -- I have not.

Q.  Or where it was located or stored?

A.  No.

Q.  Do you know if any methods were used by either Ranagappa or Raharjo or anybody who helped put the chairs on the trolley or that luggage cart, what they called a handcart, to

Page 121

stabilize the stack of chairs for transport through the -- up until the unpacking process -- at unpacking?

A.  I'm sorry, that first part, do I know if --

Q.  Yeah, were there any methods used to stabilize those chairs while they were being transported or when they were being unpacked?

A.  Not that I'm aware of.  I think that's just talk between them so those are taught down to them as a task.  So it's nothing that I'm aware of.

Q.  There's nothing in writing that says that Raharjo, Ranagappa or any crew members doing this unpacking should make announcements, verbal announcements to passengers before the unpacking process began, correct?

A.  Not that I am aware of, no.

Q.  No training, no policies, procedures or written rules about that, right?

A.  No, unless it's part of the -- again, that on-the-job kind of individual training between themselves, there is nothing else besides that, but there's nothing that we -- we know of.

Q.  As far as you understand, any CCTV that was in operation in the area of the incident,

31 (Pages 118 - 121)

Page 122

according to the investigation that was done, this area was not visible and accessible to the camera lenses?

A. Correct, based on the investigation that we had reviewed that the area would not be covered by it.

Q. So you would agree that there are cameras in the area above and around this deck area, Deck 11?

A. Sure, but that -- there are cameras in the area, yes.

Q. What's below it? This is like a -- Deck 11 is sort of an overhang to Deck 10 below, like an outdoor -- like an elevated sort of balcony or deck, like a veranda? What's below it, a pool deck?

A. If it's -- yeah, if it's on top of it, then below would be the pool deck.

Q. Pretty busy area, right?

A. Sure. But the cameras that were kind of produced in the -- those pictures were produced, even if they're there, you wouldn't be able to see down a deck. You would have to be -- have them at Deck 10 to view the Deck 10 area, the pool area.

Q. Do you know if there's any instruction

Page 123

or malfunction in these cameras that could have affected the ability to surveillance the area to see this area where the incident occurred?

A. Not that I'm aware. Not that I'm aware of.

Q. Do you know when the CCTV system in this area was last inspected or maintained prior to this incident, June 23rd?

A. No, I do not.

Q. Was Mr. Raharjo required to complete any onboard orientation before starting his duties as a deck steward?

A. I believe they have general orientation of the ship and they view videos and go through some minor tests for it to kind of assimilate or kind of familiarize themselves with the ship that I'm aware of.

Q. How many hours of training does that encompass, orientation?

A. That I don't -- I'm not too sure about that.

Q. Who is responsible for training a steward like Raharjo?

A. It would normally -- my understanding is it would be the staff of the manager trainee.

Page 124

Q. Ranagappa was senior to him, he was a room steward with more experience?

A. Yes, he was --

Q. I said room. I mean, houseman.

A. I know what you mean. But yes, it would be his -- his -- he was his senior, yes.

Q. Was he responsible for supervising Raharjo at the time of this unpacking process given that he was the senior?

A. I wouldn't say supervising, but he is -- he is there to kind of provide a task or kind of over -- oversee him, but they both still report to another -- another crew member or higher crew member.

Q. I believe Ranagappa in this case had prior contracts? This is part of the production in this case. There were two or three contracts back of Ranagappa. Do you recall that?

A. I believe that is correct, that he was prior to this.

Q. So common sense would dictate that Ranagappa should be looking out for him and instructing him along the way given the fact he knew it was only his first week on the job?

MR. JARNAGIN: Objection, form.

Page 125

THE WITNESS: Correct, he probably provides guidance or instructions as to how to.

BY MR. HOLZBERG:

Q. So you agree he was more experienced than Raharjo at the time of the incident, that is Ranagappa?

A. I would agree that, yeah, based on his the -- his more time on the ship, yes, he would have more knowledge of certain tasks around the ship, familiarization with the job than -- that Raharjo, yes.

Q. And you agree, based on the deposition testimony of Raharjo that you read, that this is the first time he had done this unpacking process, unstacking chairs and removing the plastic, setting up the chairs after being retrieved from the deck or the port or anything like this function? First time?

A. Yes, based on his testimony, I would agree that, yes, that --

Q. And as he said -- I'm sorry. And he testified that it was his last time? Never was assigned again to do that?

A. According to his testimony, yes,

32 (Pages 122 - 125)

Page 126

that's what he said.

Q. Does Carnival believe that it was a mistake or an error by Raharjo to not have the knife with him that he was supposed to have as he testified to do the plastic removal before unpacking the chairs?

A. No, it -- I believe it's Carnival's position that the knife or the tearing did not -- was not contributed to the -- to the chairs falling.

Q. Other than Raharjo and Ranagappa, there were no other crew members supervising or involved in the unpacking process? It was just the two of them alone without supervision?

A. That's correct. My understanding, that's correct, it was just them two performing the task.

Q. Was the furniture inspected for stability, quality or any hazards in the stack before they were unpacked, like anybody before it left the area where the plastic may have been placed?

A. I'm not sure. I think that would be best asked for them two. That's part of their task to inspect that.

Page 127

Q. You agree that neither the security officers that we talked about who did this complete investigation went to this plastic wrapping area or investigated in any way the steps leading up to the trolley being brought to this area and wrapped in plastic, right?

MR. JARNAGIN: Objection, form.

THE WITNESS: Correct. They deem that it was not contributing to that situation or to the fall. If it was, then I'm sure they would have went ahead and taken into account or looked into that or taken pictures of that -- the wrapping or the wrapping area, as you're referring to.

MR. HOLZBERG: Bear with me a moment. I'm almost done.

Let's look at the Answer and Affirmative Defenses filed in this case.

We're going to mark it as Plaintiff's last exhibit, I believe, Paula, Number 9.

THE COURT REPORTER: Correct.

(Thereupon, Plaintiff's Exhibit No. 9 was marked for identification.)

MR. HOLZBERG: Cooper, if you could put those up to the affirmative

Page 128

defenses, which is -- looks like they're page 5 of 9.

BY MR. HOLZBERG:

Q. Number 2, Maurice, can you read that.

A. "Plaintiff's damages were caused or exacerbated as a result of intervening and superseding factors that were independent of any fault of the defendant which were not reasonably foreseeable."

Q. So we talked about the fact that there was no wind, weather, sea, air, ship movement conditions that may have caused or contributed to this incident, correct?

A. Correct.

Q. Is Carnival aware of any other intervening or superseding factors that may have caused or contributed to this incident that was reasonably foreseeable to it?

A. No, there's nothing that we could see that -- could see as foreseeable as it had never happened before.

MR. HOLZBERG: Cooper, can we withdraw that one? Cooper, you there.

MR. JARNAGIN: Yes, I'm just reading it back to myself. We can withdraw Number

Page 129

2.

BY MR. HOLZBERG:

Q. Number 3, I believe you've testified that plaintiff, had she heard the warnings, could have heeded them, and that's the extent of what she didn't do to exercise ordinary care for her own welfare. Do you agree with that?

A. I agree, she could have. Could have --

Q. You agree -- I'm sorry. Go ahead.

A. I said I agree, she could have just either moved or -- either moved a little bit or cleared the area in entirety, but, yes, that's -- I agree to that.

Q. Right. But you do also agree that she -- it's possible she didn't even hear the instruction? You testified to that previously?

A. It's a possibility that -- she testified that she was talking to other crew members -- I mean, other passengers, so, yes, it's a possibility.

Q. Okay. Number 4 and 5, "It's open and obvious." What do you believe was open and obvious about this condition that plaintiff should have been aware of, observed and --

33 (Pages 126 - 129)

Page 130

A.   She was aware that -- she did mention in her body cam and the testimony that there was the -- she knew the trolley was there.  She knew the actions was -- was going on.  So if it's a stack of chairs that she saw could be potentially dangerous to her, she -- it is an open and obvious situation.  She could have moved if she'd wanted to.

Q.   Number 7, "Plaintiff failed to mitigate her losses or damages."  What evidence or information of any kind does Carnival have that Ms. Terry failed to mitigate her losses and damages once they occurred?

A.   It's our understanding and based on the investigation that she never followed up to the medical center.  That one visit was her -- her only time in the medical center, and the following day she went about on the paddle boarding and snorkeling and there was no issues.  She was asked on the body cam footage if she felt dizzy or anything that would have contributed to a -- a head injury.  She was fine and she was responsive to it.  So there really was nothing to follow up on.  She never returned back or complained about it afterwards.

Page 131

Q.   Number 9 says, "Plaintiff failed to seek timely medical treatment for the condition that caused or exacerbated damages."  So other than not returning to the medical center of Carnival on the ship, is Carnival aware of any other medical treatment that she did not obtain that caused or exacerbated her damages?

A.   No, aside from the no follow-ups or anything else would probably come from the expert's opinion on it.

Q.   So at this time, Carnival is not aware of any further information that she failed to seek timely medical treatment other than what you just said?

A.   Yeah, other than that.

Q.   Number 10 --

MR. HOLZBERG:  Cooper, also --

BY MR. HOLZBERG:

Q.   -- "Intervening and superseding medical conditions."  So is Carnival aware of any intervening or superseding medical conditions or events that may have caused or contributed to Ms. Terry's injuries?

A.   Yeah, as I'm sitting here today, I am not aware of any.  I don't know if the medical

Page 132

expert would opine differently -- differently to that.

Q.   Number 12, "Action or inaction of third parties over defendant who defendant is not responsible for."  So is there anybody other than Carnival or Ms. Terry that may have caused or contributed to this incident, third parties?

A.   It's much -- the previous -- the previous answer.  As I sit here, I'm not aware of.  Again, that would be --

Q.   Not you, Carnival.  It's Carnival that --

A.   Sure.  That Carnival -- Carnival is not aware of any.  Again the medical expert --

Q.   In other words, not the trolley manufacturer, not the chair manufacturer, nobody on the port that may have done something to the chairs before they got back to the ship?  There is no evidence that Carnival is aware of that those types of third parties or any third party is responsible for this incident?

A.   That is correct.

MR. HOLZBERG:  Cooper, could we withdraw that one.

MR. JARNAGIN:  Looking at Number 12.

Page 133

I can't withdraw that one yet because I -- we're still receiving medical records, so I don't want to withdraw that too quickly.  But Maurice just told you what we currently know.

BY MR. HOLZBERG:

Q.   Okay.  Does Carnival have any information currently that medical damages are inflated?  Number 13.

A.   That would be -- Carnival is not aware of any, but that would be a question for their experts.

Q.   Number 17, "Plaintiff's claims are fraudulent."  What evidence, if any, does Carnival have that plaintiff's making fraudulent claim in this -- in this case?

MR. JARNAGIN:  And, Glenn, we will withdraw Affirmative Defense Number 17.

MR. HOLZBERG:  Okay.  Thank you.

BY MR. HOLZBERG:

Q.   You agree, as it states in 19 -- 18 and 19, that maritime law applies to this action, both in our claims and law?

MR. JARNAGIN:  Yes.

THE WITNESS:  I would agree it's a

34 (Pages 130 - 133)

Page 134

legal dispute.

MR. HOLZBERG:  And, Cooper, you and I can have a conversation about 16.  Since maritime law applies, collateral source doctrine in the case doesn't apply.  We can talk about that, but I also request that you withdraw 16?

MR. JARNAGIN:  I'll go ahead and withdraw 16.

MR. HOLZBERG:  You will?

MR. JARNAGIN:  Yes.

MR. HOLZBERG:  Thank you.  I will confirm that in writing.  So we're going to withdraw 16 and 17.  We're going to withdraw 2.  And at this time, you're going to wait on 12 to see what medical providers may say about medical third parties potentially involved, correct?

MR. JARNAGIN:  Correct.

MR. HOLZBERG:  Okay.  Fair enough.  All right.  Maurice, thank you.  That's all I have.

MR. JARNAGIN:  I don't have any questions for you, Maurice.  We appreciate your time today.

Page 135

(It was agreed by and between counsel and the witness that the reading, examination and signing of the deposition were not waived.)

(Thereupon, the deposition was concluded at 2:51 p.m.)

Page 136

CERTIFICATE OF SHORTHAND REPORTER

STATE OF FLORIDA   )
             ) SS.
COUNTY OF PALM BEACH)

I, Paula Pace, RPR, do hereby certify that I was authorized to and did stenographically report deposition of MAURICE VEGA, that a review of the transcript was requested; and that the foregoing transcript, pages 1 through 134 is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED, this 19th day of March, 2025.

*Paula Pace*

PAULA PACE, RPR

Page 137

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF PALM BEACH

I, the undersigned authority, certify that MAURICE VEGA remotely appeared before me and was duly sworn.

WITNESS my hand and official seal this 19th day of March, 2025.

*Paula Pace*

PAULA PACE, RPR
Notary Public State of Florida
My commission Expires: 12-14-26

35 (Pages 134 - 137)

Page 138

Terry v. Carnival

March 19, 2025 - Maurice Vega

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____

MAURICE VEGA              DATE

Page 139

Maurice Vega c/o
Cooper Jarnagin, Esquire
Cooper.Jarnagin@gray-robinson.com

                    March 19, 2025

RE:  Terry v. Carnival
     March 19, 2025
     Maurice Vega
     Job #7203945

     The above-referenced transcript is available for review.
     Maurice Vega should read the testimony to verify its accuracy.

     If there are any changes, Maurice Vega should note those with the reason on the attached Errata Sheet.

     Maurice Vega should, please, date and sign the Errata Sheet and email to the deposing attorney as well as to Veritext at Transcripts-fl@veritext.com and copies will be emailed to all ordering parties.

     It is suggested that the completed errata be returned days from receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.

     If Maurice Vega fails to do so, the transcript may be used as if signed.
          Yours,
          Veritext Legal Solutions

*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e).

36 (Pages 138 - 139)

Veritext Legal Solutions

**[0 - 4]**

**0**

**0**  119:16
**003**  2:16
**005**  2:21
**020**  2:21,22
**021**  2:22
**040**  2:23
**052**  2:23
**079**  2:24
**094**  2:24

**1**

**1**  2:21 5:14,17
   7:22,24 8:7,10
   80:21 136:6
**1.310**  139:24
**10**  34:23 40:23
   48:1,2 111:14
   122:13,24,24
   131:16
**100**  89:1 106:16
**104th**  2:4
**10:00**  82:8
**11**  3:15 9:18
   11:5 49:21 50:5
   61:16 66:5
   69:19 93:7
   122:9,13
**11:00**  82:8
**12**  40:23 92:7,9
   93:7 132:3,25
   134:16
**12-14-26**  137:22

**120**  88:4,9,15
**127**  2:25
**12:00**  1:13
**12:47**  40:7
**12:49**  40:10
**12:57**  48:5,8
**13**  1:12 91:23
   92:13 112:21
   133:9
**134**  136:6
**135**  2:16
**136**  2:17
**138**  2:17
**139**  2:18
**14**  113:9
**14c**  103:15
**15**  104:2
**16**  104:17 114:5
   114:12 134:3,7
   134:9,14
**16:59**  100:24
**17**  100:25
   114:16,25
   133:13,18
   134:14
**1705**  49:8,9,11
**17b**  105:11
**18**  5:21 13:14
   14:8 18:13
   25:20 26:5,5,7
   26:12 107:12
   133:21
**19**  133:21,22
   138:2 139:4,6

**19th**  136:11
   137:11
**1:07**  48:6
**1:08**  48:11

**2**

**2**  2:21 20:17,18
   26:16 27:11,11
   81:8 105:1
   106:4 109:9
   113:19 128:4
   129:1 134:15
**20**  13:15 14:15
   14:16,20,24
   28:5 41:4 42:4
   65:15 85:19
   88:3,4,8,9 89:2
   89:3,16 105:3
   108:4,4 114:2,4
   115:9
**2021**  107:19
   108:14,18
**2023**  42:6 47:12
   49:6,17 50:3
   66:3 69:18
**2024**  1:3 3:15
   40:23,23 41:4,5
**2025**  1:12
   136:11 137:11
   138:2 139:4,6
**21**  41:5 114:4
**22**  85:19
**220**  2:4

**22067**  1:3
**23**  41:13 86:12
**237**  20:23
**238**  116:24
   117:22,22
**23rd**  42:8 123:8
**24**  26:5 41:16
**248**  40:15
**249**  41:3
**24th**  41:19
**25**  13:13,17,20
**250**  40:16
**26**  13:13,14
   14:11 25:21
**260**  21:7
**2692**  111:1
**2:51**  1:13 135:6

**3**

**3**  2:22 20:24
   21:1,12,16 31:8
   109:10 129:3
**30**  108:4,5
   139:23
**33156**  2:5
**33401**  2:9
**34239**  136:14
   137:18

**4**

**4**  2:22 21:2,9
   39:23 81:8
   109:19 116:24
   116:24 129:22

**[40 - afternoon]**

**40** 13:13 89:1,3 89:4
**48** 87:25 88:1,14 116:23
**4:30** 61:23 66:4 69:18
**4:35** 49:18 50:4 62:6,8
**4:38** 62:10

**5**

**5** 2:23 39:24 40:14,18 78:13 78:15 128:2 129:22
**515** 2:8
**53** 12:13,13
**5:05** 49:11
**5th** 41:13 49:6 49:17 50:3 66:3 69:18

**6**

**6** 2:23 52:4,16 52:23 55:22 56:21 61:25 62:5,10 68:6 78:19 81:8 100:23
**650** 2:8
**6:00** 34:24
**6th** 68:6 69:10 69:11 82:9

**7**

**7** 2:24 78:25 79:23,24 80:1 92:8 110:22,25 130:9
**72** 26:8
**7203945** 139:7
**7685** 2:4

**8**

**8** 2:24 42:4 79:23 81:8 94:9 94:11 100:5 101:18

**9**

**9** 2:25 111:9 127:20,23 128:2 131:1
**98** 108:11

**a**

**ability** 123:2
**able** 15:13 26:19 39:11,21 45:24 64:22 65:18 97:11 107:17 122:22
**above** 1:21 16:22 93:7 122:8 139:8
**absolutely** 12:12
**accepted** 66:16 69:25 98:14

**access** 101:20 103:16
**accessible** 47:24 122:2
**accident** 45:21 46:1,7,13,18 50:1 51:8,11 52:20 53:2,9,17 56:21,24 58:14 58:16,21,24 64:10 94:14,15 94:20,25 95:4 96:6
**account** 42:8 127:12
**accuracy** 139:10
**accurate** 21:18
**acknowledge** 14:19
**acrylic** 106:17
**action** 43:3,6,12 43:23 73:16,18 84:25 85:1 103:21 104:13 112:8 115:6 132:3 133:22 136:10,10
**actions** 66:25 99:6 104:2,8,13 104:16 114:17 115:1 130:4
**actors** 73:21,24 76:25 99:11,13

**actual** 15:7 26:11 82:18 104:16 110:9
**actually** 20:22 38:16 51:24 55:18 58:13 67:23 85:1 89:21 90:2 100:13
**adalberto** 65:14
**addition** 7:18 94:8,13
**additional** 65:23
**address** 31:4 117:17,19 118:1
**addressing** 32:20
**adhere** 32:15 37:18
**adherence** 34:8
**adhering** 37:25
**administrative** 7:12
**advise** 114:17
**advised** 102:9
**affected** 123:2
**affirmative** 2:25 78:14 127:18,25 133:18
**aftermath** 98:15
**afternoon** 3:7 3:12

**ago** 56:9 65:15
**agree** 15:22
  28:10 31:9
  34:17,19 37:5
  38:9 39:15,19
  57:9,13,20,23
  58:7,10 61:18
  66:24 67:3
  71:25 72:7,11
  72:17 76:3
  84:19 92:22
  98:7,10,19
  103:6 109:5
  112:3,5,7
  113:11 116:4,4
  116:8 118:12,16
  119:24 120:5
  122:7 125:5,8
  125:13,21 127:1
  129:7,8,10,11
  129:14,15
  133:21,25
**agreed** 45:5,6
  112:11 135:1
**agreement** 2:22
  21:4 65:9 99:24
  117:16
**ahead** 27:19
  33:24 35:19
  36:14 44:19
  46:5 53:5 72:9
  106:11 127:11
  129:10 134:8

**aides** 109:4
**air** 128:11
**alcantara** 30:2
**alcohol** 111:23
**alignments**
  31:17
**allowed** 33:2
  58:9 60:10 64:8
**aluminum**
  105:24 106:15
  107:10
**amended** 5:21
**analysis** 69:1
  95:12
**announcement**
  34:13 114:22
**announcements**
  70:23 71:5
  102:2 112:16
  121:14,15
**answer** 2:25
  3:19,22 4:12,14
  4:16 7:16 17:12
  26:19 52:25
  53:4,7 58:19
  65:5,22,24
  85:20 86:14,19
  108:10 127:17
  132:9
**answered** 53:20
  73:13 75:5
**answers** 3:21
**anybody** 6:5
  67:10 70:12,17

  74:5 93:16
  120:14,23
  126:20 132:5
**anyway** 20:3
  103:12
**apart** 87:6
**apologize** 67:24
**appear** 82:4
  83:1
**appearances** 2:1
**appeared** 137:8
**appears** 21:20
**applicable**
  109:6
**application**
  114:8
**applies** 133:22
  134:4
**apply** 44:20
  107:9 134:5
**appreciate** 10:9
  134:24
**approximate**
  13:9
**approximately**
  6:25 7:2 41:17
  49:17 50:4
  61:23 69:18
**area** 9:18 10:3
  10:24,25 11:21
  13:17 17:19
  22:2 23:15,18
  23:19,21 24:8,8
  24:11,12 31:11

  31:14 32:9,12
  33:1,4,6,7,11,18
  34:3,12,15,20
  36:9 37:12,13
  37:21 38:7,11
  38:25 44:6,10
  44:13 50:5 52:1
  58:17 61:17,18
  62:24 63:3 66:5
  66:15 67:5
  69:19,23 70:24
  71:2 72:5 80:8
  80:17,22 81:2
  81:12 82:19
  92:21 93:7,14
  95:20 96:6 97:5
  101:20 102:15
  102:18,18,23
  103:16,20
  104:19 119:4
  121:25 122:2,5
  122:8,9,11,19
  122:24,24 123:2
  123:3,7 126:21
  127:3,5,14
  129:13
**areas** 5:21 20:12
  20:14 22:2,3
  23:25 31:14
  32:5 35:1
  103:18
**arguing** 76:18
**arm** 13:14 14:10
  14:11 27:22

**[arm - based]** Page 143

28:2,5
**armrest** 27:22
27:23
**arms** 13:21
27:13,14,15
**arrange** 110:6
110:11,14
**arranging** 32:12
**ascribe** 16:25
**ashley** 75:19
91:8 115:17
**aside** 15:17,21
67:7 131:8
**asked** 4:20
23:18,19,23
36:15 52:1,2
53:18 55:16
71:24 73:13
78:21 86:22
126:24 130:19
**asking** 53:12,14
65:7 75:20 78:8
84:3 112:23
**assessment**
87:24 119:18
**assessments**
119:12
**assigned** 22:4
125:24
**assignment**
42:22
**assimilate**
123:16

**assist** 12:4
**assistant** 29:21
30:1 51:19
**assume** 3:19
56:7
**assuming** 87:23
**assumption**
59:18
**attached** 12:6
21:4 116:25
139:12
**attachment**
94:22
**attachments**
45:22 46:1 80:5
**attempted** 66:12
**attempting** 23:8
**attempts** 33:16
**attend** 55:20
**attendant** 19:11
20:9
**attendants** 32:9
**attending** 55:18
**attention** 49:10
66:15 69:24
**attorney** 136:8
136:9 139:14
**audio** 1:11
**author** 51:19
**authored** 94:17
**authority** 137:7
**authorized**
136:5

**available** 6:10
15:2 30:8,23
70:11,13 71:14
93:18 94:1
110:1 139:9
**avoid** 58:24
**aware** 4:17
33:10 59:1
71:23 73:25
79:4 92:16
100:17 102:21
121:9,11,17
123:4,5,17
128:15 129:25
130:1 131:5,11
131:20,25 132:9
132:14,19
133:10

**b**

**b** 2:19 6:6 9:1
19:13 75:22
91:16,18 108:20
108:23 111:9
**back** 9:20,22,23
11:1,5,12,15
13:24 23:22
27:14,15,20
28:23 30:17
32:2 40:9 45:25
48:6,10 50:8
52:6 53:11 60:8
62:4 66:13 69:7
69:7,16,22

78:13 80:16
96:16,16,23,25
97:6,8,12
119:17 124:17
128:25 130:24
132:18
**backed** 38:15
59:11
**background**
76:11
**backrest** 14:2
**backwards**
60:20
**bad** 66:12
**bags** 36:21
**balancing** 28:4
**balcony** 122:14
**bar** 17:18
**bars** 17:20
**base** 25:20
**based** 3:12
14:19 16:9
19:18 32:4
57:14,21 59:18
59:22 60:4 65:5
65:23 77:19
78:20 81:11
82:3 83:13,20
84:21 85:15
89:18 94:25
102:11 104:7
105:8,9 112:18
115:16 119:16
122:4 125:8,13

**[based - canopy]**                                      Page 144

125:20 130:14
**basic** 21:21,22
**basically** 13:4
  14:7 17:20
  102:25 107:9
  115:24
**basics** 6:13
**basing** 83:20
  89:14 90:10
**bates** 12:14
**beach** 2:9 136:3
  137:4
**bear** 21:6 66:12
  127:15
**beating** 64:3
**began** 23:16
  121:16
**beginning** 31:20
**behalf** 2:3,7 4:9
  5:19 6:23
**believe** 3:14
  11:16 12:6
  14:21,24 16:10
  16:16,17 19:2,4
  20:4 22:17,17
  24:15 25:15
  26:9 29:24
  30:10,16 36:17
  42:20,23 52:4
  55:1 58:13,15
  62:6 65:13
  67:21,22 74:1,9
  74:11 75:15,16
  78:5 84:22 86:7

88:20 90:13
92:8 93:1 102:8
105:4,24 106:17
107:16,18,19
108:13 110:10
110:22 111:3
113:14 117:4
123:13 124:15
124:19 126:2,7
127:20 129:3,23
**belongs** 32:3
**best** 3:16 6:3
  7:25 23:11
  80:20 82:10
  104:15 126:24
**better** 26:21
  29:1,1 36:6,14
  39:20 55:16
  71:24 87:21
**beverages** 18:20
**big** 81:9 94:25
**binding** 119:24
**bindings** 104:4
**bit** 17:21 45:20
  46:24 60:20
  78:14 129:12
**blacked** 117:17
  117:19
**blank** 54:14
**block** 21:23
  33:18 34:2
**board** 51:11
  53:21

**boarding**
  130:18
**boat** 112:8
**body** 58:4 75:4
  75:8 76:25 77:6
  77:16,25 79:11
  92:15 96:8
  100:23,25 101:4
  101:6 111:6
  113:16 130:2,20
**bottom** 12:9
  13:3 14:7 17:20
  18:5 27:7 55:22
  106:8
**bound** 88:15
**brand** 10:14
**break** 5:4,7 10:7
  47:23
**breaking** 56:14
**bridge** 43:18
  98:17 112:7
**briefly** 54:4
**bring** 9:20
  36:24 55:13
  86:16
**brought** 9:21
  11:5 36:13 54:8
  55:11 71:10
  114:2 127:5
**budi** 19:13
**bullet** 31:22,25
**bump** 43:22
  44:6

**bunch** 12:13
**burst** 43:17
**bush** 64:4
**busy** 34:22
  122:19

**c**

**c** 30:2,3,3,4
  139:1
**cabin** 62:18
  95:13
**cabins** 20:12,13
  22:4
**call** 8:2,5 120:12
**called** 3:3 77:7
  120:25
**calling** 94:14
**calls** 90:13
**cam** 58:4 75:4,8
  76:25 77:6,16
  77:25 79:11
  92:15 96:8
  100:23,25 101:4
  101:6 111:6
  113:16 130:2,20
**camera** 93:20
  96:7 122:2
**cameras** 92:21
  93:6,12,13,25
  122:8,10,20
  123:1
**canopies** 11:19
**canopy** 66:7

**[capabilities - chairs]**

**capabilities** 39:17

**capacity** 6:23

**captured** 92:25

**care** 38:14 59:14 78:10 98:14 129:6

**carnival** 1:7 4:9 4:21,22 5:20 6:23 7:4 8:1 9:15 10:19 19:23 20:2 29:4 30:13 32:15 33:5 37:18 38:4 39:15 44:16 45:1,17 47:11 58:25 65:14 74:4,11 76:14 78:22 90:13 92:24 100:8,10 103:3 110:4 111:21 118:13 119:11 126:2 128:15 130:11 131:4,5,11,20 132:6,11,11,13 132:13,19 133:7 133:10,14 138:1 139:5

**carnival's** 52:25 54:23 64:6 126:7

**carpet** 17:19

**carpeted** 18:5

**carrying** 57:3

**cart** 18:25 23:15 23:15 36:17,18 36:18 120:25

**carts** 37:8

**case** 1:3,22 3:9 3:13 5:14,20 7:9 9:10 18:12 22:8 38:13 44:22 54:3 64:8 90:22 91:2,14,22,24 93:11 101:11 109:7 111:2 112:4 124:15,17 127:18 133:16 134:5

**cause** 15:23 44:8 59:3 83:5 83:16 98:24

**caused** 35:9 43:24 58:13,15 70:3 74:6 99:3,7 100:1 111:23 112:1,9 128:5 128:12,17 131:3 131:6,22 132:6

**causing** 10:3 98:20

**caution** 101:22

**ccl** 22:4 47:11

**cclelhea2023...** 47:1

**cctv** 94:5 96:7 121:24 123:6

**cells** 90:23

**cement** 106:20

**center** 10:5 54:1 54:2 55:2,7,12 66:18 70:1 75:11 79:14 92:11 95:25 130:16,17 131:4

**central** 118:2,8

**certain** 39:7 94:24 125:10

**certainly** 64:9

**certificate** 2:16 2:17 136:1 137:1

**certifications** 106:10

**certify** 136:4,8 137:7

**cetera** 98:15

**chair** 2:21 12:8 12:21,24 13:10 13:24 14:14 15:6,6,7,9,11,12 15:14,15,19,20 15:24 16:1,2,4 20:16 25:1,5,13 25:19,20,21 26:5,6 27:4,12 27:15 28:5 31:17 32:10 35:10,22,23

38:16,18 43:4 43:10,22,23,24 44:7,8 57:25 62:22 63:8,18 63:20,21,22,23 63:24 66:8,9,10 66:14 69:21,23 80:18 81:7,9,10 81:13 84:10,18 84:23,23 85:2,4 85:13 86:7 88:8 90:5,9,9 97:2,6 97:7,8,12,14,18 97:21 105:1,20 105:24 106:1,4 106:25 107:3 109:20,21 132:16

**chairs** 9:20 10:1 10:2,2,11,12,14 10:19 11:2,8 12:18 14:23,24 15:2,10,12,23 16:7,11,12,22 18:12,18 19:4 22:20,23 23:2,3 23:8,9,17,22 24:1,3,15,20,25 25:1,19 26:11 26:13,25 27:8 27:23 28:13,23 31:18,19 32:6,6 32:7,13 34:11 34:14,16,19

**[chairs - confirmed]**

35:4,8 38:1,2
39:1 50:7 57:3,4
58:16,21 59:4
59:20 63:9,10
63:12,13,18
66:4,13 67:6,8
68:23 69:17,20
69:22 70:19
71:1,22 73:5
80:18,20,21,25
81:2,4,15,19
83:15 84:2
85:13,16,20,20
86:3,5,25 87:23
87:25 88:2,3,18
88:22,22 89:9
89:12,13,16,20
89:21 90:1
96:16,18,20
97:5 100:10,11
103:11,14,22
104:5 105:11,18
105:19 107:18
112:9 113:21
114:7 119:25
120:3,24 121:1
121:7 125:16,17
126:6,9 130:5
132:17
**chance** 20:6
**change** 138:4,7
138:10,13,16
**changed** 118:24

**changes** 139:11
**characterize**
8:20 80:20
**charge** 20:12
112:6
**charges** 111:14
**chart** 16:4
110:21
**check** 18:1
111:4
**checkmarks**
106:18,23,24
**cheer** 23:19
**chief** 51:19
**christmas**
120:10
**cigarette** 37:14
**circumstances**
74:14 78:19,22
**cite** 65:13
**civil** 139:23,23
**claim** 133:15
**claimed** 50:3
**claiming** 55:18
**claims** 133:13
133:23
**class** 108:7,18
108:19
**cleaning** 20:12
20:13 22:1
31:10
**clear** 3:23 23:15
23:18,19,24
34:12 38:25

102:15
**cleared** 129:13
**clearly** 3:17
24:2
**client** 9:17
77:25
**close** 11:9 24:8
108:4
**closed** 34:22
**closer** 14:25
**closest** 41:15
**coast** 110:25
111:4
**coated** 106:15
**collateral** 134:4
**colleague** 66:6
69:17 96:19
**collected** 36:23
**column** 90:25
**combination**
80:22
**come** 52:6 68:10
78:13 91:13
131:9
**coming** 11:1,12
34:11 75:22
**commission**
137:22
**committee**
90:16
**common** 124:21
**communicate**
39:11,21

**communication**
1:11 42:3
**communicatio...**
104:18 115:4
**competency**
115:23
**complained**
130:24
**complete** 3:21
4:16 67:8
123:10 127:2
**completed**
139:16
**completion** 41:8
**concluded**
99:17,20 135:6
**concluding**
94:25
**conclusion**
65:12 99:25
**conclusions**
45:17 92:1
**condition** 77:17
129:24 131:2
**conditions** 21:5
98:20 128:12
131:20,21
**conduct** 119:12
**cones** 33:21
101:22
**confirm** 134:13
**confirmed**
67:24

**[confirms - court]**

| | | | |
|---|---|---|---|
| **confirms** 96:9 | 132:7 | **correct** 8:25 9:8 | 87:25 88:4,10 |
| **connected** 136:9 | **contributing** | 10:20 11:10,20 | 88:11 89:6,9 |
| **considered** | 98:21 127:9 | 11:25 12:21 | 90:3 92:12,15 |
| 32:22 139:17 | **control** 101:20 | 13:19 14:3,9,13 | 92:17,20,22 |
| **consistent** 61:24 | 103:15 | 18:14 19:15 | 95:18 97:25 |
| 95:16 | **conversation** | 22:21 25:24 | 98:16 100:16 |
| **construction** | 134:3 | 28:16,17 29:15 | 101:10,13,23,24 |
| 105:17 | **cooper** 2:9 12:2 | 30:4 31:11,13 | 102:1,7,19 |
| **contain** 61:7 | 21:15 30:14 | 31:16 33:2,3,8 | 103:12 104:23 |
| **contained** 64:11 | 40:1,15 41:3 | 33:12,15 36:18 | 105:2,7,8,16,19 |
| 65:21 79:17 | 44:18 45:5 46:3 | 39:14 41:14 | 109:1,8,16,23 |
| **contains** 6:6 | 46:11 47:19 | 43:1,20 44:16 | 110:23 112:18 |
| **contemporane...** | 48:3 52:7 64:2 | 44:17 45:21 | 113:1,3,15 |
| 68:15 82:12 | 64:17 93:3 | 47:5 49:2,3,12 | 114:24 115:2,3 |
| **contemporane...** | 106:3 109:25 | 49:14,24 50:25 | 115:7,8 118:18 |
| 84:11 | 111:9,16 112:23 | 51:1,6,14,15 | 118:19 120:3 |
| **context** 53:16 | 114:10 115:11 | 52:23,24 53:19 | 121:16 122:4 |
| 91:17 | 127:24 128:22 | 53:20,22 55:4 | 124:19 125:1 |
| **continued** 24:10 | 128:23 131:17 | 56:12 59:22 | 126:15,16 127:8 |
| 103:13 | 132:23 134:2 | 61:20 62:9,11 | 127:21 128:13 |
| **contract** 19:23 | 139:1 | 62:12,15 64:1 | 128:14 132:22 |
| 19:25 31:1 | **cooper's** 4:3 | 66:23 67:2,9 | 134:18,19 |
| 116:23 | **cooper.jarnagin** | 69:11 70:4,10 | **counsel** 22:17 |
| **contracts** 31:3 | 2:10 139:2 | 70:14,20,21 | 135:2 136:8,9 |
| 124:16,17 | **copies** 139:15 | 71:7 72:14 73:7 | **counting** 80:16 |
| **contribute** 59:4 | **copy** 5:12 47:16 | 73:8,15,21,25 | **country** 117:18 |
| 98:25 | **cordoning** 34:2 | 74:15,19,20,23 | **county** 136:3 |
| **contributed** | **corner** 106:8 | 76:7,9,16 77:1 | 137:4 |
| 43:24 44:8,12 | **corp** 2:24 | 77:11,12,17 | **couple** 5:6,25 |
| 70:4 74:6 99:3,8 | **corporate** 4:18 | 78:12,18,23,24 | 17:3 |
| 100:1 111:23 | 6:21 | 79:6,7,9,10,13 | **course** 3:10 29:3 |
| 112:1,9 126:9 | **corporation** 1:7 | 79:15,18,19 | **court** 1:1 5:3 |
| 128:12,17 | 7:5 | 84:6,13,15 85:6 | 7:10,17,17,18 |
| 130:21 131:22 | | 85:14 87:18,24 | 40:6,9 48:7,10 |

**[court - describe]**

56:14 79:24
127:21
**cover** 46:10,12
62:2 93:14
117:22
**covered** 27:15
79:2 94:6 96:7
122:6
**crew** 9:2,6,19
16:9 17:3,3
20:13 22:3,18
32:8,8 33:9 36:9
42:17 50:12
60:22 70:13
78:15 83:21
96:1,14 99:7,12
104:2,9,15
114:17 115:4
121:13 124:13
124:13 126:12
129:19
**critical** 64:6
**cruise** 14:23
118:13,14
**current** 6:23
**currently** 133:4
133:8
**customers**
102:22
**cut** 47:15 72:5
82:25 83:7
**cutting** 45:20
57:12,16

**cv** 1:3

**d**

**d** 2:12 19:13
**damages** 128:5
130:10,12 131:3
131:7 133:8
**dangerous**
130:6
**date** 3:14 40:20
47:7 49:4,5,9
81:22 94:20,23
95:14 108:10
138:22 139:13
**dated** 136:11
**daughter** 50:20
55:25 58:6 76:5
77:3,5,10,15
78:7 95:24
101:12
**daughter's** 56:7
**david** 2:22 19:8
19:13 60:21
**day** 7:17 31:20
31:21 82:6
130:17 136:11
137:11
**days** 139:17
**daytime** 113:24
**dealings** 8:1
**debark** 11:4
**december** 3:15
**decent** 39:10

**decide** 27:21
111:18
**decision** 65:15
**deck** 9:18 11:5
26:4 28:24
31:12 32:3
34:22 49:21,24
50:5 61:16 66:5
69:18 92:22
93:6 100:11
104:24 120:3
122:8,9,13,13
122:15,16,18,23
122:24,24
123:12 125:17
**decks** 20:14
22:2 28:14
**declare** 138:19
**deem** 127:8
**deemed** 45:4
**defective** 15:25
**defendant** 1:8
2:7 5:20 128:8
132:4,4
**defended**
116:14
**defense** 64:6
133:18
**defenses** 2:25
78:14 127:18
128:1
**deferring** 37:19
**definitely** 7:3
102:20,23

**demeanor** 32:21
**density** 106:16
**depend** 27:7
**depending** 27:3
27:21 88:22
89:9 90:24
**depends** 26:13
72:18 87:9
88:17
**depo** 4:7 6:14
19:5 22:6
116:10,25
**depos** 2:24
**deposed** 19:7
23:12
**deposing** 139:14
**deposition** 1:16
1:21 2:21 3:13
5:13,25 6:16,17
7:7,19,23 16:10
19:12,19 30:9
35:5 71:10
84:16 85:6,9,10
85:18 86:6
91:19 116:5,14
118:2 120:15
125:13 135:4,5
136:5
**depositions** 6:25
7:6 30:19
**depth** 13:13,23
**describe** 16:19
17:14 61:21
62:16 63:13

**[describe - eight]** Page 149

96:11 105:21,22
**described** 20:6
29:10 56:8
76:14 91:1
94:14 100:8
**describes** 63:16
**description** 2:22
12:23 17:1
20:21 21:12,18
21:19,23 49:25
50:2 105:21
**designated** 4:18
5:19 6:22 31:15
32:25 33:5,10
37:12 44:5 50:5
81:1
**despite** 24:3
59:16 103:9
**detail** 20:6
56:20 111:14
**determine** 82:24
83:5
**developed**
119:23
**device** 35:7
**diagram** 13:20
106:5
**dictate** 124:21
**difference** 14:18
25:23 62:3
**different** 16:24
17:11 23:21
30:19 35:22,22
47:20 49:2

93:15 95:3
**differently** 59:8
132:1,1
**difficult** 4:10
27:12 87:8
**dig** 79:21
**dimensions**
13:12 25:19
105:3 113:19
**direct** 2:16 3:5
**direction** 24:21
57:2 93:15
**disagree** 26:10
34:15
**disagreement**
65:18
**discern** 67:17
**disciplinary**
114:25 115:6
**discipline** 42:24
**disclosed** 64:8
**discovery**
115:16
**discrepancy**
14:18 15:5
**discuss** 64:17
91:17 120:14
**discussed** 4:3
12:3 22:14
75:19 91:8
104:11 112:12
112:19,24
114:19 115:17

**discussion** 40:8
56:16 91:5
113:2
**dismount** 23:22
**dismounting**
23:1
**disposal** 36:13
**dispute** 86:2
134:1
**disregard** 40:11
**distance** 27:13
**distinguish**
107:17
**distributed**
28:15
**district** 1:1,1
**division** 1:2
**dizzy** 130:20
**docked** 96:10
**doctors** 76:8
**doctrine** 134:5
**document** 20:23
138:20
**documents** 4:1
4:2 6:7 16:7
20:5 109:11,14
113:18,24 114:5
114:16
**doing** 22:22
23:6,6,7,10 34:6
37:25 55:17
61:9 96:15
121:13

**double** 111:4
**dowel** 120:7
**downstairs** 36:5
**drinking** 111:25
**drinks** 11:22
**drive** 2:8
**dropped** 58:16
**duces** 3:13 5:13
91:18
**duly** 3:3 137:9
**duplicate** 80:16
80:17 100:14
**duties** 123:11
**duty** 32:11

**e**

**e** 2:12,19 101:2
107:23 117:25
138:3,3,3
139:23,24
**earlier** 3:14
28:11 32:24
100:7
**easily** 87:8
110:1
**easy** 72:21
87:15
**ecstasy** 107:21
**effect** 8:9
103:17
**eight** 7:3 14:21
14:25 28:5
30:19 41:17,24
80:12,14 87:25

**[eight - experienced]**

88:1 89:2,2,16 94:13 105:4,6 105:10,10 113:15
**either** 11:12 19:1,18 27:3,4 28:21 30:8 36:6 45:2 54:20 65:3 67:23 70:17 73:18 77:1 82:17 84:8 87:8 88:14 93:12 103:4,9 112:15 116:13 119:11 120:23 129:12 129:12
**el** 47:11
**elation** 47:11 48:20 107:22,23
**elevated** 122:14
**eliminated** 118:25
**email** 139:14
**emailed** 139:15
**embarkation** 37:1
**employed** 30:12
**employee** 57:2 58:16 136:8,9
**employments** 7:5
**encompass** 31:25 123:19

**encounter** 31:25
**enforcement** 111:1
**engaged** 42:3
**english** 39:5,8 39:10,16,17 115:23 118:15 118:18
**enjoy** 11:22
**enter** 99:24
**entered** 108:11 108:12
**entire** 28:5 42:8 70:7
**entirety** 66:21 92:9 113:13 129:13
**entitled** 65:12
**envision** 11:6
**equipment** 58:20 109:4
**errata** 2:17 139:12,14,16
**error** 126:3
**esquire** 2:5,9 139:1
**establish** 89:17
**estimate** 89:8
**estimated** 26:3
**et** 98:14
**evacuated** 103:21
**evaluation** 40:13,21 41:23

117:14
**evaluations** 39:23 40:2 41:9
**event** 3:17
**events** 90:17 131:22
**everybody** 11:4 37:15
**evidence** 43:9 59:1,25 72:23 72:24 74:5,18 74:25 86:4 89:14,17 101:5 102:5 105:5,7 111:21 114:22 130:10 132:19 133:14
**exacerbated** 128:6 131:3,7
**exact** 15:10,12 15:14 25:14 38:23 81:9
**exactly** 17:1,4 17:12 23:10 25:14 28:8 29:2 38:20 52:1 84:10 87:11
**examination** 2:16 3:5 135:3
**examined** 3:4
**example** 4:21
**excel** 90:23
**excuse** 32:1 62:19 94:21

**executive** 90:16
**exemplar** 109:20 110:14
**exercise** 59:13 129:6
**exhibit** 2:21,21 2:22,22,23,23 2:24,24,25 5:14 5:16 7:22 20:17 20:18,24,25 21:2,8,12,16 26:16 27:11 31:8 39:23,24 40:14,17 52:4 52:15,23 55:22 56:21 61:25 62:5,10 79:22 79:25 92:8 94:9 94:10 100:5 101:18 105:1 110:22 113:19 116:24 127:20 127:22
**exist** 91:11
**existed** 119:9
**exists** 91:10
**expect** 114:11
**expectation** 34:7
**experience** 89:20 124:2
**experienced** 125:5

**[expert - flagler]** Page 151

expert 132:1,14
expert's 131:9
experts 133:12
expires 137:22
explain 24:9
  40:4 52:19
  92:24,25
explains 96:15
extensive 21:6
extent 39:19
  104:10 129:5

**f**

f 8:11
fabric 107:10
fact 61:7 65:5
  85:17 93:1
  99:15 105:6
  119:10 124:23
  128:10
factors 128:7,16
facts 9:10 45:13
  48:23 53:6 64:7
  64:7,13,19,22
  65:13,19,21
  66:2 68:21 70:4
  76:22 91:25
  95:12 96:21
  98:12 109:7
  138:20
factual 61:8,9
  61:12 63:9
  98:12

factually 65:1
  66:22 69:14
fail 3:18
failed 130:9,12
  131:1,12
fails 139:19
fair 7:14 8:16
  32:14 104:17
  107:8,12 134:20
fairly 21:6
  110:1
fall 10:6 35:9
  81:16 97:19
  112:10 127:10
fallen 10:3 25:5
falling 16:1
  43:25 73:5
  84:10,18 96:22
  97:12,14,23
  126:10
falls 72:5
familiar 90:18
familiarity
  105:19
familiarization
  125:11
familiarize
  123:16
fantasy 108:19
far 8:14,15 37:9
  43:2 44:11 59:7
  74:8 78:20
  96:13 99:13
  104:6 113:21

119:17 121:24
farah 3:10,10
fault 99:8 128:8
february 40:23
  40:23 41:16
federal 139:17
  139:23
feeling 75:12
feet 14:5,12
  17:22 18:6
  25:16,18 26:8
fell 12:19 15:8
  15:13,14,15,24
  16:8 19:4 22:24
  24:20,22,25
  25:1,13 35:10
  43:4,10 50:7
  57:4 58:1 59:4
  63:13 66:10,11
  66:13 69:21,22
  73:6 83:15 84:2
  85:4,13 97:6,12
  97:14,25 105:12
  120:3
felt 50:6 130:20
female 62:21,23
  62:24 63:15
  66:14 69:22
  97:7
fifth 21:23
figure 110:19
  113:8
file 115:9,22

filed 1:21
  127:18
fill 53:5
filled 51:16
  55:25 58:6
final 90:25
financially
  136:10
find 60:16 91:21
  94:3 114:1
  116:22 120:15
fine 48:5 65:25
  110:13 130:22
finger 72:20
  83:6 88:13
finish 4:7 37:14
finished 33:25
  38:17 53:18
finite 72:4
firm 12:13
first 3:3 10:10
  11:13 19:23
  55:19 60:15,19
  107:9,13 117:1
  121:4 124:24
  125:15,18
fist 83:6
five 17:23 62:6
  73:3,8 80:12,13
  85:22 86:2,9,9
  88:21,23 89:2,3
fl 139:15
flagler 2:8

**flat** 16:20 17:2 18:5,11
**fleet** 10:15 73:9 73:11,12,14 108:6 109:17
**flimsy** 88:13
**flipped** 32:10
**floor** 14:2,7,10 25:16,23 26:3
**florida** 1:1,20 2:5,9 136:2 137:3,21 139:18 139:23
**follow** 9:7 130:23 131:8
**followed** 103:2 130:15
**following** 68:4,4 97:9 130:17
**follows** 3:4
**footage** 58:4 93:21 94:1,5 96:8 130:20
**force** 72:13,14
**foregoing** 136:6 138:20
**foreseeable** 128:9,18,20
**forgot** 71:11
**form** 25:25 27:17 54:14,14 55:25 75:2 83:11 84:20 85:24 89:5

112:17 124:25 127:7
**formalities** 5:2
**format** 7:15 47:20,24
**forth** 45:25
**found** 15:20 42:9,17 43:2 74:19 119:21
**four** 17:23 18:7 26:7 80:12,13 86:10 88:22
**fraudulent** 133:14,15
**front** 13:23 23:14 46:8 101:8,9
**froze** 88:6
**full** 61:5
**fully** 47:15
**function** 32:1 125:18
**furniture** 8:22 9:4 28:13 32:1 33:18 42:22 71:1 73:6 104:24 107:13 108:13,15,17 113:25 119:2,14 126:18
**further** 113:2 131:12 136:8
**future** 45:5 105:15

**g**
**gangway** 11:11
**general** 20:14 23:12 123:13
**generally** 4:20 7:15 9:9
**generic** 91:23
**gentleman** 25:3 38:21
**gently** 83:8 87:1
**getting** 11:15,23
**gift** 120:10
**give** 4:16,19 12:10 17:4 18:13 46:23 47:14 64:22 68:11 82:7 108:9
**given** 6:16 7:1,6 9:19 23:24 29:11 42:21 59:10,10,23,24 67:4 70:17 93:1 112:13,24 119:3 124:8,23
**glass** 106:21
**glenn** 2:5,6 3:8 8:6 75:18 76:17 133:17
**go** 4:5 7:10 10:4 20:6 27:19 30:17 31:22 33:24 35:19

36:14 40:4 41:2 44:19 45:25 46:5,21 47:22 48:22 53:11 54:2 60:8,19 62:4 68:20 72:9 79:5 90:4,16 92:2 93:2 101:18 106:9,11 107:12 110:6 116:24 123:14 129:10 134:8
**goes** 21:7 86:6
**going** 3:11,25 4:10 5:6,25 6:13 20:16,17 23:12 23:22 37:20 39:22 40:6,9,12 40:13 45:11,16 45:24 46:15 48:7 52:3 53:5 55:19 57:18 59:13 67:5 74:3 75:24 79:21 91:6 101:9 108:4 110:9,10 110:17 113:1,7 117:24 118:21 127:19 130:4 134:13,14,15
**good** 3:7 6:12 39:5,10 42:2 65:16

**[gornto - holzberg]**

**gornto** 3:10
**gotten** 115:9
**gr** 12:13
**gr0000237**
  20:22
**gr000053** 12:5
**gr000238** 21:7
**grab** 43:22
  66:13 69:21
  97:11
**grabbed** 97:6,8
**gray** 2:7,10
  12:14 139:2
**ground** 4:13
  14:8 25:12
**guard** 110:25
  111:4
**guess** 10:25 17:1
  21:23 24:23
  25:9 51:17
  82:10 120:9
**guest** 20:13
  32:20,21,22
  50:3,5 55:20
  61:16,24 62:21
  66:5,14,16,17
  69:19,22,24
  97:7
**guests** 37:11,19
  38:1,5 62:24
**guidance** 125:2
**guys** 45:19
**gym** 22:2

**h**

**h** 2:19 19:14
  138:3
**half** 14:5,6 18:7
  41:20 55:1,6
**hand** 96:21
  137:10
**handcart**
  120:25
**handled** 104:5
**handles** 17:23
**hands** 35:17
  71:12 72:10,12
  86:15 87:2,5,13
**handtruck**
  97:15,17,20,22
  98:9
**handwriting**
  66:11
**handwritten**
  60:25 61:1
**happen** 108:8
**happened** 35:15
  41:12 50:1
  56:20,23 64:20
  69:15 86:23
  90:7 99:25
  102:17 128:21
**happens** 72:4
  115:18
**happy** 3:18 5:9
  91:12

**hard** 47:16
  87:20
**harold** 101:1
**hazards** 104:16
  126:19
**head** 10:3 50:8
  50:9 57:8 58:17
  59:5 78:10
  96:23,25 97:12
  130:21
**hear** 4:9 70:25
  88:6 103:5,7
  129:16
**heard** 112:14
  114:21 129:4
**hearing** 65:3
  75:24 99:23
  103:10 113:3,7
**heavy** 59:15
**heeded** 59:9
  129:5
**height** 13:5,13
  13:14,14 14:1,6
  14:10 18:11
  95:14
**held** 56:16
**helped** 120:24
**high** 14:5 25:11
  43:21 85:13,16
  106:16
**higher** 124:13
**hired** 115:25
**hold** 39:25
  80:13

**holding** 88:14
**holzberg** 2:3,5
  2:16 3:6,8 5:18
  12:2,12,16
  20:15,20 21:2
  21:10,15,17
  26:2 27:18
  30:14,24 31:6,7
  35:13 38:19
  39:22 40:11,19
  41:2,6 44:18
  45:7,10,23 46:3
  46:6,10,14,20
  47:25 48:2,5,12
  52:3,13,17 55:5
  56:18 64:2,13
  64:23,24 65:10
  65:25 66:1
  72:22 75:7,21
  76:2,21,24
  79:20 80:2
  83:18 85:3 86:1
  89:7 91:15 92:6
  93:3,8 94:12
  106:3,7 109:25
  110:3,8,16,20
  111:8,13,16,20
  112:20,23 113:6
  113:10 114:9,15
  115:11,20
  116:15,20 117:6
  117:12,21 118:4
  118:8,11 125:4
  127:15,24 128:3

**[holzberg - individual]**                                      Page 154

| | | | |
|---|---|---|---|
| 128:22 129:2 131:17,18 132:23 133:6,19 133:20 134:2,10 134:12,20 | 47:10 52:16 63:11 80:1 94:11 127:23 | **inaction** 132:3 **inch** 28:3,5 **inches** 13:13,13 13:16,17 14:8 14:11 18:13 25:20,21 26:5,6 26:12 | 91:24 92:14,19 93:1,6,10,17,24 94:1 95:7,10,14 95:15 96:6,10 96:13 98:13,21 98:25 99:4,9 100:1,2,9 |

**holzberglegal....** 2:6
**home** 31:2 117:17,18 118:1
**homes** 26:24
**hotel** 2:22 17:19 18:2 19:10 20:7 20:8,10 21:25
**hour** 55:1,6
**hours** 5:6 34:22 34:23 123:18
**housekeeping** 19:11 20:8 29:21,21,25 30:1 32:9 69:20
**houseman** 124:4
**huh** 3:23 32:17 85:5 95:22
**hundred** 89:3,4
**hurt** 52:18 55:19
**husband** 93:5

**i**

**i.e.** 105:18
**ice** 11:21
**identification** 5:17 20:19 21:1 21:9 40:18

**identified** 19:5 68:10 74:10 83:2,2 100:17 109:18
**identifier** 12:15
**identifies** 50:12
**identify** 15:13 16:7 46:16 50:10 60:16 62:23 63:2,2,6 81:10
**identifying** 47:8 76:22
**identity** 78:15 95:22 104:24
**ii** 2:4
**image** 12:8 27:11,11 28:2
**images** 80:6 92:25
**imagine** 36:3 56:6 67:18
**immediately** 35:18,20 54:5
**impact** 101:21
**impacted** 114:18
**important** 38:5 83:4
**impressions** 64:25 77:16

**incident** 8:9,19 9:12,24 10:5 15:23 17:6,9 19:21 21:19 22:15 29:12 31:10 33:13 37:13 38:22 39:6 41:12 42:6 44:22,24 45:8 46:8,14 48:23 49:2,4,5,7,20 50:25 51:25 52:8 54:6,17,25 58:9 59:4,7 60:7 60:22 61:22 62:1,25 63:4 68:15 70:4 73:4 73:9,24 74:7 75:9,10,13 76:14 77:9,18 77:21 78:8,20 78:23 79:2 80:4 80:6,7,9 82:1,2 82:5,6,12,13,15 82:17 83:5 90:11,14,25 91:5,10,11,22

101:21 103:17 104:19 111:5,23 112:1,22 113:9 113:13 115:2,24 118:24 121:25 123:3,8 125:6 128:13,17 132:7 132:21
**incidents** 73:5 90:17 109:12,15 109:16
**include** 37:19 80:18
**included** 103:16
**including** 24:11 28:22 59:19 70:25 104:3 114:7
**independent** 128:7
**india** 117:8
**indicate** 111:22
**indicated** 106:18
**individual** 19:3 19:14 33:17 121:21

**[individually - jarnagin]**

**individually** 4:6
**individuals**
   19:16 24:6,7
   28:22 43:19
   44:5 51:4,22
   68:10 80:22
**indonesia** 117:5
   117:10 118:3
**infirmary** 2:24
   76:6 78:7,9 92:7
   92:19 96:9
   101:12 110:21
**inflated** 133:9
**influence**
   111:25
**informal** 5:4 8:5
**information**
   10:8 23:13 29:7
   44:14 59:2,25
   62:1 75:12
   79:16 83:20
   111:22 130:11
   131:12 133:8
**informed** 66:16
   69:25 89:18
**initial** 56:8
   94:25
**initials** 56:1,5,7
**injured** 50:3
   61:19
**injuries** 76:13
   77:17,22 78:11
   131:23

**injury** 2:23
   48:20 49:1 50:9
   51:3 52:5,9
   53:24 55:23
   61:25 62:5,10
   130:22
**inquiry** 5:21
**inspect** 126:25
**inspected** 123:7
   126:18
**inspection**
   110:9,15 114:11
**installed** 35:8
   35:25 90:14
**instance** 32:8
   34:23
**instructed** 27:8
**instructing**
   29:16 124:23
**instruction**
   59:10,22 60:2
   122:25 129:17
**instructions** 9:1
   9:6 23:24 59:24
   101:25 102:3,10
   102:14 103:2
   104:18,21 125:2
**instructs** 4:12
**intact** 83:8
**intention** 34:5
   115:13
**interaction** 58:5
**intercom** 70:23

**interested**
   136:10
**interfere** 44:7
**internal** 47:4
   49:1
**interpretation**
   77:8 107:7
**intervening**
   128:6,16 131:19
   131:21
**investigate**
   44:24
**investigated**
   42:12,16 54:16
   95:10 127:4
**investigation**
   42:14,15 44:2
   70:8 74:8,13
   79:1,12 82:3,23
   83:3,14,22
   93:20 94:4,17
   94:21 95:4
   96:12 99:14,18
   99:20 102:7
   107:15 113:14
   119:10 122:1,4
   127:3 130:15
**investigations**
   100:18
**involve** 48:23
**involved** 22:20
   50:21 58:20
   60:21 68:13
   74:5,17 78:16

   104:25 111:24
   126:13 134:18
**involvement**
   73:20
**involving** 44:22
   48:24
**ish** 18:6
**issue** 47:14
   64:14,16 65:11
   112:3 119:22
**issues** 15:19,20
   130:19
**item** 7:24 8:21
   101:19
**itemized** 111:14
**items** 8:10,10

**j**

**j** 19:14 67:22
   101:2 118:7
**jac** 67:24
**jacqueline**
   67:20
**jakelyn** 51:20
   67:25 94:17
**january** 1:12
**jarnagin** 2:9 4:8
   12:10 19:19
   25:25 27:17
   30:16 31:5
   35:12 38:8 45:6
   45:9 46:5,12,17
   47:21 48:1,4
   52:11,14 55:3

**[jarnagin - leaving]** Page 156

64:9,21 65:4,17 72:15 75:2,17 76:17 83:11 84:20 85:24 89:5 91:6 106:6 110:2,5,13 111:12 112:17 113:4 115:15 116:13,18 117:4 117:9,20,23 118:6,10 124:25 127:7 128:24 132:25 133:17 133:24 134:8,11 134:19,23 139:1

**java** 118:2,6,8,9

**job** 2:22 19:20 20:4,20 21:12 21:19,22 22:16 28:18,21 29:9 29:13,13 32:1 34:6 39:12 41:24 42:11 104:14 109:5 119:7 121:21 124:24 125:11 139:7

**joints** 106:16

**jones** 65:14

**jordan** 65:15

**judge** 65:14 76:23

**jump** 7:21

**jumped** 53:5

**june** 41:13 42:6 42:8 49:6,17 50:3 66:3 68:5,6 69:10,11,18 123:8

**jury** 9:12 11:7 53:15

### k

**k** 94:18

**kannoa** 12:8,23 12:24 105:1 106:4

**keep** 57:16

**kept** 15:21 36:8 38:17 63:16

**kind** 45:5,25 46:23 47:15 59:3 88:17 111:22 121:21 122:20 123:15 123:16 124:11 124:11 130:11

**knew** 33:13 124:24 130:3,3

**knife** 35:6 71:11 71:14,17,20,25 72:1,13 83:7 126:4,8

**know** 3:7 4:11 4:13,15,17,22 5:1,2,2,8 6:15 7:15 9:11 11:18

11:19,22,23 15:1 16:6,14,24 17:2 18:4 19:18 25:11,14,19 26:23,24,25 28:8,25 29:4,4 30:11,14,25 31:17,17 34:11 36:1,24 38:20 38:23 39:6 43:11,12 44:12 45:14,17 46:3 51:4 52:1 55:9 55:21 56:1,6 57:17,18 62:4 64:7,18 66:9 67:6,7 71:15,20 81:25 82:19,20 83:19 90:24 91:1,4,8 93:9 98:13 99:23 100:21 102:16 103:10 105:13 106:21 107:14 108:2,8 111:16 114:13 116:11 116:16 117:5,11 119:2 120:7,9 120:10,22 121:4 121:23 122:25 123:6 124:5 131:25 133:5

**knowledge** 4:19 4:23 6:3 14:22

17:10 20:2 29:5 30:9 43:7,14 102:20 103:19 104:12 113:22 119:6 125:10

**known** 7:25

**kumar** 29:24

### l

**l** 30:2,3,3,4

**l.t.** 56:3

**lagging** 46:24

**laid** 8:10

**language** 39:17 116:10 117:10 118:17

**languages** 117:6

**large** 1:20

**laundry** 16:16 16:19 19:1

**laurel** 50:20 56:11

**law** 64:8 65:16 111:1 133:22,23 134:4

**lay** 31:21

**laying** 58:5

**leading** 23:15 127:4

**leave** 37:14,21 52:7 67:5 102:23

**leaving** 11:12 37:16

**[left - manager]** Page 157

**left** 24:11,18,24 56:2 57:3,7 102:18 120:1 126:21
**legal** 2:3 134:1 139:22
**legs** 27:6
**lenses** 122:3
**letter** 2:18
**letters** 47:8
**level** 115:23
**light** 15:4,4
**likely** 17:25 18:19,24 36:18 54:15 119:25
**likewise** 9:5
**line** 56:2 58:18 58:22 64:16 138:4,7,10,13 138:16
**lisping** 43:12
**listed** 13:14 14:16 94:16 110:23
**listen** 103:5
**listened** 102:25
**listening** 103:10
**litigation** 74:2
**little** 5:5 14:5,11 17:21 28:3 45:20 46:24 53:5 60:20 66:12 72:14 78:14 100:24

129:12
**live** 93:12
**loading** 36:5 47:15
**located** 28:14 49:19 50:5 120:20
**location** 47:7
**locations** 45:15
**lockers** 22:3
**log** 2:24 43:18 75:16 76:19 94:9 98:17 100:6,24 111:7 112:7
**long** 11:14 17:21 18:7 19:20 61:2,3 103:23
**look** 7:21 12:5 13:3 18:6 26:15 30:18 44:19 45:8 52:8 60:9 60:10,15 68:25 80:4 82:14,15 85:18 93:16 94:3 108:20 114:12 117:2,21 118:21 127:17
**looked** 15:1,2 59:12 62:6 74:17,18 80:24 83:7 93:23 94:2 94:6 95:5

100:19 104:25 107:16 113:12 114:1 127:12
**looking** 13:5 27:10 31:8 48:25 49:16 59:17 73:2 80:11 89:22 100:5 116:21 117:13 124:22 132:25
**looks** 13:11,12 20:22 21:5,22 25:20 28:2 39:24 40:1,3,15 40:22 41:24 67:22 68:16 69:3,4,8 80:15 92:9 100:13 128:1
**looping** 45:3
**lose** 37:17
**losses** 130:10,12
**lot** 6:7 10:8 108:23
**loud** 71:6
**louis** 3:10 6:19 75:19,20 91:8 115:17 116:10
**lounge** 31:18
**luggage** 17:17 18:12,25 19:1,2 36:16,17,18,21 36:21 37:4,8

98:8 120:25
**lunch** 83:9

**m**

**made** 33:16 42:25 70:23 71:6 106:25 111:15
**magistrate** 76:23
**mail** 117:25
**maintain** 32:11
**maintained** 123:7
**maintaining** 22:1 31:11
**maintenance** 31:16 32:5 57:11
**majority** 39:15 106:1
**make** 15:5 18:6 27:25 30:22 110:1 117:25 121:14
**making** 4:8 133:15
**male** 62:23
**malfunction** 123:1
**managed** 104:6
**manager** 29:21 29:22,25,25 30:1 123:25

**manufacturer** 12:24 132:16,16
**manufacturer's** 14:20
**marbella** 2:21 12:8 13:1 105:1 106:4
**march** 108:11 136:11 137:11 138:2 139:4,6
**maritime** 133:22 134:4
**mark** 5:14 39:22 40:12,14 52:3 79:21 94:9 101:1 127:19
**marked** 5:17 15:16 20:17,19 20:24 21:1,9 40:18 52:16 80:1 92:8 94:11 110:22 127:23
**marks** 83:6
**matches** 107:5
**material** 59:2 88:15 104:4 105:22 106:2 114:6
**materials** 71:1 104:7 105:17 106:10,11,19,22 113:19 114:5,16 119:25

**math** 88:10
**matter** 8:18 42:12,15 94:16
**maurice** 1:16 2:15 3:2 4:1 7:24 8:2 12:17 21:11 41:10 45:12 48:13 64:10,21 76:3 111:18 113:11 115:22 128:4 133:4 134:21,24 136:5 137:8 138:2,22 139:1 139:6,10,11,13 139:19
**mean** 8:22 18:19 24:12,13 25:18 26:9 27:14,16 32:18 37:23 42:2,7 59:14 65:4 78:4 87:3,7 94:2 113:12 118:1 124:4,5 129:20
**means** 4:22 29:4 94:6
**measures** 9:1,5 101:19 103:15 109:3 119:3
**meat** 6:14
**medical** 10:5 48:21 49:10 54:1,2 55:2,7,12

66:15,17 69:24 70:1 75:11 78:10 79:14,18 92:7,10 95:25 98:14 99:14 110:21 130:16 130:17 131:2,4 131:5,13,20,21 131:25 132:14 133:2,8 134:16 134:17
**meeting** 90:15 91:5,9
**meetings** 90:16 111:11
**meets** 95:25
**member** 32:8 42:17 60:22 124:13,14
**member's** 16:9
**members** 9:2,6 9:19 17:3,4 22:18 32:9 33:10 34:13 45:17 50:12 78:15 83:21 96:1,14 99:7,12 104:2,9,15 114:17 115:4 121:13 126:12 129:20
**mention** 77:9 96:1,5,7 98:5 130:1

**mentioned** 95:13,21,24
**mentions** 96:5
**met** 55:11
**metal** 17:18 105:18
**methods** 120:22 121:6
**miami** 1:2 2:5
**michael** 116:14
**michelle** 1:4 3:9 48:24 55:21 57:23 93:5
**mid** 50:6
**middle** 52:18
**mind** 8:2 64:2
**minor** 123:15
**minute** 90:15 111:11
**minutes** 4:6 47:23 54:8 56:9 62:7,14 84:12 91:9 92:3 100:24,25 118:22
**missed** 42:10
**mistake** 126:3
**mitigate** 130:10 130:12
**mixed** 107:24
**mla** 118:12
**model** 13:1 113:19

**[moment - objection]**

**moment** 12:11 40:5 127:15
**monday** 1:12
**months** 41:17 41:24 42:4,4 74:3 76:20
**morning** 20:5 21:14 34:24 40:2 68:4,4 69:4 69:9 82:5,9 93:4 115:13,14
**mother** 77:24
**mother's** 77:17
**move** 5:7 23:25 59:21 103:11
**moved** 24:7 38:14,15 59:9 90:9 129:12,12 130:7
**movement** 43:5 43:12 128:11
**moving** 32:6 43:16 88:16 89:24 96:20 119:13
**multiply** 25:22

**n**

**n** 2:12 30:2
**name** 3:8 19:6 29:24 30:1 46:16 47:7 50:19 51:20,22 56:9 62:16,19

96:2
**names** 45:15 50:18
**narrative** 95:6 100:3 111:7
**nassau** 66:7 120:1
**nationality** 116:16
**nature** 78:25 83:5
**navarro** 78:3
**near** 11:11 104:19
**nearby** 51:10 52:2
**necessarily** 24:13 31:18 37:2 72:16 83:12
**necessary** 83:13
**neck** 10:3 50:9 58:17 78:11
**need** 3:21,22 4:16 5:4,7 6:5 55:13 103:24 112:6 117:2
**needed** 15:1 42:12,18,18
**needing** 38:2
**needs** 38:4,4,5
**neil** 3:9
**neither** 102:17 127:1

**never** 42:21 125:23 128:20 130:15,24
**new** 10:10,14 30:5
**newer** 108:15
**nice** 18:6
**night** 34:23
**nine** 80:12,14 80:15,17 100:12
**normally** 20:11 20:11 23:23 93:11 123:24
**north** 2:8
**notary** 1:19 137:21
**note** 139:12
**noted** 85:15
**notes** 136:7
**notice** 1:21 2:21 3:12 5:12 7:22
**notification** 2:18 34:9 102:11
**notified** 77:20
**notify** 114:18
**november** 41:4 41:5,19
**number** 8:7 25:14 27:10,11 47:1,3,4,12 48:16,17 62:19 63:9,12 78:13 78:15,19,25

80:21 91:23 92:7 100:23 105:11 106:4 109:9,10,18 110:25 111:8,14 113:9 127:20 128:4,25 129:3 129:22 130:9 131:1,16 132:3 132:25 133:9,13 133:18
**numbered** 79:22
**numbers** 6:1 47:9
**numerous** 117:7
**nurses** 76:8,10

**o**

**o** 19:14 101:2 139:1
**o'clock** 34:23
**oath** 2:17 4:15 5:3 137:1
**object** 4:10 25:25 38:8 55:3 72:15
**objected** 100:20
**objection** 35:12 75:2 84:20 85:24 89:5 112:17 124:25 127:7

**objections** 4:9 7:16 44:25 45:5
**objective** 45:13 48:23 64:7 65:13 91:25
**observed** 129:25
**observing** 15:5
**obtain** 131:6
**obtained** 54:25 67:11 79:17
**obvious** 34:10 129:23,23 130:6
**obviously** 5:3 24:2
**occasionally** 4:8
**occasions** 26:24
**occur** 119:20
**occurred** 8:19 9:24 10:6 50:1 54:6,9 56:24 75:5 95:7 101:21 103:25 119:17 123:3 130:13
**occurrence** 57:1
**offered** 66:15 69:24 98:14
**office** 3:11 4:3 68:8,11 69:12 110:7,18
**officer** 22:3 51:20 54:21 67:15 69:15

77:1 78:3 101:2 101:4,7
**officers** 54:16 74:16 76:4 77:4 93:17 119:11 127:2
**offices** 2:4
**official** 137:10
**oh** 18:10
**okay** 4:5 5:1,11 5:24 6:6,12,21 7:4,21 8:16,20 10:7 11:18 12:1 12:22 13:3 14:1 15:15 18:4,9,16 19:18 20:4 24:2 25:17 27:10,25 28:10 30:8,24 31:5 32:14,24 37:11,20 41:12 42:13 43:9,17 46:5,7 47:13 48:25 49:19,25 50:10,14 52:12 52:22 54:7 56:8 57:1,6,9 58:7,12 59:18 68:1,9 69:7,9 70:2 73:16 75:14 76:12 77:21,24 88:12 92:13 95:19 96:4 97:13,24 98:2 98:11 100:5,16

101:18 102:25 103:6,9 104:17 106:20 107:9,12 108:7,13 110:16 113:18 114:5,25 118:20 129:22 133:7,19 134:20
**old** 107:20
**older** 108:5
**omitted** 79:3
**onboard** 10:13 14:21 16:25 17:11,15 29:22 30:11,12,22 35:1 37:3 51:9 52:21 53:8 54:24 107:19 108:17 110:6 123:11
**once** 9:25 130:13
**ones** 30:17 38:3 91:1 93:4 100:7 100:11
**open** 20:12 22:2 31:11,14 34:10 35:7,10,17 46:2 68:17 86:16 129:22,23 130:6
**opened** 86:24
**operation** 121:25
**opine** 132:1

**opinion** 64:25 65:12 131:10
**opinions** 45:17 92:1
**opportunity** 6:9 8:7 22:10
**opposite** 24:21 57:2
**ordering** 139:15
**ordinary** 129:6
**orientation** 123:11,14,19
**orje** 101:1
**orleans** 30:5
**ostensibly** 78:9
**outdoor** 63:24 122:14
**outline** 17:21
**outside** 9:20,21 10:24,24 11:2 49:23,24 82:4
**outstanding** 30:20
**overall** 13:5,11 13:12 32:21
**overhang** 122:13
**overhead** 102:1 102:2
**oversee** 124:12
**own** 43:6,23 74:12 129:6

**[p.a. - photos]**

| p |
|---|

**p.a.** 2:7
**p.m.** 1:13,13
  40:7,10 48:8,11
  49:13,18 61:23
  66:4 69:18
  135:6
**pace** 1:19 136:4
  136:15 137:20
**packing** 9:3
**padding** 105:25
**paddle** 130:18
**page** 2:15,20
  20:23 41:3,7,8
  52:6 61:5,5
  85:19 86:12,21
  94:16 113:15
  128:2 138:4,7
  138:10,13,16
**pages** 40:16
  92:9 94:13 95:5
  113:15 117:1
  136:6
**pain** 10:4
**palm** 2:9 136:3
  137:4
**paper** 83:10
  87:1,16,17
**papers** 87:14
  100:18 118:21
**paragraph** 61:4
**part** 7:5 31:16
  31:19 32:4,11

32:12 37:24
39:18 42:11
60:7 65:8 75:15
75:22 79:11
80:7 83:3 93:19
94:7 105:12
108:19 109:13
116:24 121:4,20
124:16 126:24
**particular** 17:5
  91:10 105:20
**particularly**
  31:1
**parties** 26:24
  132:4,7,20
  134:17 136:9,9
  139:15
**partner** 63:3
**party** 57:14
  132:20
**passenger** 2:23
  36:25,25 49:1
  51:3 52:5,9
  53:24 55:23
  62:5,10,18,19
  63:14,15 70:13
  99:3 103:18
**passengers** 11:1
  23:21,24 24:19
  33:1 34:6 35:1,2
  35:3 36:23
  39:16 44:13
  50:14,17,22,24
  51:9,11,13

52:21 53:7,10
53:20 54:24
58:8 60:3 70:12
70:19,24 73:7
77:20 95:22,24
99:12 102:17
114:18 118:14
119:4,14 121:15
129:20
**past** 45:12
**patient** 57:2,5
  57:11,25 58:1
**paula** 1:19 4:10
  20:15 127:20
  136:4,15 137:20
**pdf** 94:17
**peel** 87:1
**penalties** 138:19
**people** 11:12
  27:1 30:19 38:6
  45:15 52:2
  59:19 68:12
  104:15
**percent** 106:16
**perform** 37:24
**performance**
  2:23 39:23 40:2
  40:13 41:24
  42:5 117:13
**performing**
  126:16
**period** 40:22
  42:8 84:9 90:18

**periodic** 90:16
**perjury** 138:19
**person** 22:19
  26:20 59:17
  95:9
**person's** 57:10
  57:10
**personal** 4:19
  14:22 17:10
  21:3 48:20
  89:20
**personally**
  22:12 29:5
  89:25
**personnel** 99:15
  115:9,21
**pertain** 107:1,2
**philippines**
  117:8
**phonetic** 63:21
  72:2
**photo** 80:17
**photographs**
  26:16 44:23
  59:2 75:23 80:4
  80:6 81:3,6,14
  81:22,25 82:11
  82:16 87:10
  92:14 93:2
  100:6,8
**photos** 80:8,13
  80:14,15,17
  81:17 100:15,16
  100:22 109:18

**[photos - preserved]**

111:6,6 113:16
**phrase** 64:3,16
**phrased** 3:20
**phrasing** 57:21
**physically** 46:18
**picking** 89:24
**picture** 11:7
17:5 20:16
27:10 90:25
**pictures** 16:14
16:17 74:18
80:18 122:21
127:13
**pier** 11:9 66:6
**pinecrest** 2:4
**pitcher** 30:6
**place** 8:13 23:23
58:8 92:14
119:5
**placed** 9:23 32:2
81:15 126:22
**places** 26:25
**placing** 84:22
85:2 86:25 97:1
97:3,4
**plaintiff** 1:5 2:3
3:8 104:19
105:13 111:15
129:4,24 130:9
131:1
**plaintiff's** 2:20
5:16 20:18,25
21:8 40:17 52:4
52:5,15 79:25

94:10 127:19,22
128:5 133:13,15
**plastic** 23:16
35:7,11,17,21
35:24 36:2,8,22
37:3,6,10 71:21
72:4,5,6,10,12
82:17,18,18,20
82:24 83:2,17
83:25 84:4,4,6,9
84:11,12,13,18
85:1 86:13,14
86:15,17,23,24
87:4,5,7,9,11,12
87:19,20,21
88:12,18 98:2,4
98:5 104:4
105:18 114:6
119:24 120:4,6
120:18 125:16
126:5,21 127:3
127:6
**platform** 16:21
**please** 3:18 5:8
13:9 15:5 38:25
45:23 56:20,23
56:25 58:23
60:13 66:2 67:6
67:7 85:18
114:13 139:13
**plus** 25:23 26:6
26:8 111:6
113:15

**point** 96:14
**pointing** 93:14
**points** 31:23,25
99:8
**police** 101:7
**policies** 8:8,13
8:24 28:11,16
28:17 29:7
74:12 103:20
108:24 109:6
118:23 121:18
**policy** 37:5 68:9
103:16,23,25
**polite** 32:20
**polymers**
106:16
**pool** 122:15,18
122:24
**port** 11:5,14,14
37:16 43:16
49:21 50:6
61:16 66:5
69:19 120:1,12
125:18 132:17
**portion** 91:18
96:11
**position** 10:22
19:9 59:7 98:16
126:8
**positioned**
10:23 104:6
**positioning** 32:6
**possibilities**
103:7

**possibility**
129:18,21
**possible** 3:22
4:17 12:4 26:17
29:9 129:16
**possibly** 86:11
103:8
**post** 21:16
**potential** 45:4
73:23
**potentially**
130:5 134:18
**pound** 28:5
87:25 88:3
89:16
**pounds** 13:15
14:15,16,20,22
14:24,25 87:25
88:4,8,15 89:1,1
89:2,2,4,16
105:3,4,6,10
**powder** 106:15
**precarious** 28:4
**preceding** 73:3
**present** 28:8
34:7 43:19
50:17,21,24
51:22 68:23
70:12 71:3 76:8
77:10,13 119:15
**presents** 116:8
**preserved** 15:16
15:21 45:2

**presumably** 69:7 97:24 98:1

**presumption** 36:4

**pretty** 11:3 28:3 39:9 66:22 72:21 74:21 94:24 115:10 117:2 122:19

**previous** 19:25 41:8 62:1 89:15 132:8,9

**previously** 4:2 10:19 29:14 62:6 75:19 104:25 129:17

**pride** 42:3

**printed** 90:21

**prior** 6:19 34:14 123:7 124:16,20

**privilege** 2:24 4:14 45:1 75:16 76:19 94:9 100:6,24

**privileged** 44:25 64:5

**probably** 7:2 14:25 23:11 24:16 61:3 75:24 108:3 125:1 131:9

**procedure** 9:7 9:11 33:19 34:3 37:6,9 94:7

118:23 119:22 139:23,24

**procedures** 8:9 8:12 28:12,18 29:8 74:13 108:24 109:6 118:23 119:1,4 121:18

**proceeded** 103:11

**proceeding** 7:12

**process** 10:1 38:17 44:7 55:17 71:18 78:16 104:3,10 114:18 120:4 121:2,16 124:8 125:15 126:13

**produce** 91:12 111:10 113:1

**produced** 6:7 20:5,21 40:2 75:14,18 92:5 101:4 111:17 115:12 116:3 122:21,21

**production** 12:7 124:16

**proficiency** 118:15

**pronounce** 118:9

**propounded** 3:13

**protest** 64:12

**provide** 9:3 65:18 68:13 124:11

**provided** 4:1 6:8 48:16,18 53:4 54:10,12 71:17 79:4 102:10

**providers** 134:16

**provides** 125:2

**providing** 110:14 119:1

**public** 1:19 22:1 31:11 32:5 137:21

**pull** 45:9,23 46:18 52:11 68:20 72:10,12 79:21 82:21 116:21 120:8

**pulled** 17:2

**punishment** 42:24

**purchased** 107:13,18

**purposes** 33:7 36:10 44:21 47:4 116:5

**pursuant** 1:20

**push** 72:20

**pushed** 72:3

**put** 15:17 23:22 25:21 32:2 36:2 91:19 106:3 108:1 116:1 120:4,24 127:25

**putting** 34:9 35:22

**q**

**quality** 126:19

**quarters** 27:14 56:19

**question** 3:20 4:14 7:15 26:20 29:1 42:1 52:19 53:1,9,12 58:19 85:19,19 86:13 86:18,22 111:18 133:11

**questions** 3:11 3:17 4:20 45:11 53:14 64:10 65:6,23 75:5 78:2,8,21 134:24

**quickest** 65:20

**quickly** 117:3 133:3

**quite** 14:4 41:19

**r**

**r** 19:14,14 30:2 101:2 138:3,3

**rah** 2:22

**raharjo** 19:8,9 19:13 21:19 22:5,19,23 23:7 25:2,15 26:21 28:22 29:11 31:10 33:9,16 35:6 38:20 40:4 50:13,23 59:19 60:1,7,12,21,21 67:16 68:22 70:8,17 71:9 73:18 74:22 78:16 79:8 83:24 96:19 99:7 102:4,9 103:12 104:22 105:13 112:14 114:20 115:1 120:23 121:13 123:10,23 124:8 125:6,12,14 126:3,11

**raharjo's** 21:3 39:5 40:14 41:23 44:15 60:17 68:2 84:16 102:12 115:23

**ranagappa** 22:21,22 26:21 29:20 39:24 40:3 50:12,23 60:7 68:18,19 68:22,25 69:14

70:8,17 71:20 73:19 74:22 78:17 79:8 83:24 99:7 102:9 103:12 104:22 105:14 115:1 120:23 121:13 124:1,15 124:18,22 125:7 126:11

**ranagappa's** 70:15

**ravi** 29:24

**razor** 72:1

**read** 7:17 13:4,8 21:21,24 31:23 40:20 53:7,14 55:1 56:22 64:13,14 65:7 66:2 70:9 79:6 83:24 84:1 85:6 85:9 88:21 97:9 125:14 128:4 138:20 139:10

**reading** 52:22 53:18 64:3 85:23 91:16 100:3 128:24 135:3

**ready** 11:4 37:16 46:4

**real** 48:15

**realized** 50:7

**really** 16:25 41:25 130:23

**rearranging** 31:19

**reason** 5:8 7:11 10:4 55:15 138:6,9,12,15 138:18 139:12

**reasonable** 18:15 38:13,14 59:13,14,17 77:14 139:17

**reasonably** 26:17 128:8,18

**recall** 19:5 85:17,23 86:12 119:5 124:18

**receipt** 139:17

**receive** 28:19

**received** 28:23 107:14 113:25

**receiving** 133:2

**recess** 48:9

**recognize** 51:5

**recollection** 85:15

**recommend** 75:20

**record** 3:24 8:17,21 13:4,8 19:12 20:15 21:24 40:5,7,8 40:10 44:20 47:22 48:8,11

53:15 56:17 64:17 65:8 70:22 91:20 92:10 93:13 136:7

**recording** 93:14

**records** 2:24 6:8 54:22,23 79:14 79:17,18 92:8 116:17,18 133:2

**redacted** 91:23 91:25 112:21 113:9

**refer** 8:3 45:13

**reference** 45:3 50:16 62:20

**referenced** 62:21 99:13 139:8

**references** 63:18

**referencing** 97:18

**referred** 45:12

**referring** 3:25 8:18 9:13 95:1 98:7 101:1 127:14

**refers** 63:22 106:24,25

**reflect** 42:5 116:17

**reflecting** 113:24

**refuse** 112:25
**regard** 139:18
**regarding** 8:10
22:8 70:7 84:14
91:25 108:25
115:5 118:23
119:13
**regardless**
50:17
**regulations** 8:8
8:15,24 28:12
**reiterate** 89:15
**related** 113:18
**relating** 114:6
**relation** 82:1
84:10,18
**relative** 136:8,9
**relatively**
108:14
**relaying** 75:11
**relevance** 41:22
42:1
**relevant** 31:24
111:19
**reloaded** 71:2
**relocate** 67:6
**relocated** 10:21
28:14
**relocating** 9:3
**relocation** 42:22
**remember**
71:12 86:18
103:24 108:2
116:9,11 119:1

119:17
**remote** 1:11
**remotely** 137:8
**removal** 104:3
126:5
**remove** 71:3,21
72:4 86:13,14
**removed** 84:6,9
84:11,12,13,17
86:7 88:19 98:3
**removing** 9:3
66:7,8 69:19
72:6 84:25
97:21 125:16
**rep** 2:24 4:18
**repeat** 53:3
**rephrase** 3:18
**replaced** 108:14
**replacing** 66:4
96:15,18
**report** 44:22
45:8,21 46:2,7,8
46:13,18 48:14
49:2 51:16 52:8
60:8 62:1 80:4,7
91:22,24 93:25
94:5,14,15,17
94:21,21 95:1,4
95:4 98:11
110:25 111:4
112:22 113:14
113:14 124:12
136:5

**reporter** 2:16
40:6,9 48:7,10
56:14 79:24
127:21 136:1
**reporting** 46:25
47:3
**reports** 21:24
**repositioning**
43:11
**represent** 3:8
47:2
**representative**
4:21 6:22,22
**reprimand**
42:25
**reprimanded**
42:18
**request** 12:7
134:6
**requested** 30:15
30:18 49:10
98:14 114:12
136:6
**requests** 91:20
100:19
**require** 72:12
103:16 118:14
**required** 9:2,7
39:9 103:17
116:5 123:10
**requirements**
39:12 42:11
103:20

**requires** 72:14
118:12
**reserved** 6:1
**respond** 115:18
**responding** 78:2
**response** 12:7
39:2 53:8 56:22
**responses**
115:16
**responsible**
22:1 123:22
124:7 132:5,20
**responsive**
100:19 130:22
**rest** 11:13 98:13
**restaurants**
26:24
**restricted**
103:18,21
**result** 42:25
76:13 99:25
128:6
**retracted** 72:2
**retrieved**
125:17
**returned** 120:2
130:24 139:17
**returning** 11:13
32:1 37:15
131:4
**review** 2:23 6:9
8:8,14,15 40:22
93:20 136:5
139:9

**[reviewed - security]**

**reviewed** 93:22 93:23 104:8 113:12 115:22 122:5

**right** 6:12 9:9 9:21 12:10,22 15:11 18:8 21:15,21 24:14 25:4 29:6 30:24 37:9 38:21 39:10 41:18,21 44:18 45:7 48:13,22 54:22 56:9 57:6,25 58:2 60:9 61:14 64:9,12 65:6 66:24 71:25 74:2 76:15 78:8 78:17 79:20 80:11 82:12,13 89:10 91:15 95:11 98:17 101:8 106:8 107:4 109:9,24 112:21 116:6 117:6 121:19 122:19 127:6 129:15 134:21

**rip** 83:6 87:5

**ripped** 87:2

**ripping** 72:13

**risk** 119:12,18

**rka** 1:3

**robinson** 2:7

**robinson's** 12:14

**robinson.com** 2:10 139:2

**roll** 120:7

**room** 124:2,4

**rooms** 36:25,25

**ropes** 33:20,20

**roughly** 108:1 114:2

**round** 82:20

**row** 81:9

**rpr** 1:19 136:4 136:15 137:20

**rule** 139:23,24

**rules** 4:7,24 8:8 8:24 28:12 121:19 139:17

---
**s**
---

**s** 2:19 138:3

**s.w.** 2:4

**safe** 72:3,6,9 73:1

**safer** 72:11

**safety** 9:1,5 32:21 90:15 109:3 111:11 119:2

**sail** 37:17

**salvador** 51:20 51:21 54:18,20 67:19,20,25

69:6,15 78:4 94:18

**salvador's** 95:8

**sample** 15:7,9 17:7

**samples** 114:14

**sandwich** 83:9 87:1

**saran** 114:6

**sauna** 22:2

**saw** 62:1 130:5

**saying** 11:8 76:19 89:22 94:5

**says** 8:21 13:5 14:20 37:6 42:2 56:13 57:11 61:21 63:17 64:8 65:1,1,2 66:25 67:4 70:3 77:20 86:7 99:22 100:23 101:1 103:15 105:3 106:21 121:12 131:1

**scene** 100:9

**schedule** 5:21 6:6 7:22 73:2 75:22 91:16,17 91:18 101:19 108:20,23 111:9

**screen** 12:3 31:9 46:19 47:17,18 113:5

**sea** 98:20 112:8 118:17 128:11

**seafarer** 2:22

**seafarer's** 21:4 117:16

**seal** 137:10

**seaman's** 115:5

**seamen** 118:13

**seat** 13:5,13,18 13:24 14:6,8 27:13,13

**seated** 9:18 24:8 44:11 50:4 95:20 106:1

**seats** 37:17 102:22

**second** 5:25 19:23 39:17,25 46:23 47:14 67:12 68:1 91:7 118:5

**section** 9:24 81:1 96:17 116:23

**secure** 114:7

**security** 51:17 54:16,21 67:14 68:8,11 69:12 69:15 74:16 77:1,3 78:3 93:17 100:9 101:2,3 119:11 127:1

**[see - sit]**

**see** 18:1 26:11 26:25 31:24 32:14 40:14 46:10 49:8,17 50:11 56:13 60:11 64:5 76:10 80:5 81:24 91:21 92:2 93:17 96:17 116:22,25 122:22 123:3 128:19,20 134:16

**seeing** 71:12 118:2

**seek** 131:2,12

**seem** 90:22 117:14

**seems** 24:3

**seen** 5:12 16:18 17:7,11,15 18:10,17 21:11 21:13 37:2 59:12 90:21 91:2 101:16 115:22 116:2 120:6

**sees** 32:9

**send** 47:19,23

**senior** 29:20 124:1,6,9

**sense** 37:24 117:25 124:21

**sent** 4:2 6:5 93:4

**separately** 64:18

**service** 3:14 32:15,19,22 37:18,25 108:1 108:11,12

**serving** 118:14

**set** 11:11 25:1 30:15 81:1 104:13 107:6 113:2 114:10

**setting** 8:21 9:4 66:8 69:16,16 96:19 97:5 119:2,14 125:16

**setup** 11:2,17 66:7 80:19 81:11

**seven** 7:3 80:12 80:14

**several** 84:12

**sharing** 12:3

**sharp** 59:15

**she'd** 130:7

**sheet** 46:11,12 62:2 117:22 139:12,14

**ship** 8:22 9:21 9:21,22 10:15 10:22,22,24 11:1,4,9,9,13,15 11:24 17:12 29:13 30:21,22

33:1 36:9 37:16 37:16 43:5,11 43:12,15 47:7 47:12 48:19,20 50:6 69:12 70:24 73:5,11 73:14 76:14 89:19 90:4,7 96:9 98:16 105:10 107:20 108:11 109:10 110:6 114:3 116:1 118:13,14 119:14 120:2,11 120:11 123:14 123:17 125:9,11 128:11 131:5 132:18

**ships** 9:4 90:8 90:17 108:5 109:11

**shirt** 101:8

**shoreside** 119:12

**short** 48:9

**shorter** 18:23

**shorthand** 136:1

**shoulder** 24:24

**show** 54:23 75:25 80:21 81:3,6,8,14 105:5

**showing** 93:6 113:4

**shows** 75:8 80:25 86:4 101:8 115:23

**side** 13:21,21 38:15 49:22 50:6 57:3,7 61:16 66:5 69:19 120:11

**sides** 16:20,21 17:24

**sideways** 66:11 69:21 96:22 97:23

**sign** 139:13

**signature** 55:22 56:2,2,4 67:14 67:18 136:14 137:18

**signed** 55:25 139:20

**significance** 47:6

**signing** 135:3

**signs** 101:21,22

**silver** 17:20

**similar** 17:9,18 19:2 87:18 109:10,11,15,21

**sit** 11:15 27:1 38:2 100:21 132:9

| | | | |
|---|---|---|---|
| **sits** 14:7 | **soft** 87:20 | **speaking** 39:16 | **stacked** 16:7 |
| **sitting** 14:23 | **solutions** 139:22 | 77:25 | 26:10,12,13 |
| 24:4 28:24 | **somebody** 6:1 | **specific** 30:17 | 27:1,2,8,9 28:9 |
| 37:12 38:6 44:5 | 22:13 51:17 | 61:7 84:17 | 28:14,20 66:10 |
| 44:10 57:2,25 | 57:20 58:1 | **specifically** 84:3 | 81:19 89:13 |
| 62:22 65:5 | 67:16 | 90:4 113:3 | 97:22 104:5 |
| 66:14 69:23 | **somewhat** 5:4 | **specs** 12:9 13:12 | **stacking** 26:22 |
| 89:22,25 97:7 | **soon** 30:25 | **spell** 118:4 | **staff** 22:3 99:14 |
| 131:24 | 54:25 55:8 | **spelling** 30:5 | 123:25 |
| **situation** 43:21 | 85:10 | **spindle** 120:7 | **stamp** 12:14 |
| 127:9 130:7 | **sorry** 7:25 33:24 | **split** 35:9 | **stamped** 81:23 |
| **six** 26:8 80:12 | 40:25 41:25 | **spoken** 22:18 | **stanchions** |
| 80:14 85:22 | 49:5,8 53:3 | **spools** 82:20 | 33:20 34:2 |
| 86:3,9 87:23,25 | 57:12 67:20 | **spot** 24:14 | **stand** 34:12 |
| 88:3,9,22 90:23 | 78:4 85:8 88:6 | **spreadsheet** | **standard** 68:9 |
| **size** 13:9 | 97:4 99:19 | 90:23 | **standards** 22:4 |
| **skills** 42:3 | 103:1 107:23 | **ss** 136:3 | 74:12 |
| **sliced** 35:10 | 109:13 121:4 | **stability** 126:19 | **standing** 16:22 |
| **slide** 72:3 | 125:22 129:10 | **stabilize** 121:1,7 | **start** 12:17 |
| **small** 81:2 | **sort** 105:25 | **stack** 12:19 | 60:12 |
| **smaller** 18:22 | 120:8,9 122:13 | 15:25 16:8 23:4 | **started** 19:24 |
| **smiling** 32:20 | 122:14 | 25:1,7,8,8,10,11 | 66:9 86:25 |
| **smoke** 33:2,2 | **sounds** 18:14,14 | 25:12 26:15,18 | 96:21 97:23 |
| **smoking** 9:18 | 41:18 | 27:4,5,12,20,21 | **starting** 123:11 |
| 9:24 32:25 33:5 | **source** 134:4 | 27:22 28:4 | **starts** 32:15 |
| 33:6,7,10 37:13 | **southern** 1:1 | 43:25 57:3,4 | 96:18 |
| 38:7 44:6 50:4,5 | **spa** 22:2 31:14 | 58:16,21 63:17 | **state** 1:20 46:16 |
| 61:17 66:5,14 | **speak** 22:5,10 | 63:19 69:20 | 56:20,23 58:23 |
| 69:19,23 70:18 | 22:13 39:10,17 | 73:6 81:4 85:12 | 136:2 137:3,21 |
| 80:25 81:1 | 102:2 117:23 | 85:20,21 86:3 | **stated** 138:20 |
| 96:16 102:18 | **speaker** 71:6 | 88:2,23 89:12 | **statement** 2:23 |
| **snorkeling** | 102:1 | 97:17,18,24,25 | 40:12 44:15 |
| 130:19 | **speakers** 77:2 | 105:12 121:1 | 49:1 51:3 52:5,9 |
| | | 126:19 130:5 | 53:24 54:12,24 |

55:7,23 57:22 58:12 60:10,17 60:20,23 61:25 62:5,10,20 64:11 65:19,21 66:22,25 67:4 67:10,12,13 68:2,11,13,14 70:16,16 79:9 83:23 84:1,5,8 84:14,21 92:22 97:10 114:20

**statements** 43:18 44:23 51:23 54:23 55:8 59:1 60:1,6 61:8,13 68:22 70:6,7,11 74:17 74:21 77:5 79:5 82:8 83:21 87:11 102:6 114:21

**states** 1:1 133:21

**stating** 77:16

**statute** 139:18

**stay** 8:5

**steamrooms** 22:3

**stenographic** 136:7

**stenographica...** 136:5

**step** 67:7 75:17 91:6

**steps** 127:4

**steward** 2:22 20:7,8,10 21:25 123:12,23 124:2

**stewardess** 19:10 21:25

**stick** 88:13

**stip** 113:13

**stipulated** 44:21

**stipulation** 112:25

**stipulations** 44:20

**stop** 5:9 64:3

**stopping** 65:10

**store** 120:11

**stored** 120:20

**street** 2:4

**strike** 67:11

**striking** 15:24 43:25 44:8

**struck** 16:4 43:10 50:6 63:14 81:7 84:24 96:22,22 96:24 105:12

**subject** 4:23 8:18 12:21 44:25 94:16 99:23 100:9,11 101:20 111:15 112:25 113:12

**subjects** 108:25

**subparagraphs** 6:1

**substance** 102:13

**substantially** 17:8 109:9,10

**succinctly** 3:17

**suddenly** 66:8 69:21

**suggested** 139:16

**suite** 2:4,8

**suited** 26:21 29:1 36:6 87:21

**summarize** 106:11

**summarized** 22:14

**summary** 64:22 95:6

**sunbrella** 106:17

**sunny** 82:4

**superseding** 128:7,16 131:19 131:21

**supervising** 124:7,10 126:12

**supervision** 126:14

**supervisor** 22:11,15 29:16 29:18 54:18

66:17 69:25

**supervisors** 19:19

**supplemental** 12:6 115:16

**supposed** 57:7 71:10,21 126:4

**sure** 15:5 21:25 26:23 36:3,11 39:4 51:24 55:15 58:3 60:14 61:6 71:16,16,18 88:2,5,10,24 89:6,11,12 106:13 116:12 122:10,20 123:20 126:23 127:10 132:13

**surf** 112:8

**surface** 18:5,11 26:4

**surprise** 74:4

**surveillance** 123:2

**sustained** 50:8 76:13

**sworn** 3:4 137:9

**system** 123:6

**t**

**t** 2:19 30:2 138:3,3

**[table - things]**

table 104:5
105:18 107:5
tables 81:2
85:21 105:11
114:7
take 4:11 18:13
42:7 43:23 45:8
47:22 64:4 82:7
116:9
taken 1:19 6:15
16:10 44:15
48:9 50:18,19
53:24,25 54:10
54:23 66:6,17
68:3,7,15 69:1,2
69:3 70:1,7 79:6
79:9 82:1,5,8
92:14 93:18
100:8 101:1,19
103:15,21 104:2
104:9 114:17
115:1 118:1
127:11,12
takes 42:3
talk 76:22
121:10 134:6
talked 101:22
108:25 111:6
127:2 128:10
talking 9:11
64:6 88:24
119:19 129:19
tapes 33:19

task 9:20 37:23
52:7 71:19
103:13 121:11
124:11 126:17
126:24
tasks 119:13
125:10
taught 121:10
team 34:13
tear 72:18 83:6
87:4,5,7,15
tearing 72:13
126:8
tears 63:21
tecum 3:13 5:13
91:18
teetered 10:2
16:4,8 83:15
tell 26:16 41:22
57:19 69:14
80:5 94:20
116:13
telling 99:22
tempered
106:21
ten 7:3 80:12,14
80:15 100:6,12
100:14,15 111:6
113:16
terms 21:5
terrace 63:18,23
63:24,25 66:4,9
66:9 69:17
96:16,18 97:1,5

97:21
terry 1:4 3:9
9:18 12:20 16:2
16:5,8 19:4
22:24 24:4,7,11
24:18,21 25:2
25:13 28:24
32:25 37:11
38:6,21 39:2
43:10,22 44:9
48:24 50:20
51:2 53:1 56:11
57:24 58:7 59:3
59:20 60:2
61:19,25 62:16
62:20 63:14
67:1 70:3,18,25
73:20 74:25
76:3,5,13 77:1,3
77:15,24 78:8
79:9 80:7 81:7
92:18 95:13
98:24 99:12
101:12 102:5,17
102:20 111:24
112:14 130:12
132:6 138:1
139:5
terry's 10:3
24:23 55:22
78:7 131:23
test 90:5,14
109:21

testified 3:4 7:9
25:15 28:11
29:14 32:24
42:21 71:9 75:1
78:21 88:21
95:17,17 100:7
102:4 105:14
114:2 125:23
126:5 129:3,17
129:19
testify 5:20 7:11
7:12,18 42:23
testifying 7:16
77:15
testimony 2:15
44:1 60:5 73:18
89:15 102:8,12
104:7 125:14,20
125:25 130:2
139:10,17
tests 123:15
text 13:3
thank 5:10 31:6
40:15 133:19
134:12,21
thereto 80:5
thickness 26:6
thing 3:21 43:2
48:17 55:19
77:14
things 8:14
45:15 79:5 92:4
103:22 108:21

**[think - trolley]**

**think**  6:4,18
7:24 11:6 23:10
26:17 30:18,20
41:3,7 54:4 57:7
65:6,19 75:18
79:2 81:10
83:13 93:5
106:22,24 107:8
108:20 110:8,16
114:2 115:11
116:22 119:8
121:9 126:23
**third**  41:7 57:9
57:14 132:4,7
132:20,20
134:17
**thorough**  74:13
**thought**  100:12
**three**  14:4 16:11
16:12 18:7 25:1
25:22,23 27:14
40:16 56:19
73:12,21,22,23
80:12,13 85:13
85:16 86:3,4
106:18,23,24
107:9 124:17
**time**  4:12 5:8
6:19 8:9 10:13
16:13 17:4
19:17 22:8,23
23:2 31:9 33:13
37:13 38:7 39:6
42:6 43:16,18

49:7,8,9,15,17
50:24 51:11
55:1 56:20,24
57:1 58:9 61:10
61:21 62:3,24
63:3 64:4 68:2
69:5 77:13,18
79:1 81:16,23
82:2,7 84:9,11
84:17,25 89:11
90:14,18 94:24
95:2,15 96:10
97:19 102:1
103:17 115:24
115:24 120:1
124:8 125:6,9
125:15,19,23
130:17 131:11
134:15,25
**timely**  131:2,13
**times**  26:7 32:16
37:3,18 84:14
88:1,4,9 89:2,3
**timing**  45:15
110:12
**tissue**  87:14,15
87:17
**title**  20:7 46:22
47:13 48:13,15
**titles**  48:15
**today**  5:14 6:17
6:20 7:1 16:24
20:21 21:12
45:4,13 85:10

100:21 114:11
131:24 134:25
**together**  88:15
**told**  59:19 104:8
105:9 133:4
**took**  19:5 67:13
67:25 74:17
93:5
**tool**  86:16
**top**  14:2,11
15:24 16:12,21
17:20 18:5,11
25:7,9,10,12,21
25:22,24 26:4
26:13 27:2,4,6
63:17 66:10,10
85:13 117:15
122:17
**tore**  86:15,23,24
87:3,12
**torn**  87:15
**total**  85:22
100:12
**totality**  74:24
**touching**  27:22
**toward**  24:21
**tracted**  72:2
**traffic**  103:19
**trainee**  123:25
**training**  28:18
28:21 29:10
104:14 109:4
119:8 121:18,21
123:18,22

**transcript**
117:24 136:6,6
139:8,20
**transcripts**
139:15
**translator**  116:6
116:8
**transport**  18:17
100:10 121:1
**transported**
121:8
**transporting**
37:7
**treating**  76:12
**treatment**  48:21
78:10 79:16
131:2,6,13
**trial**  45:2,3 74:3
**tried**  69:21
**trips**  33:20
**trolley**  9:23 16:4
16:13,15,16,19
16:25 17:7,21
18:22,24 19:2
19:17 23:2,4
25:2,5,6,24 26:4
34:11 36:24
59:12 66:11
69:20 80:22
81:4,15,18
88:16 98:8,8
120:24 127:5
130:3 132:15

**[trolleys - unseal]** Page 172

trolleys 17:11
  17:14,17 18:10
  18:16,20 37:8
truck 96:20,21
true 42:20 136:6
  138:20
truth 57:19
truthful 3:21
  4:16
try 3:16 5:6
  48:6 57:19
trying 67:17
turned 32:10
  59:11
turning 27:5
two 9:19 14:5
  14:12 16:11,12
  17:22 18:6
  19:16 25:18
  29:12,14 30:16
  30:20 31:1 41:9
  41:20 50:11,12
  54:16 55:11
  58:12 67:23
  70:9 73:12
  74:16 78:6 79:5
  80:11,13 81:17
  85:12,16 86:3,4
  96:1,14 99:6,12
  104:15 115:25
  117:1 124:17
  126:14,16,24
type 7:6 15:12
  16:15 17:11

18:22,25 19:1
35:6,7 43:2
48:20 71:11,14
72:1,19 75:4
81:9 82:24
87:19 93:20
109:4 113:18
114:8
typed 60:25
types 16:25 18:9
  18:16,20 28:13
  36:10 132:19
typically 4:13
  27:2 36:8,22
  53:24

**u**

u 19:13
u.s. 118:14
uh 3:23,23,23
  32:17 85:5
  95:22
umbrellas 11:19
  81:2
under 4:15 5:3
  5:5 7:3,19 11:18
  20:21 21:24
  46:25 57:10
  74:14 94:16
  100:24 111:25
  138:19 139:17
undergoing
  78:10

undersigned
  137:7
understand
  3:20 4:24 7:14
  9:10,12 12:23
  23:11 39:21
  41:25 63:20
  73:3 76:21
  78:20 104:6
  107:8 113:21
  121:24
understanding
  9:16,17,25
  10:12,16 11:25
  12:18,25 14:17
  15:16,18 16:3
  18:21 19:15,22
  22:25 23:5,20
  24:6,17,22 25:4
  29:19 35:3,5,14
  35:16 36:19
  38:24 41:10,11
  41:14 43:20
  44:2 51:6 54:5
  55:10,24 58:3
  77:8,12 108:16
  119:7 123:24
  126:15 130:14
understands
  53:15 78:22
undo 72:21
undoing 23:16
unexpectedly
  57:4

unintelligible
  57:15
union 115:5
united 1:1
unknown 51:11
unload 36:16
unloading 10:1
  10:1 23:25
  34:14 35:22
  38:25 39:1
  71:22
unpack 103:11
  103:22
unpacked 9:22
  24:3 73:6 121:8
  126:20
unpacking 8:21
  9:4 22:20 23:1
  24:10,13,16
  33:17,19 42:22
  44:7 67:6
  103:14 104:3,9
  109:3 119:1,13
  121:2,3,14,15
  124:8 125:15
  126:6,13
unpeeled 83:8
unrecognizable
  51:9,12 52:21
  53:8,22
unrelated 43:5
unsafe 73:1
unseal 35:7

**[unstable - we've]** Page 173

| | | | |
|---|---|---|---|
| **unstable** 28:1 | **usually** 48:16 | **versus** 65:14 | 133:3 |
| **unstack** 23:8 | 53:25 68:12,13 | 86:3 | **wanted** 37:13 |
| **unstacked** 22:23 | 90:25 | **vessel** 107:14 | 130:7 |
| 28:15 70:19 | | **vest** 101:7 | **warehouse** |

**v**

| | | | |
|---|---|---|---|
| 71:2 | **v** 1:6 118:7 | **victor** 47:1 | 110:18 |
| **unstacking** 19:3 | 138:1 139:5 | **video** 1:11 59:6 | **warn** 114:17 |
| 23:8,13,17 | **vacation** 31:2 | 92:15,16 93:9 | **warning** 33:20 |
| 28:23 59:20 | **values** 32:16,19 | **videos** 59:1 | 33:21 59:9 67:4 |
| 67:8 68:23 71:4 | 32:23 37:18 | 75:23 80:3 | 101:21 112:13 |
| 125:16 | **various** 90:17 | 87:10 92:13 | 119:3 |
| **unwrapped** | **vega** 1:16 2:15 | 93:16 111:5 | **warnings** 9:2,6 |
| 35:21 | 3:2 8:3 65:18,22 | 123:14 | 70:16 102:1 |
| **unwrapping** | 65:24 136:5 | **view** 96:14 | 112:12,15 129:4 |
| 83:9 | 137:8 138:2,22 | 122:24 123:14 | **warp** 114:6 |
| **ups** 131:8 | 139:1,6,10,11 | **visible** 122:2 | **water** 11:21 |
| **upside** 27:6,23 | 139:13,19 | **visit** 130:16 | 43:12 |
| 27:23 | **veranda** 122:15 | **voyage** 49:6 | **wave** 43:12 |
| **use** 37:3,10 | **verbal** 23:24 | 90:15 111:7,15 | 112:8 |
| 82:21 103:18 | 34:9,12 101:25 | | **way** 28:15 44:8 |

**w**

| | | | |
|---|---|---|---|
| **used** 10:10,14 | 102:3,10,11 | | 56:19 63:14 |
| 10:17,19 11:3,8 | 104:17,21 | **wait** 34:21 | 65:3,20 72:3,6,9 |
| 17:6,9,13,17,19 | 112:13,15 | 37:21 134:16 | 72:9 81:10 99:8 |
| 18:17,20,24 | 114:22 121:14 | **waiting** 35:3 | 99:13 111:8 |
| 35:2,4,6,16 36:9 | **verbally** 3:22 | 38:1 | 118:25 124:23 |
| 36:23 37:7 | **verbatim** 38:23 | **waived** 135:4 | 127:4 |
| 38:10,11,12,14 | 65:7 | **waiver** 45:4 | **ways** 26:17 |
| 45:3 71:11,18 | **verify** 139:10 | **walk** 11:14 | **we've** 7:25 |
| 71:21 82:17,25 | **veritext** 139:14 | **want** 11:13 12:5 | 16:18 45:12 |
| 96:8 100:10 | 139:22 | 37:14,17,20 | 79:2 92:4,8 |
| 114:7,8 120:22 | **veritext.com** | 44:19 46:17 | 95:16 104:20 |
| 121:6 139:20 | 139:15 | 47:22 56:22 | 105:9 108:23 |
| **using** 33:4 36:17 | **version** 91:24 | 64:16,24,25 | 109:5 110:22 |
| 72:10,12 86:15 | 112:21 113:9 | 65:1 74:3 75:21 | 113:20 114:18 |
| 87:5,12 | | 75:25 110:9,10 | |

wears 101:7
weather 5:5 98:20 112:8 128:11
week 4:3 6:8 19:23 29:12,13 115:25 116:1 124:24
weigh 89:21 90:2,5 109:21 110:10
weighed 14:17 14:21 15:2 89:19 105:6
weighing 90:1
weight 13:6,9 13:14 14:14,19 14:24 89:8,9,12 95:14
welded 106:15
welfare 129:7
went 88:14 100:11 102:7 127:3,11 130:18
west 2:9
whatnot 28:20 32:11
wheels 16:23 18:10
wicker 105:23 105:23 106:2,16 107:10
wide 14:6 17:23 18:6 73:10,11

73:12 90:23
width 13:17 17:22 28:1,6
wind 43:11,15 43:17,21 98:20 112:8 128:11
winds 43:5
wishes 37:19
withdraw 128:22,25 132:24 133:1,3 133:18 134:7,9 134:14,15
witness 3:3 26:1 38:9 41:4 45:24 52:12 55:4 72:16 75:3 83:12 84:21 85:25 89:6 112:18 125:1 127:8 133:25 135:2 137:10
witnessed 51:8 52:20 53:1,9,17
witnesses 50:10 51:25
wood 105:18
word 42:4 63:21 64:4 118:5
words 5:24 7:10 13:17 15:22 17:8 21:22 24:25 31:2 32:15 33:19

34:5 45:14 57:21 72:3 87:12 95:8,8 107:2 111:24 117:23 119:19 132:15
working 19:20 24:17,17 25:3,6
wrap 35:8,24 36:2,8 37:6,10 72:19 82:17,18 83:2,17 86:13 86:14,15 98:3,4 98:6 108:21 120:6,8
wrapped 36:22 127:5
wrapping 23:16 72:19 83:10 86:24 118:20 120:10,10 127:3 127:13,14
wraps 82:18
write 51:21
writing 57:10 112:15 121:12 134:13
written 8:13 28:11 29:7 42:19 58:14 60:6,17,23 104:18,20 105:5 105:7 109:5 114:22 118:22

121:19
wrong 42:9,18 43:2,3
wrote 57:20,24 58:2 60:11

**x**

x 2:12,19
xs 106:25

**y**

yeah 6:4 13:19 16:3 19:10 25:8 34:8 39:19,19 42:2 43:20 47:25 48:2 50:2 51:17 53:4 54:14,15 56:10 57:18 58:3 60:12 61:13 64:21 65:4 67:21,21 69:8,8 72:8 73:8 74:1 76:4,17 80:14 85:25 92:2 96:5 96:17 101:3 103:4,4,13 104:12 105:23 106:8 108:16 109:2,16 113:22 114:4 117:9,16 117:20 118:10 118:16 119:6 121:6 122:17 125:8 131:15,24

**[year - zeros]**                                                    Page 175

| | |
|---|---|
| **year**  41:20  47:12 73:4 | |
| **years**  8:1 41:20  65:15 73:3,9  108:5 | |
| **yesterday**  85:11 | |
| **z** | |
| **zeros**  12:13 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.